## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| **MATTERN & ASSOCIATES, L.L.C.,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) C.A. No. 1:06-CV-36 KAJ |
| | ) |
| | ) |
| v. | ) |
| | ) |
| | ) |
| **JOHN SEIDEL,** | ) |
| | ) |
| Respondent/Defendant. | ) |
| | ) |
| | ) |
| | ) |

## DECLARATION OF GEORGE H. SEITZ IN FURTHER SUPPORT OF PLAINTIFF MATTERN & ASSOCIATES, L.L.C.'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO TRANSFER VENUE TO EITHER THE EASTERN DISTRICT COURT OF PENNSYLVANIA OR THE DISTRICT COURT OF NEW JERSEY

I, George H. Seitz, III, declare as follows:

1.    I am an attorney with the law firm of Seitz, Van Ogtrop & Green, counsel representing Plaintiff in the above-captioned action.

2.    I am admitted to practice before this Court.

3.    This Declaration is submitted in further support of Plaintiff Mattern & Associates, L.L.C.'s Brief in Opposition to Defendant's Motion to Transfer Venue to Either the Eastern District Court of Pennsylvania or the District Court of New Jersey.

4.    Attached to this Declaration as **Exhibit A** is a true and correct copy of the Verified Complaint filed on December 16, 2005 in the Chancery Court of the State of Delaware.

5.     Attached to this Declaration as **Exhibit B** is a true and correct copy of the

Amended and Restated Limited Liability Company Agreement of Mattern & Associates, LLC

dated July 1, 2003.

6.     Attached to this Declaration as **Exhibit C** is a true and correct copy of the

Declaration of Mattern & Associates, L.L.C. dated February 24, 2006.

7.     Attached to this Declaration as **Exhibit D** is a true and correct copy of Anchor

Hocking Corporation v. Aladdin Synergetics, Inc., WL 2752 (D. Del. 1984).

Dated: February 24, 2006

By _____

George H. Seitz, III (No. 3126)
SEITZ, VAN OGTROP & GREEN
222 Delaware Avenue, Suite 1500
P.O. Box 68
Wilmington, DE 19899
(302) 888-0600

# EXHIBIT A – PART 1

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

## IN AND FOR NEW CASTLE COUNTY

MATTERN & ASSOCIATES, LLC )
 )
  Plaintiff, )  C.A. No.
 )
  v. )
 )
JOHN SEIDEL, )
 )
  Respondent/Defendant. )

### VERIFIED COMPLAINT

1. This is an action, *inter alia,* to enforce a Limited Liability Company Agreement (the "Agreement") and, in particular, a non-competition provision of the Agreement. A true and correct copy of the relevant portions of the Agreement is attached hereto as "Exhibit A". As set forth below, Defendant John Seidel has breached the Agreement, has breached his fiduciary duties of good faith, loyalty, and fair dealing, and Seidel's actions demand specific enforcement.

### Parties

2. Plaintiff Mattern & Associates, LLC ("M&A") is a Pennsylvania limited liability corporation having its principal place of business at 2036 Foulk Road, Wilmington, New Castle County, Delaware 19810.

3. John Seidel ("Seidel") was last known to be a resident of the State of New Jersey residing at 803 Augusta Circle, Mount Laurel, Burlington County, New Jersey 08054. Seidel may be served by serving the Secretary of State pursuant to 10 Del. C. § 3104.

## BACKGROUND FACTS

### Seidel's Employment with M&A

4.    Beginning on June 1, 2001, and continuing until April 11, 2005, Seidel was employed by M&A as an independent contractor and/ or an employee.

5.    Seidel became Vice President of Business Development and during his employment was entrusted with M&A's confidential information, customized techniques, and trade secrets, as well as the names and addresses of M&A's customers.

6.    On July 1, 2003, Seidel became a member of M&A and signed and accepted the terms of the Operating Agreement with M&A. Under the terms of the Operating Agreement, Seidel agreed:

> a) to maintain privacy regarding M&A's trade secrets and all other classified information, including but not limited to: databases, customer lists, Request for Proposals, Request for Proposal templates, workflow analysis, benchmarking data, on-site questionnaires for gathering information, guides for analyzing mail, copy, fax, records operations, cost recovery systems, and the "Mattern Method®";
>
> b) not to solicit business or act as an employee of a competitor of M&A operating within 100 miles of M&A's principal place of business, for a period of twenty-four (24) months after terminating employment with M&A;
>
> c) not to disclose any of M&A's confidential information to a "person, firm, corporation, association, limited liability company, joint venture, or other judicial entity" without first obtaining M&A's prior written consent; and,
>
> d) to pay M&A $150,000 in the event he breached the non-competition

provision.

7. As an employee and shareholder of M&A, Seidel owed fiduciary duties to M&A, including an obligation to maintain confidentiality of all M&A Property.

Seidel's Competitive Conduct

8. Beginning on or about December of 2004 and continuing up to the time of his resignation, Seidel engaged in a course of conduct designed to misappropriate M&A's assets in violation of the Agreement.

9. On February 16, 2005 and thereafter, Seidel engaged in a course of conduct designed to seek employment with competitors of M&A. Seidel sent and received various "E-mail" correspondences using the M&A computer system to seek employment with M&A's competitors. These e-mails included messages to Huron Consulting Group, a direct competitor of M&A, seeking employment and offering to provide the same services M&A provides to current and prospective clients. The e-mails are attached hereto as "Exhibit B".

10. From February 16, 2005 to April 11, 2005, Seidel exchanged twelve (12) e-mails with Christopher Petrini-Poli ("Poli") regarding a position with Huron Consulting Group in furtherance of his scheme to seek employment in direct competition with M&A in violation of the Agreement.

11. Seidel's plan to compete with M&A, in violation of his Agreement, is reflected in an April 11, 2005 e-mail from Poli, stating that "our legal has indicated that it's a pretty stringent agreement. The[y] only solution would be for you to obtain a waiver from [M]attern on these issues. I wanted to get your thoughts on this before we proceeded any further. I don't want to compromise your current situation."

50654 v1

3

12. Seidel, during this period, also exchanged emails with Kevin Kennedy of Pitney Bowes Management Services, another direct competitor of M&A, seeking employment.

13. Seidel traveled to Stamford, Connecticut for an interview with Pitney Bowes Management Services on March 23, 2005 and charged M&A $235.00 for the cost of his expenses under the false pretense that he was meeting with a potential client.

Seidel's Misuse of M&A Funds & Resignation

14. During this same period, Seidel's job performance at M&A continued on a downward spiral and he failed to meet company goals. On April 8, 2005, Robert Mattern, Manager of M&A, confronted Seidel about his poor job performance and continuous use of the Company credit card to pay for, or reimburse himself for the cost of, personal expenses.

15. Seidel responded by mentioning his intent to resign from M&A..

16. On April 11, 2005, Seidel advised Mattern that he was resigning.

17. Prior to Seidel's resignation, he·agreed to reimburse M&A for personal expenses he charged to the Company and delivered a personal check in the amount of $1,748.78 to cover this expense. The bank returned the check to M&A due to insufficient funds. Seidel has never reimbursed M&A for personal expenses charged to the firm's credit card.

18. As a result of his resignation, Seidel also owes M&A for the net liability due to M&A to the extent his monthly draws and health insurance costs exceeded his actual commissions earned. These amounts are $8,188.18 from 2004 and $11,919.63 from 2005.

19. Seidel has failed to surrender his Ownership Units as required under the terms of the Agreement upon resignation from M&A.

20. Despite repeated requests, Seidel has refused to reimburse M&A for these expenses or to return his Ownership Units.

50654 v1

4

Seidel's Continued Competition

21.    Seidel continued to act in breach of the Agreement by accepting employment with Konica Minolta Business Solutions U.S.A., Inc., a competitor of M&A, located at 300 Stevens Drive, Philadelphia, Pennsylvania, and the facility is within a 100 mile radius of M&A's Wilmington, Delaware office.

22.    As more specifically stated in the Affidavit ("Exhibit C") under "The M&A Business" heading, M&A is in the field of support services consulting, document management, and cost recovery analysis primarily focused on law firms and other companies. Konica Minolta Business Solutions U.S.A., Inc. is in direct competition with M&A's business.

23.    In October of 2005, while working for Konica Minolta Business Solutions U.S.A., Inc., Seidel solicited one of M&A's current clients for business and offered them $50 if they would listen to his company's sales pitch.

24.    Seidel, as former Vice President of Business Development for M&A, has valuable insider knowledge about M&A's business and its customers.

25.    On four separate occasions M&A, through its counsel, wrote to Seidel and/or his attorney demanding he cease and desist from any activities in violation of the Agreement, reimburse M&A for monies received in violation of the Agreement, and requesting the return of all M&A property, including but not limited to: trade secrets, databases, customer lists, Request for Proposals, Request for Proposal templates, workflow analysis, benchmarking data, on-site questionnaires for gathering information, guides for analyzing mail, copy, fax, records operations, cost recovery systems, and the "Mattern Method®", taken in violation of the LLC Agreement. The correspondences are attached hereto as "Exhibit D".

26.     Although Seidel, through counsel, admitted to possessing the back-up copy of Seidel's laptop's hard drive and promised to return it to M&A, along with written confirmation that Seidel has not retained any copies of it nor is he in possession of any other confidential or proprietary information belonging to M&A, M&A has yet to receive either of these documents.

27.     To date, Seidel has refused to comply with these requests.

28.     Seidel's activities in breach of the Agreement, as set forth herein, have caused and will continue to cause irreparable injury to M&A unless Seidel is enjoined.

29.     M&A has no adequate remedy at law, as previously agreed to by Seidel at the time of the Agreement.

### Count I

### Breach of Contract - Injunctive Relief

30.     Plaintiff repeats the allegations in paragraphs 1 through 29 above.

31.     Under the terms of the M&A Operating Agreement, Seidel agreed that a Member's material or immaterial breach will cause irreparable harm to M&A, rendering monetary damages alone insufficient, and thereby affording the non-breaching party with various remedies under the Agreement, including: compensatory damages, punitive damages, specific performance, and injunctive relief. [Exhibit A §5.9(g)(1)]

32.     Defendant's refusal to abide by the non-competition provision with M&A, as set forth in the Agreement, is a breach of the contract between the parties. As a result of Defendant's breach, Plaintiff will suffer irreparable harm.

33.     There is reason to believe that Defendant is in possession of, or continues to use, privileged information belonging to M&A, including but not limited to: trade secrets, databases, customer lists, Request for Proposals, Request for Proposal templates, workflow analysis,

benchmarking data, on-site questionnaires for gathering information, guides for analyzing mail, copy, fax, records operations, cost recovery systems, and the "Mattern Method®", all in violation of the LLC Agreement Defendant signed with M&A.

34.    As a result of Defendant's breach, Plaintiff will be damaged and will lose economic and business opportunities within its area of competition.

35.    As more specifically set forth above, Plaintiff's ability to maintain, solicit, and sell its copyrightable material presents a unique business opportunity from which the Plaintiff expects to derive benefits.

36.    As a result of Defendant's failure to comply with the terms of the contract, the Plaintiff has been irreparably harmed.

37.    Plaintiff is entitled to injunctive relief requiring the Defendant to stop competing within a 100 mile radius of M&A for the remainder of the two years as set out in the Agreement, to return all confidential and proprietary information to M&A, to refrain from the distribution of and/or use of M&A's trade secrets, to disclose any confidential and proprietary information, and to release and identify any individuals or entities to whom Seidel distributed such information.

### Count II

### Breach of Contract - Damages

38.    Plaintiff repeats the allegations in paragraphs 1 through 37 above.

39.    Defendant has breached the Agreement by soliciting competitors of M&A for employment opportunities.

40.    Defendant has breached the Agreement by using M&A's credit card to pay for expenses incurred in seeking employment with M&A's competitors and also to pay for personal expenses, and in failing to reimburse M&A for these charges. Seidel is also in breach of the

Agreement for failing to reimburse M&A for these charges and overpayments of his monthly draws and health insurance costs from 2004 and 2005.

41.    Defendant has breached the Agreement by performing or assisting in the rendering of professional consulting services in competition with M&A within the geographic and time periods during which such activities are prohibited, in violation of Sections 5.9(d) and 5.9(e) of the Agreement.

42.    As a result of these breaches, M&A has been harmed and is entitled to recover damages not less than $172, 091.59. As a result of Seidel's continued competitive conduct and use of M&A's proprietary information, all in violation of the Agreement, M&A is further threatened with additional damages consisting of lost profits resulting from the loss of existing and potential clients.

## Count III

### Breach of Fiduciary Duties

43.    Plaintiff repeats the allegations in paragraphs 1 through 42 above.

44.    As an employee, officer, and member of M&A, Seidel owed M&A a duty of good faith, loyalty, and fair dealing.

45.    Seidel breached his fiduciary duties of good faith, loyalty, and fair dealing owed to M&A by engaging in a course of conduct designed to divert M&A's assets, to compete directly with M&A, and to damage its relationship with existing and potential clients.

46.    As a result of Seidel's breach of his fiduciary duties, M&A has been harmed and is entitled to damages representing economic harm caused to M&A's business interests.

**WHEREFORE**, Mattern & Associates, LLC prays that this Court:

1)    Permanently enjoin Defendant John Seidel from owning, engaging in, or being
      associated with, either as a partner, member, stockholder, employee,
      subcontractor agent or otherwise, any business which competes with and operates
      within a 100 mile radius of Wilmington, Delaware for a period of two (2) years
      from April 11, 2005;

2)    Order Defendant to return to M&A all Ownership Units, any trade secrets,
      databases, customer lists, Request for Proposals, Request for Proposal templates,
      workflow analysis, benchmarking data, on-site questionnaires for gathering
      information, guides for analyzing mail, copy, fax, records operations, cost
      recovery systems, the back-up copy of the laptop's hard drive, and the "Mattern
      Method®" taken in violation of the Agreement;

3)    Order Defendant to account for all fees and income obtained by him or anyone
      working in concert with him in violation of the Agreement;

4)    Award Plaintiff damages in an amount of not less than $170,000 plus such sum
      that will be proved at trial representing the actual loss caused by Defendant's
      wrongful conduct and breach of the Agreement;

5)    Award Plaintiff its costs and expenses incurred in this action, including
      reasonable attorneys' fees; and,

6)      Award Plaintiff such other and further relief as the Court deems equitable under

the circumstances.


                                    **SEITZ, VAN OGTROP & GREEN, P.A.**



                                    GEORGE H. SEITZ, III, ESQ. (No.667)
                                    222 Delaware Avenue, Suite 1500
                                    Wilmington, DE  19899
                                    (302) 888-0600
                                    **Attorneys for Plaintiff**

Dated:  December 16, 2005

# EXHIBIT B

**AMENDED AND RESTATED**

**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**MATTERN & ASSOCIATES, LLC**

**A Pennsylvania Limited Liability Company**

**Dated effective as of July 1, 2003**

**AMENDED AND RESTATED**
**LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**MATTERN & ASSOCIATES, LLC**

TABLE OF CONTENTS

## ARTICLE I   GENERAL PROVISIONS

| | | |
|---|---|---|
| 1.1 | Formation Of The Company. | 1 |
| 1.2 | Name Of The Company. | 1 |
| 1.3 | Purpose. | 1 |
| 1.4 | Fictitious Business Name. | 1 |
| 1.5 | Other Acts/Filings. | 1 |
| 1.6 | Principal Place Of Business And Office Of The Company. | 2 |
| 1.7 | Registered Office; Registered Agent. | 2 |
| 1.8 | Manager; Management Committee. | 2 |
| 1.9 | Term. | 2 |
| 1.10 | No State Law Partnership. | 3 |

## ARTICLE II DEFINITIONS

| | | |
|---|---|---|
| 2.1 | "Affiliate" | 3 |
| 2.2 | "Agreement" | 3 |
| 2.3 | "Bankruptcy" | 3 |
| 2.4 | "Capital Account" | 4 |
| 2.5 | "Capital Contributions" | 4 |
| 2.6 | "Cash Flow" | 4 |
| 2.7 | "Cause" | 5 |
| 2.8 | "Certificate" | 5 |
| 2.9 | "Control" | 5 |
| 2.10 | "Closing Date" | 5 |
| 2.11 | "Code" | 5 |
| 2.12 | "Company" | 5 |
| 2.13 | "Company Property" or "Property" | 5 |
| 2.14 | "Disability" | 5 |
| 2.15 | "Distributions" | 6 |
| 2.16 | "Hypothetical Tax Amount" | 6 |
| 2.17 | "Hypothetical Tax Rate" | 6 |
| 2.18 | "Law" | 6 |
| 2.19 | "Majority Vote" | 6 |
| 2.20 | "Manager" | 6 |
| 2.21 | "Member" or "Members" | 6 |
| 2.22 | "Net Cash Flow" | 6 |
| 2.23 | "1933 Act" | 7 |
| 2.24 | "Operating Expenses" | 7 |
| 2.25 | "Person" | 7 |

2.26  "Purchase Price" ..........................................................................................7
2.27  "Refinancing" ...............................................................................................7
2.28  "Revocable Trust" .........................................................................................7
2.29  "Sale" ............................................................................................................7
2.30  "Total Outstanding Units" ............................................................................7
2.31  "Transfer" ......................................................................................................7
2.32  "Treasury Regulations" .................................................................................8
2.33  "Unit" or "Units" ..........................................................................................8
2.34  "Valuation Date" ..........................................................................................8
2.35  "Working Capital" ........................................................................................8

## ARTICLE III  CAPITAL CONTRIBUTIONS, MEMBERSHIP, AND RELATED MATTERS

3.1  Capital Contributions By The Members. ........................................................8
3.2  No Withdrawal Of Capital Contributions. .....................................................9
3.3  Return Of Capital. .........................................................................................9
3.4  No Interest or Salary On Capital Contributions. ...........................................9
3.5  Membership Rights ........................................................................................9
3.6  Representations and Warranties. ....................................................................9
3.7  Creation of Additional Units .......................................................................11
3.8  Default Capital Contribution. ......................................................................11

## ARTICLE IV  TAX PROVISIONS: ALLOCATION OF TAXABLE INCOME AND TAX LOSSES, DISTRIBUTIONS TO MEMBERS, AND ELECTIONS

4.1   Taxable Income Or Tax Loss. .....................................................................13
4.2   Allocation Of Annual Taxable Income Or Tax Losses. ...............................13
4.3   Special Allocation Of Credits. ....................................................................15
4.4   Allocation Of Taxable Income Or Tax Losses Arising From A Sale Or
      Refinancing Or Dissolution Of The Company ............................................15
4.5   Allocation In The Event of Transfer. ...........................................................16
4.6   Authority Of Manager To Vary Allocations To
      Preserve And Protect Members' Interests. ...................................................17
4.7   Guaranteed Payments. ..................................................................................18
4.8   Distributions. ................................................................................................18
4.9   Limitation Upon Distributions. ...................................................................18
4.10  Section 754 Election. ...................................................................................19
4.11  Withholding Taxes. ......................................................................................19

## ARTICLE V  MANAGEMENT OF THE COMPANY

5.1  Appointment of Manager. .............................................................................19
5.2  The Management Powers Of The Manager. ..................................................19
5.3  Delegation Of Authority And Duties. ...........................................................22
5.4  Approval Or Ratification Of Acts Or Contracts By Members. .....................22

ii

5.5    Limitations On Authority Of The Manager. ........................................................23
5.6    Right Of Third Parties To Rely On Authority Of The Manager. ..........................23
5.7    Limitations On Authority. ...................................................................................24
5.8    Duty To Devote Time. .........................................................................................24
5.9    Restrictive Covenants. .........................................................................................24
5.10   Dealing With The Company. ................................................................................28
5.11   Indemnity. ...........................................................................................................29
5.12   Fiduciary Duty Of A Member. .............................................................................29
5.13   Reserves. .............................................................................................................30

## ARTICLE VI  BOOKS, RECORDS, AND REPORTS

6.1    Books And Records. .............................................................................................30
6.2    Reports. ...............................................................................................................30
6.3    Tax Returns. .......................................................................................................30
6.4    Filings With Regulatory Agencies. .....................................................................30
6.5    Tax Matters. ........................................................................................................30

## ARTICLE VII  ASSIGNMENT OR SALE OF INTERESTS
## IN THE COMPANY

7.1    Restrictions On Transfers. ...................................................................................31
7.2    Proposed Transfers. .............................................................................................32
7.3    Permitted Transfers To Or From Revocable Trusts. ............................................32
7.4    Cessation of Participation Call Option; Majority Option to Purchase or Sell .......33
7.5    Death Of A Member. ...........................................................................................33
7.6    Legal Proceedings Involving Members or Defaults. ...........................................34
7.7    Purchase Or Redemption Price. ...........................................................................34
7.8    Payment Terms. ...................................................................................................35
7.9    Closing Date. .......................................................................................................36
7.10   Impairment Of Capital .........................................................................................36
7.11   Operating Rules. ..................................................................................................37
7.12   Agreement to Purchase Only Part of Units. .........................................................37
7.13   Restrictions Apply to Subsequently Issued Units. ...............................................37
7.14   Insurance. ............................................................................................................37
7.15   Waiver of Restrictions. ........................................................................................38
7.16   Recognition of Transfer by Company. .................................................................38
7.17   Creditors of Members and Transferees. ...............................................................38

## ARTICLE VIII  DISSOLUTION AND TERMINATION OF
## THE COMPANY

8.1    Dissolution. .........................................................................................................38
8.2    Liquidation. .........................................................................................................39
8.3    Distribution In Kind. ...........................................................................................39
8.4    Termination. .........................................................................................................39

WP3:862187.4

57164.1001

## ARTICLE IX   REMOVAL OF MEMBERS OF
## MANAGEMENT COMMITTEE

9.1     Removal Of Manager..................................................................40
9.2     Termination of Executory Contracts With Manager Or Affiliate.........................40
9.3     Reports After Removal. ................................................................40

## ARTICLE X   MEETINGS AND VOTING RIGHTS

10.1    Notice Of Meetings..................................................................40
10.2    One Vote Per Unit...................................................................41
10.3    Consents.............................................................................41

## ARTICLE XI   COMPANY EXPENSES

11.1    General...............................................................................42
11.2    Direct Payment Of Company Expenses..................................................42
11.3    Payment Of Expenses Of The Company. ...............................................42
11.4    Limitation on Liability of Members ...................................................43

## ARTICLE XII   AMENDMENTS OF COMPANY DOCUMENTS

12.1    Amendments.........................................................................43

## ARTICLE XIII   BORROWINGS

13.1    Loans By Members To The Company...................................................44
13.2    Advances Related to a Loan .........................................................44

## ARTICLE XIV   REPRESENTATIONS AND WARRANTIES AND
## INDEMNIFICATION OF THE MANAGER

14.1    Manager..............................................................................44
14.2    Indemnification Of The Manager. ....................................................45

## ARTICLE XV   MISCELLANEOUS PROVISIONS

15.1    Notices. ..............................................................................45
15.2    Article And Section Headings. ......................................................45
15.3    Construction..........................................................................45
15.4    Severability..........................................................................46
15.5    Governing Law. ......................................................................46
15.6    Counterparts.........................................................................46
15.7    Entire Agreement.....................................................................46
15.8    Further Assurances...................................................................46

WP3:862187.4

57164.1001

15.9    Successors And Assigns. ....................................................................................46
15.10   Creditors.............................................................................................................46
15.11   Schedules. ..........................................................................................................46
15.12   Remedies.............................................................................................................46
15.13   Jurisdiction; Expedited Proceedings Election; Specific Performance. ...................47
15.14   No Presumption Against the Drafter....................................................................47
15.15   Agreement Drafted by Company's Attorney. .......................................................47


SCHEDULE 3.1.......................................................................................................49
SCHEDULE 4.7(a) ..................................................................................................50
SCHEDULE 5.9(b)..................................................................................................51
SCHEDULE 7.1.......................................................................................................52
SCHEDULE 7.7.......................................................................................................53
SCHEDULE 7.8.......................................................................................................57
SCHEDULE 15.1.....................................................................................................63

# AMENDED AND RESTATED

## LIMITED LIABILITY COMPANY AGREEMENT

## MATTERN & ASSOCIATES, LLC

THIS AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT (the "Agreement") is made effective as of the 1st day of July, 2003, by and between ROBERT C. MATTERN and JOHN SEIDEL, as the Members, ROBERT C. MATTERN, as the Initial Manager, and MATTERN & ASSOCIATES, LLC, a Pennsylvania limited liability company (the "Company"), and shall be binding upon such other individuals and Members as may be added pursuant to the terms of this Agreement. JOHN SEIDEL agrees and acknowledges that the offer of ownership in the Company was contingent on his execution of this Agreement and all of the provisions contained herein.

## ARTICLE I

## GENERAL PROVISIONS

1.1     Formation Of The Company.  By execution of this Agreement, the Members hereby ratify the filing of that certain certificate of organization (the "Certificate") filed with the Secretary of Commonwealth of the Commonwealth of Pennsylvania on June 16, 2000, for the purpose of forming the Company, under the Pennsylvania Limited Liability Company Act, 15 *Pa. Cons. Stat.* § 8901 *et seq.* (the "Act"), and hereby amend and restate the Company's operating agreement dated June 16, 2000.

1.2     Name Of The Company.  The name of the company to be stated in the Certificate and the limited liability company governed by this Agreement shall be "MATTERN & ASSOCIATES, LLC."

1.3     Purpose.  The purpose of the Company is to undertake any and all other activities permitted under the Act, and to undertake any and all other activities incidental thereto or as may be necessary to the foregoing.

1.4     Fictitious Business Name.  The Manager is directed and authorized to execute, file, and cause to be published with the proper authorities in each jurisdiction in which the Company conducts business such certificates or documents as required by the fictitious business statement acts or similar statutes in effect in each jurisdiction.

1.5     Other Acts/Filings.  The Members shall from time to time execute or cause to be executed all such certificates and other documents and do or cause to be done all such filings, recordings, publishings, and other acts as the Manager may deem necessary or appropriate to comply with the requirements of law for the formation and operation of the Company in all jurisdictions in which the Company desires to conduct business.

1

1.6    <u>Principal Place Of Business And Office Of The Company</u>. As of July 1, 2003, the principal place of business of the Company shall be located at 2036 Foulk Road, Wilmington, Delaware 19810, or such other place or places as the Manager may from time to time designate. The Company may also maintain such other offices as the Manager may from time to time deem advisable.

1.7    <u>Registered Office; Registered Agent</u>. The registered office of the Company required by the Act to be maintained in the Commonwealth of Pennsylvania shall be changed pursuant to a filing with the Department of State of the Commonwealth of Pennsylvania such that it is 4 Pennrose Talley, Boothwyn, Delaware County, Pennsylvania 19061, or such other office as the Manager may designate from time to time in the manner provided by the Act. The registered agent of the Company in the Commonwealth of Pennsylvania shall be Mattern & Associates, LLC or such other Person as the Manager may designate from time to time in the manner provided by the Act.

1.8    <u>Manager</u>. At all times, there shall be a manager to manage the Company as set forth in Section 5.1 of this Agreement. The Manager shall be responsible for any and all such duties as the Members may choose to confer upon the Manager. The Manager(s) may, but need not, be a Member, and to the extent that he or she acquires membership units, he or she shall be treated as a Member with respect to such units. It is acknowledged and agreed that **ROBERT C. MATTERN** will continue to serve as the initial Manager.

1.9    <u>Term</u>.

(a)    The Company shall have perpetual existence.

(b)    Notwithstanding the provisions of Section 1.9(a), above, the Company shall dissolve and its affairs shall be wound-up in accordance with the Act upon the first to occur of the following events:

(1)    The unanimous decision of all Members to dissolve Company;

(2)    The date the Company may be otherwise dissolved by operation of law or judicial decree; or

(3)    The occurrence of an event that terminates the continued membership of the last remaining Member; provided, however, that if an event described in this Section 1.9(b)(3) shall occur, the Company shall not be dissolved and its affairs shall not be wound-up if, within ninety (90) days after the occurrence of the event that terminated the continued membership of the last remaining Member, the personal representative of the last remaining Member agrees in writing to continue the Company and to the admission of the personal representative of such Member, or its nominees or designee, to the Company as a Member, effective as of the occurrence of the event that terminated the continued membership of the last remaining Member.

2

1.10  <u>No State Law Partnership</u>.  The Members intend that the Company not be a partnership (including a limited partnership) or joint venture, and that at any time when there is more than one Member, no Member or Manager be a partner or joint venturer of any other Member or Manager, for any purposes other than applicable tax laws, and this Agreement may not be construed to suggest otherwise.

## ARTICLE II

### DEFINITIONS

All terms in this Agreement shall have the meanings specified in this Article II, whether presented with initial capital letters (for emphasis) or otherwise. Similarly, terms defined in the text of this Agreement shall have the meanings specified in such text, whether presented with initial capital letters or otherwise.

2.1  "<u>Affiliate</u>" means, when used with reference to a specific Person, (a) any Person or entity directly or indirectly controlling, controlled by, or under common control with another Person, (b) any Person or entity owning or controlling ten percent (10%) or more of the outstanding voting securities of such other Person, (c) any officer, director, partner, or member of such Person or entity, and (d) if such other Person is an officer, director, partner, or member, any entity for which such Person acts in such capacity.

2.2  "<u>Agreement</u>" shall mean this Limited Liability Company Agreement, as amended, modified, supplemented, and/or restated from time to time in accordance with the terms hereof. Words such as "herein", "hereinafter", "hereof", "hereto", "hereby", and "hereunder," when used with reference to this Agreement, refer to this Agreement as a whole, unless the context otherwise requires.

2.3  "<u>Bankruptcy</u>" shall mean, with respect to any Member or Manager, the happening of any one of the following events:

    (a)  If such Member or Manager:

        (1)  Makes an assignment for the benefit of creditors;

        (2)  Files a voluntary petition in bankruptcy;

        (3)  Is adjudged a bankrupt or insolvent, or has entered against him an order for relief, in any bankruptcy or insolvency proceeding;

        (4)  Files a petition or answer seeking for himself any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation;

        (5)  Files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against him in any proceeding of this nature; and/or

(6)    Seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of the Member or Manager or of all or any substantial part of his properties; and

(b)    Except with the written consent of all Members, one hundred twenty (120) days after the commencement of any proceeding against the Member or Manager seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation, if the proceeding has not been dismissed, or if within ninety (90) days after the appointment without his consent or acquiescence of a trustee, receiver, or liquidator of the Member or Manager or of all or any substantial part of his properties, the appointment is not vacated or stayed, or within ninety (90) days after the expiration of any such stay, the appointment is not vacated.

2.4    "Capital Account" shall mean, with respect to each Member, the account established for such Member pursuant to this Agreement and maintained in accordance with the capital accounting rules of Treas. Reg. § 1.704-1(b)(2)(iv). A Member's Capital Account will equal the Capital Contributions of such Member to the date for which the account is being determined and will be (a) increased by the amount of taxable income and non-taxable income allocated to such Member to the date for which the account is being determined; (b) reduced by the amount of tax losses and non-deductible losses and expenditures allocated to such Member and the amount of aggregate distributions distributed to such Member to the date for which the account is being determined; and (c) adjusted in accordance with the other capital account maintenance rules of Treas. Reg. § 1.704-1(b)(2)(iv). Each Member shall have only one Capital Account regardless of the number of Units owned by such Member and regardless of the time or manner in which such Units were acquired. In addition, a Capital Account shall be established for each Person who becomes a substituted Member in accordance with this Agreement as of the date agreed to by the transferor and such Person. The initial balance in such account will equal the balance in the transferor's Capital Account on the date agreed to by the parties multiplied by a fraction, the numerator of which is the number of Units acquired by the transferee and the denominator of which is the sum of the Units owned by the transferee and the transferor immediately after the transfer. The transferor's Capital Account will be reduced by the balance in the substituted Member's Capital Account as determined above.

2.5    "Capital Contributions" shall mean the total amount of cash and the fair market value of property contributed under this Agreement as capital of the Company by any Member or all of the Members (or the predecessor holders of the interests of any Member or Members) (net of any liabilities secured by such contributed property that the Company is deemed to assume or take subject to under §752 of the Code) as well as any payments by any Member to lenders or third parties pursuant to guarantees of the Company's obligations executed by any Member or all of the Members (or the predecessor holders of the interests of any Member or Members).

2.6    "Cash Flow" for any fiscal year shall mean all of the Company's cash receipts in that year other than receipts from: (a) Capital Contributions, or (b) a sale

4

or refinancing, including the financing or refinancing of Company Property or other loans to the Company and a sale or other disposition of Company Property, less any reserves established by the Manager and cash expenditures for operating expenses in such year. In no case shall Cash Flow be less than zero.

2.7    "Cause" shall mean, for purposes of Section 7.4(a) hereof (and only for purposes of such section): (a) the withholding by the Member of any receipts which constitute property of the Company; (b) the Member's habitual drunkenness or use of illegal drugs; (c) the Member's conviction, guilty plea, or plea of no contest (or other similar plea) with respect to a crime of moral turpitude by or to a court of competent jurisdiction; (d) the Member's dishonesty, fraud, or deceit; (e) the Member's failure to render services on behalf of the Company on a substantially full-time basis other than by reason of the Member's death, disability, or retirement, including, without limitation, any unexcused absence from the Company for more than 10 days (need not be consecutive) in any 12-month period; (f) the Member's rendition of services on behalf of the Company in a manner which is grossly negligent or willfully damaging to the Company or its reputation; (g) the Member's breach of this Agreement, and failure to cure such breach within the time provided under this Agreement or, if no cure period is provided, thirty (30) days of notice of such breach and the intent to invoke Section 7.4(a); or (h) any act that is the proximate cause of a breach of any agreement to which the Corporation or any of its affiliates are a party.

2.8    "Certificate" shall mean the certificate of organization, as the same may be amended from time to time, filed with the Secretary of Commonwealth of Pennsylvania pursuant to the Act.

2.9    "Control" (regardless of capitalization) means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise; and a "change of control" shall mean when the person or persons who, directly or indirectly, controlled an entity Member when it became a Member cease to control such Member.

2.10    "Closing Date" shall mean the date determined pursuant to Section 7.9 for the transfer of Units.

2.11    "Code" means the Internal Revenue Code of 1986, as amended.

2.12    "Company" shall refer to the limited liability company governed by this Agreement.

2.13    "Company Property" or "Property" shall refer to real or personal property, or any interest therein, acquired directly or indirectly by the Company or produced by or inuring to the Company (e.g., intangible property), whether owned or leased.

2.14    "Disability" shall mean the Member or trustor of a Revocable Trust that is a Member is (a) under a legal decree of incompetency, (b) is granted a claim

5

for permanent disability by a reputable disability insurance carrier or the Social Security Administration, on account of a permanent more than fifty percent (50%) disability, or (c) is determined, to reasonable medical certainty, to be permanently more than fifty percent (50%) disabled, as determined by a physician mutually acceptable to the Member, trustee or his or her personal representative, as the case may be, and the Company. Permanent disability shall mean mental or physical inability to perform substantially all of his or her regular duties, and that such disability is determined or reasonably expected to last at least twelve (12) months.

2.15    "Distributions" shall refer to cash or other property (from any source) distributed to the Members by the Company.

2.16    "Hypothetical Tax Amount" shall mean an amount equal to the product of (i) a Member's pro rata share of the Company's income net of the Company's items of loss, deduction, and credit for such taxable year, as computed for the relevant taxable year under the Code and Treasury Regulations, multiplied by (ii) the Hypothetical Tax Rate.

2.17    "Hypothetical Tax Rate" shall mean a hypothetical tax rate equal to the sum of (i) the maximum marginal United States federal income tax rate and (ii) the maximum marginal state income tax rate applicable to the Member, in each case as applied to ordinary income in the calendar year that includes the last day of the relevant taxable year.

2.18    "Law" shall mean any applicable constitutional provision, statute, act, code (including the Code), law, regulation, rule, ordinance, order, decree, ruling, proclamation, resolution, judgment, decision, declaration, or interpretative or advisory opinion or letter of a governmental authority.

2.19    "Majority Vote", "Two-Thirds Vote" and "Unanimous Consent" shall have the meanings set forth in Section 10.2.

2.20    "Manager" shall mean the person appointed pursuant to Section 5.1 of this Agreement to manage the affairs of the Company.

2.21    "Member" or "Members" shall mean those individuals identified in the preamble to this Agreement, as well as any Person who may hereafter be admitted as a Member by written approval of the Manager and all of the Members. The term "Member" shall not include any member of the Company that has disposed of his Units. The term "member" shall have the meaning given to such term under the Act. The term "Member" shall where the context makes it appropriate (including, without limitation, Section 2.7 and Section 7.6(b)), include the trustor of any Revocable Trust that is a Member.

2.22    "Net Cash Flow" shall mean net profits of the Company from operations except (a) depreciation of buildings, improvements, personal property, and amortization of leasehold improvements, if applicable, shall not be considered as deductions, (b) repayment of principal of debts shall be considered as a deduction,

6

(c) any amounts expended on behalf of the Company by the Manager for capital improvements shall be considered a deduction, and (d) if the Manager finds it necessary or advisable or required by applicable law, a reasonable reserve shall be deducted for capital needs, to provide a reserve to be invested in additional Company Property, to provide funds for improvements, or for any other contingency of the Company (the "Working Capital Reserve").

2.23   "1933 Act" shall mean the Securities Act of 1933, as amended.

2.24   "Operating Expenses" shall mean the expenses of the Company set forth in Section 11.3 of this Agreement. Notwithstanding the foregoing, operating expenses shall not include: (a) any cash or capital expenditures expended up to the whole of the accumulated cash reserve of the Company not otherwise allocated for specific purposes (any capital expenditure in excess of accumulated cash reserves shall be deemed an operating expense); and (b) non-cash items such as depreciation.

2.25   "Person" shall mean a natural person, corporation, partnership, joint venture, trust, estate, unincorporated association, limited liability company, limited liability partnership (registered or otherwise), or any other juridical entity.

2.26   "Purchase Price" shall mean the purchase price for a Unit or Units determined under Section 7.7 hereof.

2.27   "Refinancing" shall mean the borrowing of money by the Company for the purpose of paying the entire balance due, including accrued interest and fees, on any outstanding loan.

2.28   "Revocable Trust" means an inter vivos trust of which the trustor is the income beneficiary and with respect to which the trustor has the right, during his lifetime, to withdraw all trust principal and the power to amend, in any way, or terminate such trust, and that is, at all times, eligible to hold Units of the Company.

2.29   "Sale" shall mean any Company transaction resulting in the receipt of cash or other consideration (other than the receipt of Capital Contributions) not in the ordinary course of its business, including, without limitation, sales or exchanges of real or personal property, condemnations, recoveries of damages awards, and insurance proceeds (other than business or rental interruption insurance proceeds).

2.30   "Total Outstanding Units" shall mean the total Units issued and outstanding at any point in time.

2.31   "Transfer" shall mean any disposition of Units, voluntary or involuntary, whether or not for value, and includes, without limitation, sales, exchanges (including exchanges pursuant to a plan of merger or consolidation, regardless of whether new Unit certificates are issued), assignments, gifts, pledges, and hypothecations, passage by intestate succession or bequest, vesting of title in a trustee, receiver, conservator, or otherwise in connection with any insolvency, guardianship, or conservatorship proceeding, subjection to judgment lien, dispositions pursuant to any separation

7

agreement, judicial decree, or judgment entered in connection with any domestic relations proceeding, and, as to Units owned by any entity Member, a change of control or management or the vesting of title in another or successor trustee.

      2.32    "Treasury Regulations" shall mean the proposed, temporary, and final regulations promulgated under the Code in effect as of the date of the filing of the Certificate and the corresponding sections of any regulations subsequently issued that amend or supersede such regulations and shall sometimes be referred to herein as "Treas. Reg."

      2.33    "Unit" or "Units" shall represent the relative ownership Interests of a Member in the Company. A Member may own, hold, and vote fractional or whole Units. Accordingly, the "Interests" or "LLC Interests" shall mean a Member's right to participate in the management of the business and affairs of the Company, including without limitation voting and management rights, in accordance with the provisions of this Agreement, including any restrictions thereon, a Member's share of the profits and losses of the Company and a Member's rights to receive distributions of the Company's assets in accordance with the provisions of this Agreement and the Pennsylvania Act.

      2.34    "Valuation Date" shall mean the last day of the month ending prior to or coincident with the date (i) on which the Manager of the Company has actual knowledge of the transfer or proposed transfer, in the case of a purchase and sale under Section 7.2, (ii) of a demand of purchase made, in the case of a purchase under Section 7.4(b), (iii) of the death of the deceased Member or the death of the deceased person who was the trustor of the Revocable Trust Member, in the case of a purchase or sale under Section 7.5, or (iv) on which the Manager of the Company has actual knowledge of a legal proceeding or default involving a Member, as defined in Section 7.6(b), in the case of a purchase and sale under Section 7.6(a).

      2.35    "Working Capital" shall mean those monies not utilized in the purchase, development, construction, repair, or improvement of Company Property, plus the net profit of the Company retained as a reserve for contingencies, future development, and anticipated obligations, as determined by the Manager.

## ARTICLE III

## CAPITAL CONTRIBUTIONS, MEMBERSHIP, AND RELATED MATTERS

      3.1    Capital Contributions By The Members. In consideration of the Units in the Company granted to the Members, the Members (or their predecessors in interest) transferred the property set forth on **Schedule 3.1** hereto for the number of Units delineated on **Schedule 3.1**, which Units shall be the Units of such Members in the Company. Except as provided in this Section 3.1, no Member shall be obligated to make Capital Contributions to the Company. In the event the Company requires cash for operating or other business purposes, Members may loan funds to the Company as provided in Section 13.1 hereof or Members may be required to make additional Capital Contributions, on a pro rata basis, as determined by the Manager in his sole discretion. In

8

addition, the Members agree to execute guarantees of indebtedness or other obligations of the Company, as determined by the Manager, as long as proportionate or joint and several guarantees are required to be executed by all Members. Each Member agrees to indemnify and hold harmless each other Member from and against any proper claim arising out of or proper payment made pursuant to a guaranty in excess of such other Member's proportionate interest in the Company.

      3.2    No Withdrawal Of Capital Contributions. Except upon the dissolution and liquidation of the Company, no Member shall have the right to withdraw from the Company and/or to withdraw his Capital Contributions.

      3.3    Return Of Capital. Except upon the dissolution and liquidation of the Company, as set forth in this Agreement, there is no agreement for, nor time set for, return of any Capital Contribution of any Member. To the extent funds are available therefor, the Manager may return said capital out of Cash Flow or out of the proceeds of a sale or refinancing of Company Property, after reserving sufficient funds for payment of debts, working capital, contingencies, replacements, and withdrawals of capital, if any, and, to the extent of available funds, the Manager shall return said capital at dissolution and termination, as hereinafter set forth. If any Member shall receive the return, in whole or in part, of such Member's Capital Contributions, such Member shall nevertheless be liable to the Company (to the extent of such Member's Capital Contributions) to the extent required under the Act. Under circumstances requiring a return of any Capital Contribution, no Member shall have the right to demand or receive property other than cash, except that the Manager, or the Members by unanimous consent, shall have the sole discretion to make in kind distributions, including distributions of different property to the various Members based upon the Manager's reasonable appraisal of the value of such property.

      3.4    No Interest On Capital Contributions. No Member shall be entitled to interest on such Member's Capital Contribution.

      3.5    Membership Rights. A member's rights include: (a) that Member's status as a Member; (b) that Member's interest in the Company; (c) all other rights, benefits, and privileges enjoyed by that Member (under the Act, the Certificate, this Agreement, or otherwise) in his capacity as a Member, including that Member's rights to vote, consent, and approve and otherwise to participate in the management of the Company as provided herein; and (d) all obligations, duties, and liabilities imposed on that Member (under the Act, the Certificate, this Agreement, or otherwise) in his capacity as a Member, including any obligations to make Capital Contributions; provided, however, that such term shall not include any management rights held by a Member solely in his capacity as a Manager.

      3.6    Representations and Warranties. Each Member hereby represents and warrants to the Company and each other Member as follows:

          (a)    In the case of a Member that is an entity: (i) that Member is duly incorporated, organized, or formed (as applicable), validly existing, and (if applicable) in good standing under the law of the jurisdiction of its incorporation,

9

organization, or formation; (ii) if required by applicable law, that Member is duly qualified and in good standing in the jurisdiction of its principal place of business, if different from its jurisdiction of incorporation, organization, or formation; and (iii) that Member has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder, and all necessary actions by the board of directors, shareholders, managers, members, partners, trustees, beneficiaries, or other applicable Persons necessary for the due authorization, execution, delivery, and performance of this Agreement by that Member have been duly taken;

        (b)     That Member has duly executed and delivered this Agreement, and it constitutes a legal, valid, and binding obligation of that Member enforceable against such Member in accordance with its terms (except as may be limited by bankruptcy, insolvency, or similar laws of general application and by the effect of general principles of equity, regardless of whether considered at law or in equity);

        (c)     That Member's authorization, execution, delivery, and performance of this Agreement does not and will not (i) conflict with, or result in a breach, default, or violation of (A) the organizational documents of such Member (if it is an entity), (B) any contract or agreement to which that Member is a party or is otherwise subject, (C) the trust agreement governing any trust which is a Member, or (D) any Law, order, judgment, decree, writ, injunction, or arbitration award to which that Member is subject; or (ii) require any consent, approval, or authorization from, filing, or registration with, or notice to, any governmental authority or other Person, unless such requirement has already been satisfied; and

        (d)     That Member is familiar with the existing or proposed business, financial condition, properties, operations, and prospects of the Company; that Member has asked such questions and conducted such due diligence concerning such matters and concerning such Member's acquisition of Membership Rights as such Member has desired to ask and conduct, and all such questions have been answered to such Member's full satisfaction; that Member has such knowledge and experience in financial and business matters that such Member is capable of evaluating the merits and risks of an investment in the Company; that Member understands that owning Membership Rights involves various risks, including the restrictions on transferability set forth in this Agreement, lack of any public market for Membership Rights, the risk of owning such Member's Membership Rights for an indefinite period of time, and the risk of losing such Member's entire investment in the Company; that Member is able to bear the economic risk of such investment; that Member is acquiring such Member's Membership Rights for investment, solely for such Member's own beneficial account and not with a view to or any present intention of directly or indirectly selling, transferring, offering to sell or transfer, participating in any distribution, or otherwise disposing of all or a portion of such Member's Membership Rights; and that Member acknowledges that the Membership Rights have not been registered under the 1933 Act or any other applicable federal or state securities laws, and that the Company has no intention, and shall not have any obligation, to register or to obtain an exemption from registration for the Membership Rights or to take action so as to permit sales pursuant to the 1933 Act (including Rules 144 and 144A thereunder).

                          

3.7    Creation of Additional Units. Additional Units may be created and issued to any existing Member or to other Persons, and such other Persons may be admitted to the Company as the Members, at the direction of the Manager, on such terms and conditions as the Manager may determine at the time of admission, but only after the written approval and consent of the Manager and the Majority Vote of the Members; provided that no Member's Membership Rights in the Company shall be changed, and no Member's percentage ownership of the Total Outstanding Units in the Company shall be decreased, except as may be otherwise specifically provided in this Agreement, without such Member's written consent. The terms of admission or issuance must specify the allocation of profits and losses and may provide for the creation of different classes or groups of members and having different rights, powers, and duties. The Manager may reflect the creation of any new class or group in an amendment to this Agreement indicating the different rights, powers, and duties, and such an amendment need be executed by only the Manager, but only after the approval Majority Vote of the Members; provided that no Member's Membership Rights in the Company shall be changed, and no Member's percentage interest of the Total Outstanding Units in the Company shall be decreased, except as may be otherwise specifically provided in this Agreement, without such Member's written consent. Any such admission is effective only after the new Member has executed and delivered to the Manager an instrument containing the notice address of the new Member, the new Member's ratification of this Agreement (including, without limitation, such new Member's spouse's execution of a Spousal Consent as set forth on Schedule 7.1) and agreement to be bound by it, and its confirmation that the representations and warranties in Section 3.5 are true and correct with respect to it. Notwithstanding the foregoing, the Manager may permit the issuance of Units to, or the acquisition of Units by, JOHN SEIDEL, as the Manager shall determine is in the best interests of the Company, said determination to be in the Manager's sole and absolute discretion.

3.8    Defaulted Capital Contribution. Upon the failure of any Member (a "Defaulting Member") to execute any guaranty and/or pay in full any Capital Contribution required to be made pursuant to this Agreement (a "Defaulted Capital Contribution"), or to make provisions for execution and/or payment reasonably acceptable to the Manager, the Manager shall, based upon the unanimous consent of the other Members (the "Non-Defaulting Members"), provide notice of the Non-Defaulting Members' intent to invoke any one or more of the provisions of this Section. If the Defaulting Member does not cure the Defaulted Capital Contribution within ten (10) days after notice of default is received by such Defaulting Member (such tenth (10th) day after delivery of such notice being the "Default Date"), then:

(a)    the Non-Defaulting Members (upon unanimous consent thereof) shall have the right, but not the obligation, to make pro rata Capital Contributions in the amount required of the Defaulting Member, and except as may be further limited under subsection (e) hereof, such Defaulting Member shall only be entitled to exercise any voting or other consensual rights with respect to its Units as such Member's Units are reflected in **Schedule 3.1**, which shall be adjusted consistent with the amount of the Defaulted Capital Contribution and Capital Contributions made by the Non-Defaulting Members; or

11

(b)     the Non-Defaulting Members (upon unanimous consent thereof) shall have the right, but not the obligation, to make advances to the Company consistent with the provisions under Section 13.1 in an aggregate amount equal to the amount of such Defaulted Capital Contribution (a "Defaulted Contribution Advance") which shall be repaid (together with interest) prior to any distributions to the Members; and, in addition to either (a) or (b), as the case may be,

(c)     if the Non-Defaulting Members elect (a), the Company and/or the Non-Defaulting Members, in either case upon unanimous consent of the Non-Defaulting Members, shall have the rights afforded under Section 7.6 to purchase the Defaulting Member's Units;

(d)     if the Non-Defaulting Members elect (a) or (b), the Defaulting Member's right to receive his or her distributions of Net Cash Flow shall be suspended and such distributions shall be deemed to have been distributed to the Defaulting Member and immediately contributed by the Defaulting Member to the Company as such Defaulting Member's capital contribution until the Defaulting Member's Defaulted Capital Contribution, plus interest at the rate set forth under Section 13.1, is cured in accordance with this Section and such Defaulting Member's Units shall be adjusted as such contributions are made and **Schedule 3.1** shall be amended to reflect the same;

(e)     if such Defaulted Capital Contribution is not cured on or before the first anniversary of the Default Date (the "Forfeiture Date"), then, upon the unanimous consent of the Non-Defaulting Members, the Defaulting Member shall thereupon forfeit (the "Forfeiture") all of its voting rights and management rights with respect to its remaining Units, if any, until such time as the Defaulted Capital Contribution is completely cured, including interest, pursuant to subsection (d) hereof;

(f)     during a Forfeiture, the remaining Member(s) (upon unanimous consent thereof) shall be entitled to cause the Company to commence any judicial or other proceeding with respect to damages resulting from a Defaulted Capital Contribution; and

(g)     Except as to each Members individual right to take legal action against any other Member or person based on the provisions of Section 3.1 hereof pertaining to indemnification based upon excess payments under any guaranty, the provisions of this Section (including also those Sections of this Agreement incorporated herein) shall constitute the Non-Defaulting Members' exclusive remedy with respect to such Defaulted Capital Contribution.

12

## ARTICLE IV
## TAX PROVISIONS: ALLOCATION OF TAXABLE INCOME AND/TAX LOSSES, DISTRIBUTIONS TO MEMBERS, AND ELECTIONS

4.1     <u>Taxable Income Or Tax Loss</u>. "Taxable income" or "tax loss" means, at all times during the existence of the Company, the taxable income or taxable loss of the Company for federal income tax purposes for each fiscal year determined by the Company's accountants or tax advisors at the close of the Company's fiscal year, including, without limitation, each separately stated item of Company income, gain, loss, deduction, or credit. Taxable income and tax loss shall be allocated and distributed in accordance with the subsequent provisions of this Article IV.

4.2     <u>Allocation Of Annual Taxable Income Or Tax Losses</u>.

(a)     Taxable income or tax losses of the Company from operations during each taxable year shall be allocated to the Members in proportion to their percentage ownership of the Total Outstanding Units in the Company during such taxable year. For the 2003 taxable year, since JOHN SEIDEL acquired a three percent ownership interest in the Total Outstanding Units effective on July 1, 2003, JOHN SEIDEL shall be allocated 1.51232 percent of the taxable income or tax losses of the Company, including, without limitation, each item of income, loss, deduction, and credit required to be separately stated on the Company's 2003 Form 1065, U.S. Return of Partnership Income.

(b)     Notwithstanding the allocation provided in Section 4.2(a), in the event that any Member receives an unexpected allocation of loss or deduction or an unexpected adjustment, allocation, or distribution described in Treas. Reg. §§ 1.704-1(b)(2)(ii)(d) (4), (5), or (6) that results in a deficit balance in such Member's Capital Account in excess of (i) the amount such Member is obligated to restore, if any, and (ii) the amount such Member is deemed to be obligated to restore pursuant to Treas. Reg. §§ 1.704-2(g)(1) and 1.704-2(i)(5), such Member shall be allocated items of income or gain in the amount necessary to eliminate such excess as quickly as possible. This provision is intended to qualify as a "qualified income offset" as defined in Treas. Reg. §1.704-1(b)(2)(ii)(d).

(c)     In the event any Member would have a deficit capital account balance at the end of such year that is in excess of the sum of any amount that such Member is obligated to restore to the Company under Treas. Reg. § 1.704-1(b)(2)(ii)(c) and such Member's share of minimum gain as defined in Treas. Reg. §1.704-2(g)(1) (that is also treated as an obligation to restore in accordance with Treas. Reg. § 1.704-1(b)(2)(ii)(d)), the Capital Account balance of such Member shall be specially credited with items of Members' income (including gross income) and gain in the amount of such excess as quickly as possible.

(d)     Notwithstanding any other provision of this Article, if there is a net decrease in the Company's minimum gain as defined in Treas. Reg. § 1.704-2(d) during a taxable year of the Company, then, the Capital Accounts of each Member shall be allocated items of income (including gross income) and gain for such year (and if

13

necessary for subsequent years) equal to that Member's share of the net decrease in Company minimum gain. This provision is intended to comply with the minimum gain chargeback requirement of Treas. Reg. § 1.704-2(f) and shall be interpreted consistently with such intention. If in any taxable year that the Company has a net decrease in the Company's minimum gain, if the minimum gain chargeback requirement would cause a distortion in the economic arrangement among the Members and it is not expected that the Company will have sufficient other income to correct that distortion, the Manager may, in her discretion (and shall, if requested by any Member), seek to have the Internal Revenue Service waive the minimum gain chargeback requirement in accordance with Treas. Reg. § 1.704-2(f)(4).

(e)    Items of Company loss, deduction, and expenditure described in § 705(a)(2)(B) of the Code that are attributable to any nonrecourse debt of the Company and are characterized as "partner nonrecourse deductions" under Treas. Reg. § 1.704-2(i) shall be allocated to the Members' Capital Accounts in accordance with said Treas. Reg. § 1.704-2(i).

(f)    Beginning in the first taxable year in which there are allocations of "nonrecourse deductions" (as described in Treas. Reg. § 1.704-2(b)) such deductions shall be allocated to the Members in proportion to their percentage interest in the Company.

(g)    In accordance with § 704(c)(1)(A) of the Code and Treas. Reg. § 1.704-1(b)(2)(iv)(d), if a member contributes property with a fair market value that differs from its adjusted basis at the time of contribution, income, gain, loss and deductions with respect to the property shall, <u>solely for federal income tax purposes</u> (and not for Capital Account purposes), be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company and its fair market value at the time of contribution.

(h)    Pursuant to § 704(c)(1)(B) of the Code, if any contributed property is distributed by the Company other than to the contributing Member within seven (7) years of being contributed, then, except as provided in § 704(c)(2) of the Code, the contributing Member shall, <u>solely for federal income tax purposes</u> (and not for Capital Account purposes), be treated as recognizing gain or loss that would have been allocated to such Member under § 704(c)(1)(A) of the Code if the property had been sold at its fair market value at the time of the distribution.

(i)    In the case of any distribution by the Company to a Member, such Member shall, <u>solely for federal income tax purposes</u> (and not for Capital Account purposes), be treated as recognizing gain in an amount equal to the lesser of:

(1)    the excess (if any) of (A) the fair market value of the property (other than money) received in the distribution over (B) the adjusted basis of such Member's interest in the Company immediately before the distribution, reduced (but not below zero) by the amount of money received in the distribution, or

WP3:862187.4    57164.1001

(2)     the "net precontribution gain" (as defined in §737(b) of the Code) of the Member. The "net precontribution gain" means the net gain (if any) that would have been recognized by the distributee Member under § 704(c)(1)(B) of the Code if all property that (i) had been contributed to the Company within seven (7) years of the distribution, and (ii) is held by the Company immediately before the distribution, had been distributed by the Company to another Member. If any portion of the property distributed consists of property that had been contributed by the distributee Member to the Company, then such property shall not be taken into account under this Section 4.2(i) and shall not be taken into account in determining the amount of the net precontribution gain. If the property distributed consists of an interest in any entity, the preceding sentence shall not apply to the extent that the value of such interest is attributable to the property contributed to such entity after such interest has been contributed to the Company.

(j)     All recapture of income tax deductions resulting from any sale or disposition of Company Property shall be allocated to the Member or Members to whom the deduction that gave rise to such recapture was allocated hereunder to the extent that such Member is allocated any gain from the sale or other disposition of such property.

(k)     Any credit or charge to the capital account balances of the Members pursuant to Sections 4.2(b), (c), (d), (e), and/or (f) hereof shall be taken into account in computing subsequent allocations of profits and losses pursuant to Section 4.2(a), so that the net amount of any items charged or credited to Capital Accounts pursuant to Sections 4.2(a) and 4.2(b), (c), (d), (e), and/or (f) shall, to the extent possible, be equal to the net amount that would have been allocated to the Capital Account balance of each Member pursuant to the provisions of this Article if the special allocations required by Sections 4.2(b), (c), (d), (e), and/or (f) hereof had not occurred.

4.3     Special Allocation Of Credits. Any federal, state, or local income tax credits arising from the Company's operations shall be allocated among the Members in the same ratio as taxable income is allocated pursuant to Section 4.2.

4.4     Allocation Of Taxable Income Or Tax Loss Arising From A Sale Or Refinancing Or Dissolution Of The Company.

(a)     Taxable income that is recognized from a sale of a portion of the Property that does not cause the dissolution of the Company shall be allocated to the Members, pro rata, according to their respective Capital Contributions (less Capital Contributions previously returned other than from Cash Flow).

(b)     Taxable income that is recognized from a sale of all or substantially all of the Property that causes the dissolution of the Company shall be allocated in the following order of priority:

First : To the Members, an amount of gain equal to any deficit balance in their Capital Accounts. If such deficit is greater than the amount

15

of taxable income to be allocated, then such taxable income shall be allocated among the Members in the ratio that the deficit balance in each respective Capital Account bears to the aggregate of deficit balances in all Capital Accounts; and

Second: To the Members, pro rata, amounts equal to their respective Capital Contributions (less Capital Contributions previously returned other than from Cash Flow).

(c)     Tax loss that are recognized from a sale of the Property or from a dissolution of the Company shall be allocated in the following order of priority:

First: To the Members, an amount equal to the total of their respective positive Capital Accounts; provided, however, that if the positive balances are greater than the amount of tax loss to be allocated pursuant to this Section 4.4(c), then such tax loss shall be allocated among the Members in the ratio that the positive balance in each respective Capital Account bears to the aggregate of positive balances in all such Capital Accounts;

Second: To the Members, the balance of such tax loss, pro rata, in amounts equal to their respective Capital Contributions (less Capital Contributions previously returned other than from Cash Flow); and

Third: To the Members, any residual taxable income in proportion to their percentage interests in the Company.

4.5     Allocation In The Event of Transfer. If an interest in the Company is transferred in accordance with Article VII of this Agreement, there shall be allocated to each Member who held the transferred interest during the fiscal year of transfer the product of (a) the Company's taxable income or tax loss allocable to such transferred interest for such fiscal year multiplied by (b) a fraction the numerator of which is the number of days such Member held the transferred interest during such fiscal year and the denominator of which is the total number of days in such fiscal year; provided, however, that the Manager may in his discretion allocate such taxable income or tax loss by closing the books of the Company immediately after the transfer of an interest or by any other reasonable method permitted by § 706 of the Code and the Treasury Regulations promulgated thereunder. Such allocation shall be made without regard to the date, amount, or recipient of such transferred interest.

16

4.6    Authority Of Manager To Vary Allocations To Preserve And
Protect Members' Interests.

(a)    It is the intent of the Members that each Member's
distributive share of income, gain, loss, deduction, or credit (or item thereof) shall be
determined and allocated in accordance with this Article to the fullest extent permitted by
§§ 704(b) and (c) of the Code. In order to preserve and protect the determinations and
allocations provided for in this Article, the Manager shall be, and hereby is, authorized to
allocate income, gain, loss, deduction, or credit (or item thereof) arising in any year
differently than otherwise provided for in this Article if, and to the extent that, allocating
income, gain, loss, deduction, or credit (or item thereof) in the manner provided for in
this Article would cause the determinations and allocations of each Member's distributive
share of income, gain, loss, deduction, or credit (or item thereof) not to be permitted by
§§ 704(b) or (c) of the Code and any Treasury Regulations promulgated thereunder. To
correct distortions created by the "ceiling rule" (as defined in Treas. Reg. § 1.704-
3(b)(1)), the Manager shall be, and hereby is, authorized to make reasonable curative
allocations to reduce or eliminate disparities between book and tax items of
noncontributing Members in accordance with Treas. Reg. § 1.704-3(c). Any allocation
made pursuant to this Section 4.6(a) shall be deemed to be a complete substitute for any
allocation otherwise provided for in this Article and no amendment to this Agreement or
approval of any Member shall be required.

(b)    In making any allocation under Section 4.6(a) (the "new
allocation"), the Manager is authorized to act only after having been advised in writing,
both by counsel to the Company and the Company's accountants, that in their opinion,
after examining §§ 704(b) and (c) of the Code and any current or future proposed or final
Treasury Regulations thereunder, (1) the new allocation is necessary, and (2) the new
allocation is the minimum modification of the allocations otherwise provided for in this
Article necessary in order to assure that, either in the then current year or in any
preceding year, each Member's distributive share of income, gain, loss, deduction, or
credit (or item thereof) is determined and allocated in accordance with this Article to the
fullest extent permitted by §§ 704(b) and (c) of the Code and the Treasury Regulations
thereunder.

(c)    New allocations made by the Manager in reliance upon the
written advice of the attorneys and accountants described above shall be deemed to be
made pursuant to the fiduciary obligation of the Manager to the Company and the other
Members and no such new allocation shall give rise to any claim or cause of action by
any Member.

(d)    In the event that the Manager is required to make any new
allocation in a manner less favorable to the Members than is otherwise provided for in
this Article, the Manager shall be, and hereby is, authorized and directed, insofar as he is
permitted to do so by §§ 704(b) and (c) of the Code, to allocate income, gain, loss,
deduction, or credit (or item thereof) arising in later years in a manner so as to bring the
proportion of income, gain, loss, deduction, or credit (or item thereof) allocated to the

Members as nearly as possible to the proportion otherwise contemplated by this Article IV.

(e)    The Manager shall be, and hereby is, authorized to take all steps to preserve and protect the determination that the Company is subject to taxation as a partnership for federal income tax purposes. No election shall be made by the Manager or any Member for the Company to be excluded from the application of the provisions of subchapter K of the Code. Except as provided in Section 4.10 below, all elections required or permitted to be made of the Company under the Code shall be made by the Manager in such manner as in the Manager's reasonable judgment shall be most advantageous to the Members. Each of the Members shall, upon request, supply the information necessary to properly give effect to any such election.

4.7    Guaranteed Payments.

(a)    Mattern Guaranteed Payments. Commencing July 1, 2003, the Company shall pay to Robert C. Mattern a guaranteed payment for serving as Manager of the Company (the "Mattern Guaranteed Payment"). The Mattern Guaranteed Payment shall be paid for rendering services on a full-time basis to the Company as its Manager, and shall be paid monthly irrespective of the profits and losses of the Company. The Mattern Guaranteed Payment shall be in the annual amount of $150,000.00 and shall be payable monthly in the amount of $12,500.00 each and every month.

(b)    Seidel Guaranteed Payments. Commencing July 1, 2003, the Company shall pay to John Seidel a guaranteed payment for serving as Vice President – Business Development of the Company (the "Seidel Guaranteed Payment"). The Seidel Guaranteed Payment shall be paid for rendering services on a full-time basis to the Company, and shall be paid monthly irrespective of the profits or losses of the Company. The Seidel Guaranteed Payment shall be in the amount and manner set forth on attached **Schedule 4.7(b)**. The Mattern Guaranteed Payments and the Seidel Guaranteed Payments are referred to hereinafter, collectively, as the "Guaranteed Payments."

4.8    Distributions. To the extent the Company may lawfully do so and to the extent of the Company's Cash Flow, the Company shall make pro rata distributions of the Hypothetical Tax Amount, no less frequently than annually, in respect of the Members' Units, in proportion to the Members' percentage ownership of the Total Outstanding Units in the Company during such fiscal year. To the extent practicable, all distributions made to a Member pursuant to this Section shall be made in a manner to allow the income tax attributable to the income passed through to Members for a taxable year to be paid when due. The Manager, after consultation with the Members, or the Members, by unanimous vote, may require a distribution of (i) Net Cash Flow, (ii) the net proceeds of any refinancing or other debt incurred by the Company, and/or (iii) the working capital reserve.

4.9    Limitation Upon Distributions. No distribution shall be declared and paid unless, after the distribution is made, the assets of the Company (valued at fair market value) are in excess of all liabilities of the Company, except liabilities to Members on account of their Capital Contributions, if any.

18

4.10    Section 754 Election. In the event a Member acquires Units in the Company in compliance with the terms and conditions of this Agreement by either purchase from another Member or by testate or intestate succession from a deceased Member, the Company shall, if requested by such Member, make an election pursuant to § 754 of the Code to adjust the basis of its assets for federal income tax purposes, provided that the requesting Member pays the additional bookkeeping, accounting, and legal costs resulting from such election.

4.11    Withholding Taxes. The Company is authorized to withhold from any amounts allocable or distributable to a Member and to pay over the amount so withheld to any federal, state or local government any amounts required to be withheld pursuant to the Code, or any applicable provisions of any other federal, state or local law. Any amounts so withheld shall be treated as having been distributed to such Member pursuant to this Article 4 for all purposes of this Agreement and shall be offset against the amounts otherwise distributable to such Member.

## ARTICLE V

## MANAGEMENT OF THE COMPANY

5.1    Appointment of Manager. The initial Manager of the Company shall be **ROBERT C. MATTERN**. The Manager (whether an initial or a successor Manager) shall cease to be a Manager upon the earliest to occur of the following events: (a) such Manager shall resign as a Manager, by giving notice of such resignation to the Members; (b) such Manager, if a natural person, shall die, become subject to a Disability, or become Bankrupt (as those terms are defined herein); (c) such Manager, if an entity, shall (1) dissolve (unless its business is continued without the commencement of liquidation or winding up), (2) become Bankrupt, or (3) be the subject of a Change in Control, or (d) such Manager shall be removed in accordance with Section 9.1 of this Agreement. Any vacancy in any Manager position, whether occurring as a result of a Manager resigning or ceasing to be a Manager, shall be filled appointment by the resigning or terminated Manager, or, in the absence of such appointment, by the two-thirds vote of Members. Managers need not be Members or residents of the Commonwealth of Pennsylvania. In the event there is no Manager of the Company, management shall revert to the Members until such time as a replacement manager is appointed in accordance with this Section 5.1.

5.2    The Management Powers Of The Manager. Except for powers specifically reserved to the Members by this Agreement (if any) or by non-waivable provisions of applicable law, as provided herein, the Company shall be managed by the Manager, as authorized agent of the Company. The Members shall have all of the rights, powers, and authority required to be conferred upon the Members by Law or under other provisions of this Agreement, including the right to amend this Agreement upon the unanimous written approval or vote of the Members, and the right to remove any Manager in accordance with Article IX hereof. Subject to the restrictions specifically contained in this Agreement, including, without limitation, Section 5.5, the Manager may

19

make all decisions and take all actions for the Company not otherwise provided for in this Agreement, including, without limitation, the following decisions:

(a)    Enter into, make and perform contracts, agreements, and other undertakings binding the Company that may be necessary, appropriate, or advisable in furtherance of the purposes of the Company, including entering into any agreement to lease or purchase real or personal property, and make all decisions and waivers thereunder;

(b)    Open and maintain bank and investment accounts and arrangements, draw checks and other orders for the payment of money, and designate individuals with authority to sign or give instruction with respect to those accounts and arrangements;

(c)    Purchase or lease real estate for the business of the Company;

(d)    Purchase, lease, rent, or otherwise acquire or obtain the use of machinery, equipment, tools, materials, and all other kinds and types of real or personal property that may in any way be deemed necessary, convenient, or advisable in connection with carrying on the business of the Company;

(e)    Make improvements to real estate purchased or leased by the Company;

(f)    Borrow money, issue evidences of indebtedness in connection therewith, refinance, increase the amount of, modify, amend, or change the terms of, or extend the time for the payment of, any indebtedness or obligation of the Company, and secure such indebtedness by mortgage, deed of trust, pledge, or other lien on Company assets;

(g)    Pay all expenses incurred in connection with the Company, as hereinafter set forth in this Agreement;

(h)    Sell, exchange, lease, or otherwise dispose of Company Property, or any part thereof, or any interest therein;

(i)    Sue on, defend, or compromise any and all claims or liabilities in favor of or against the Company; submit any or all such claims or liabilities to arbitration; and confess a judgment against the Company in connection with any litigation in which the Company is involved;

(j)    File applications, communicate, and otherwise deal with all governmental agencies having jurisdiction over, or in any way affecting, the Company's Property or any part thereof or any other aspect of the Company's business;

(k)    Make or revoke any election permitted by the Company by any taxing authority;

20

WP3:862187.4                                                    57164.1001

(l)    Maintain such insurance coverage for or against public liability, fire, and casualty losses, and any and all other insurance necessary or appropriate to the business of the Company, including insurance for the Manager and officers of the Company (if any), in such reasonable amounts and of such reasonable types as the Manager shall determine from time to time;

(m)    Determine, in such person's discretion, whether or not to apply any insurance proceeds for any property to the restoration of such property or to distribute the same;

(n)    Retain legal counsel, auditors, and other professionals in connection with Company business and to pay therefor such remuneration as the Manager may deem reasonable and proper;

(o)    Retain other services of any kind or nature in connection with the Company business and to pay therefor such remuneration as the Manager may deem reasonable and proper;

(p)    Hire employees in connection with the Company business and to pay therefor such remuneration as the Manager may deem reasonable and proper;

(q)    Alter, improve, repair, raze, refurbish, and rebuild property leased by the Company;

(r)    Redeem or repurchase Units on behalf of the Company if such purchase does not impair the capital of the Company or the operation of the Company's business;

(s)    Collect sums due to the Company;

(t)    Borrow money to further the purposes of the Company and secure such loans by mortgage liens on the Property and, to the extent that funds of the Company are available therefor, paying debts and obligations of the Company;

(u)    Select, remove, and change the authority and responsibility of architects, lawyers, accountants, trade contractors, realtors, and such other advisers and consultants as shall further the business of the Company, including entering into agreements with Affiliates of the Members;

(v)    Perform any and all other acts necessary or appropriate to the Company's business; and

(w)    Maintain the assets of the Company in good order;

(x)    Establish annual budgets for the Company and any of its subsidiaries.

WP3:862187.4    57164.1001

5.3    Delegation Of Authority And Duties.

(a)    The Manager may, from time to time, delegate to one or more Persons such authority and duties as the Manager may deem advisable. In addition, the Manager may assign, in writing, titles to any person, including, without limitation, the titles of President, Vice President, Secretary, Assistant Secretary, Treasurer, and Assistant Treasurer. Unless the Manager decides otherwise, if the title is one commonly used for officers of a business corporation formed under the general corporation law of the Commonwealth of Pennsylvania, the assignment of such title shall constitute the delegation to such person of the authority and duties that are normally associated with that office, subject to any specific delegation of authority and duties made pursuant to the first sentence of this Section 5.3(a). Any number of titles may be held by the same person. Each officer shall hold office until his or her successor shall be duly designated and shall qualify or until his or her death, resignation, or removal in the manner hereinafter provided. Any number of offices may be held by the same Person. The salaries or other compensation, if any, of the officers and agents of the Company shall be fixed by the Manager. Any delegation pursuant to this Section 5.3(a) may be revoked at any time by the Manager.

(b)    Any person dealing with the Company, other than a Member, may rely upon the authority of the Manager or any officer designated in writing as such by the Manager in accordance with Section 5.3(a) above in taking any action in the name of the Company without inquiry into the provisions of this Agreement or compliance herewith, regardless of whether that action actually is taken in accordance with the provisions of this Agreement.

(c)    Unless authorized to do so by this Agreement or by the Manager, no Member, agent, or employee of the Company shall have any power or authority to bind the Company in any way, to pledge its credit, or to render it liable pecuniarily for any purpose; provided, however, that the Manager may act by a duly authorized attorney-in-fact.

(d)    Any officer may resign as such at any time. Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the Manager. The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation. Any officer may be removed as such, either with or without cause, by the Manager whenever, in her judgment, the best interests of the Company will be served thereby; provided, however, that such removal shall be without prejudice to the contract rights, if any, of the person so removed. Designation of any officer shall not of itself create contract rights. Any vacancy occurring in any office of the Company (other than a Manager) may be filled by the Manager.

5.4    Approval Or Ratification Of Acts Or Contracts By Members. The Manager, in his or her discretion, may submit any act or contract for approval or ratification at any annual meeting of the Members or any special meeting of the Members called for the purpose of considering any such act or contract.

22

5.5    Limitations On Authority Of The Manager. Notwithstanding any
other provision of this Agreement to the contrary, at any time when there are two (2) or
more Members, without unanimous consent of the Members (including the vote of any
Member-Manager), neither the Manager nor any Member shall have the right or power to
take any of the following actions:

(a)    do business of the Company in any jurisdiction or political
subdivision in which the Company has not previously taken such steps as may be
necessary to assure for any Member the same limited liability as is provided for such
Member under the Act;

(b)    commingle funds of the Company with funds of any other
Person;

(c)    do any act, or refrain from doing any act, that would cause
the Company to be characterized for purposes of the Code, only, as anything other than
an unincorporated sole proprietorship or partnership; or

(d)    do any other act that the Act specifically requires to be
approved by all the Members; provided, however, that, to the extent the provisions of the
Act may be varied by agreement of the Members, the provisions of this Agreement
providing for less than unanimous approval of the Members shall be fully operative.

5.6    Right Of Third Parties To Rely On Authority Of The Manager.
Notwithstanding any other provision of this Agreement to the contrary, no seller or
purchaser, including, without limitation, any purchaser of property or assets of the
Company, shall be required to look to the application of proceeds hereunder or to verify
any representation by the Manager or its attorney-in-fact as to the extent of the interest in
the assets of the Company that the Manager is entitled to acquire, sell, or otherwise use,
and any such person shall be entitled to rely exclusively upon the representations of the
Manager as to her authority to enter into such purchase or sale arrangements and shall be
entitled to deal with the Manager as if it were the sole party in interest therein, both
legally and beneficially. Each Member and assignee hereby waives any and all defenses
or other remedies that may be available against any such seller, purchaser, or other person
to contact, negate, or disaffirm any action of the Manager in connection with any such
sale or purchase. In no event shall any person dealing with the Manager or the
Manager's representative with respect to any business or property of the Company be
obligated to ascertain that there has been compliance with the terms of this Agreement,
and each such person shall not be obligated to inquire into the necessity or expedience of
any act or action of the Manager or the Manager's representative; and every contract,
agreement, deed, or other instrument or document executed by the Manager or the
Manager's representative with respect to any business or Company Property shall be
conclusive evidence in favor of any and every person relying thereon or claiming
thereunder that (a) at the time of the execution and/or delivery thereof this Agreement
was in full force and effect, (b) such instrument or document was duly executed in
accordance with the terms and provisions of this Agreement and is binding upon the
Company, and (c) the Manager or the Manager's representative was duly authorized and

23

empowered to execute and deliver any and every such instrument or document for and on behalf of the Company.

        5.7    <u>Limitations On Authority</u>. The authority of the Manager over the conduct of the affairs of the Company shall be subject only to such limitations as are expressly stated in this Agreement or in the Act (to the extent this Agreement does not supersede provisions of the Act).

        5.8    <u>Duty To Devote Time</u>. Unless otherwise agreed in writing, the Members shall devote such time to the Company as the Members determine is reasonably necessary to accomplish the Company's business and affairs. Members shall use their best efforts to observe and perform each and every obligation that they have, or will, make to the Company and Members.

        5.9    <u>Restrictive Covenants</u>. Unless otherwise agreed in writing, no Member may engage (directly or indirectly) in any activity or opportunity in direct competition with the business of the Company or its subsidiary entities or the obligations of the Members to the Company, or which could be taken by the Company, without first presenting such investment or business opportunity to the Company and the Company providing written authorization indicating that the Member may engage in such activity and the extent to which the Company shall have an interest, if any, in and to such other business venture or the income or profits derived therefrom. The following restrictive covenants shall apply to each Member (and, for purposes of this Section 5.9, the term "Member" shall include the trustor of a Revocable Trust which is a Member):

        (a)    <u>"Affiliates" Defined</u>. For purposes of this Agreement, the term "Affiliates" shall mean, collectively, and each individually, the Company, any subsidiary of the Company, and any entity owned by all of the Members.

        (b)    <u>Ownership of Inventions and Developments</u>. (1) All ideas, inventions or developments that a Member may conceive or create, in whole or in part, either alone or jointly with others, during such Member's ownership of Units in the Company and any prior employment with the Company (collectively "Developments") will be the sole property of the Company. The Company will be the sole owner of all patents, copyrights, trade secrets and other proprietary rights in and with respect to such Developments. To the fullest extent permitted by law, such Developments will be deemed works made for hire. Each Member hereby transfers and assigns to the Company any proprietary rights which such person may have or acquire in any such Developments without further compensation, and each Member waives any moral rights or other special rights that such person may have or that may accrue therein. At the request and cost of the Company, each Member agrees to execute any documents and take any actions that may be required to effect and confirm such transfer and assignment and waiver. Each Member agrees to disclose promptly to the Company, or to any persons designated by it, all Developments which are or may be subject to the provisions of this subsection (b). The provisions of this subsection (b) shall apply to all ideas, inventions and developments that are conceived or developed during the term of each Members ownership of Units and any prior employment with the Company, whether before or after the date of this Agreement, and whether or not further development or reduction to practice may take

24

place after termination of ownership, for which purpose it will be presumed that any ideas, inventions or developments conceived by the Member that are reduced to practice within one year after termination of the Member's ownership were conceived during the term of ownership and/or employment (and are therefore "Developments" within the meaning of this subsection) unless such Member is able to establish a later conception date by clear and convincing evidence. The provisions of this subsection shall not apply, however, to the ideas, inventions or developments disclosed in **Schedule 5.9(b)** attached to this Agreement and accepted by Company, which schedule represents ideas, inventions or developments acknowledged by the Company to have been made by such Member (as may be designated on the schedule) prior to or outside the scope of such Member's relationship with the Company, as defined by this Section 5.9. By entering in to this Agreement, the Company does not waive and expressly retains its shop rights, works for hire, implied licenses and other rights resulting from the Members or Manager.

                    (2)  <u>Obtaining and Enforcing Proprietary Rights</u>.  Each Member agrees to assist the Company, at the Company's request and expense, to obtain and enforce patents, copyrights and other proprietary rights with respect to any Developments. Each Member will execute all documents reasonably necessary or appropriate for this purpose. This obligation will survive the termination of ownership or this Agreement, provided the Company will compensate at a reasonable rate after such termination for time actually spent by such former Member at the Company's request on such assistance. In the event that the Company is unable for any reason whatsoever to secure a Member's signature to any document reasonably necessary or appropriate for any of the foregoing purposes (including renewals, extensions, continuations, divisions or continuations in part), each Member hereby irrevocably designates and appoints the Company, Manager and their duly authorized officers and agents as such Member's agents and attorneys-in-fact to act for such Member and on his or her behalf, but only for the purpose of executing and filing any such document and doing all other lawfully permitted acts to accomplish the foregoing purposes with the same legal force and effect as if executed by such Member.

                    (c)  <u>Use of Confidential Information</u>. Each Member acknowledges that in the course of the Member's activities with the Company, he or she will become acquainted with confidential information belonging to the Affiliates and/or any of the customers, prospects or third party business relationships of the Affiliates. This information may relate to persons, firms, corporations, or other entities that already are or will become clients, customers, or accounts of the Affiliates during the term of this Agreement. A Member shall not, during or after the term of the Member's ownership of Units, disclose said confidential information, or any part thereof, to any person, firm, corporation, association, limited liability company, joint venture, or other juridical entity, for any reason or purpose whatsoever, without the prior written consent of the Company. The parties agree that the party asserting that information is not "confidential information" shall have the burden of proof, and the term "confidential information" shall not include any knowledge or information which (i) is or becomes generally available to the public other than as a result of a disclosure by the Member, (ii) information that becomes available on a non-confidential basis from a source that is not prohibited from disclosing such information by a legal, contractual or fiduciary obligation to the other

25

parties to this Agreement, (iii) information that is developed independent of any disclosure by any party to this Agreement, and (iv) information that was in the possession or known by a party to this Agreement prior to its receipt of such information. Without limiting the generality of the foregoing, the Member shall not disclose (or assist in disclosure) to any person or entity any of the following information:

        (1)     The name(s) or address(es) of any current or prospective customers and information regarding any current or prospective accounts of any of the Affiliates, including methods of soliciting and retaining clients, customers, and accounts;

        (2)     The project development techniques and/or technology utilized by the Affiliates;

        (3)     Any invoicing/billing information and any other information reflecting the Affiliates' pricing practices;

        (4)     The Affiliates' confidential financial information and operational budgets and plans of the Affiliates; and

        (5)     Any other confidential information of the Affiliates, including information deemed confidential or proprietary by the clients, customers, and accounts of the Affiliates.

For the purposes of Section, confidential information may be kept in any form, including, but not limited to, computer files, papers, documents, contracts, letters, communications and other things, tangible and intangible. Upon the conclusion or termination of ownership of Units, the Member shall immediately return to the Affiliates all confidential information and other property of the Affiliates in such Member's possession or subject to such Member's control.

        (d)     <u>Non-Competition.</u>  During the term of the Member's ownership of Units and for a period of twenty-four (24) months following termination, for whatever reason, the Member shall not, without Company's prior written consent, own, manage, control, be employed by, participate in, engage in, or be connected in any manner with any independent business enterprise which competes directly or indirectly with the Affiliates or which is located within 100 miles of 2036 Foulk Road, Wilmington, Delaware, and is similar to the business of an Affiliate, unless the Company authorized such activity in accordance with this Section; provided, however, that nothing herein shall prohibit a Member, following termination, from taking a position with a competing enterprise that is primarily technical in nature and does not involve participation in any substantial sales solicitation activities, provided the terminated Member provides the Company 30 day's advance written notice of such employment. Each Member acknowledges the extreme importance being placed on the time and geographic scope of the covenants set forth in the preceding sentence and fully agrees to these restrictions. Moreover, each Member shall not use any confidential information (as defined above) for his personal gain or in an independent business enterprise that competes directly or indirectly with the Affiliates.

26

(e)  <u>Non-Solicitation of Customers.</u>

(1)  Each Member acknowledges and agrees that the Affiliates have a legitimate interest in preventing the exploitation or appropriation of the goodwill of a customer, client, or account that has been created or maintained at the Affiliates' expense. A Member shall not during the term of Member's ownership of Units and for a period of twenty-four (24) months from the date of termination, directly or indirectly, on the Member's own behalf or in the service or on behalf of others, solicit active or prospective clients, customers, or accounts of the Affiliates.

(2)  For purposes of this Agreement, a prospective client, customer, or account (a "prospect") is any third party with whom any of the Affiliates or their agents have been in individual contact, either in person, by mail, telephone, telecopy, or in any other way other than mass mailings, advertisements and such, in the twelve (12) months preceding Member's termination of ownership of Units in an effort to make that third party an active client, customer, or account.

(f)  <u>Non-Solicitation of Employees.</u> Each Member acknowledges and agrees that the Affiliates provide services through the personnel who have close relationships with the Affiliates' clients, customers, and accounts and that such relationships are created and maintained at the Affiliates' expense. Each Member further acknowledges and agrees that the Affiliates have a legitimate interest in a stable and experienced workforce. A Member shall not, during the term of Member's ownership of Units and for a period of twenty-four (24) months from the date of termination, directly or indirectly, on the Member's own behalf or in the service or on behalf of others, hire, solicit, induce, take away, or attempt to hire, solicit, induce, or take away any employee, independent contractor, or other personnel of the Affiliates, or their clients, customers, or accounts.

(g)  <u>Remedies for Breach.</u>

(1)  Each Member agrees that this Agreement creates rights that cannot solely be protected by an award of money damages. Each Member agrees, in the event of any breach of this Agreement, material or immaterial, that the Company will suffer irreparable harm and will not have an adequate remedy at law. Each Member agrees, in the event of a breach of any of the terms of this Section, that specific performance shall lie for any breach, and the Company (or the particular Affiliate affected by the breach in the case of one of the other Affiliates) (hereinafter the "Injured Affiliate") shall be entitled to secure an order in any suit brought for that purpose to enjoin the Member from further violating any of the provisions of this Section. Pending the hearing and decision of the application for such an order, the Company or the Injured Affiliate shall be entitled to a temporary restraining order or injunctive relief without prejudice to any other legal or equitable remedy available to the Company or the Injured Affiliate. Nothing herein shall be construed as prohibiting the Company or the Injured Affiliate from pursuing any other remedies available to it for such breach or threatened breach, including the recovery of compensatory and punitive damages, costs, and reasonable attorneys' fees from a Member.

27

(2)     In consideration of John Seidel receiving an ownership interest in the Company and the development of such Member's expertise in the Company's business, in the event that he, directly or indirectly, violates Section 5.9(d) within the twenty-four (24) months following the termination of his ownership of Units, for whatever reason, he agrees to pay Company the amount of $150,000.00 (the "initial base amount"), as increased (but not decreased) each January 1st by the annual positive unadjusted change, if any, in the December Chained Consumer Price Index for All Urban Consumers (C-CPI-U) for all items as reported by the United States Department of Labor Bureau of Statistics for the immediately preceding December (the "Index"), so that each January 1st a new base amount shall be established. If the Index is less than zero, the Index shall be deemed to be zero. The initial base amount and subsequent base amounts shall be increased (but not decreased) each January 1st by multiplying such initial base amount or subsequent base amount, as the case may be, by the product of (a) one plus (b) the Index multiplied by 1/100 (.01) (for example, the December, 2002 Index was 2.1, which would result in a factor of 1.021 to be multiplied by the applicable base amount).

(3)     Nothing herein shall be construed as prohibiting the Company from pursuing other remedies available to it for a breach or threatened breach of this Agreement, including without limitation, the recovery of damages.

(h)     Interpretation. Each Member acknowledges that the law concerning restrictive covenants is based on facts and circumstances; therefore, each Member specifically agrees that if any court or board of arbitration to which a dispute over these restrictions is referred shall find any of these restrictions overbroad or unreasonable, then the Member authorizes the court or board to enforce the restrictions to the greatest extent it deems reasonable.

(i)     Tolling Period. The non-disclosure, non-competition, and non-solicitation obligations contained herein shall be extended by the length of time during which the Member shall have been in breach of any said provisions.

(j)     Outside Remuneration. Each Member shall turn over to Company any and all remuneration received, directly or indirectly, and in whatever form, duly endorsed for assignment or with an executed assignment to Company, from all sources (excepting proper distributions from Company) from any activities or duties contemplated under this Agreement, except as may be excluded under the introductory paragraph of this Section 5.9.

(k)     Survival. Except as may be expressly provided to the contrary in a separate written agreement with the Company, the provisions of this Section shall survive the termination of a Member's withdrawal from the Company and/or the termination of this Agreement.

5.10     Dealing With The Company. Subject to the limitations set forth in this Agreement, any Member and any Affiliates shall have the right to contract or otherwise deal with the Company for the sale or lease of property or goods, the rendition

28

of services, and for all other purposes, and to receive payments and fees from the Company in connection therewith as the Manager shall determine, provided that such payments and fees are comparable to the payments and fees that would be paid to unrelated Persons providing the same property, goods, or services to the Company.

      5.11   Indemnity.

      (a)   General. To the extent not inconsistent with the Act and other applicable law, the Company, its receiver, or its trustee, shall indemnify each Member and each Member's employees, agents, affiliates, heirs, executors, administrators, successors, and assigns, against and save them harmless from any claim, demand, judgment, or liability and against and from any loss, cost, or expense (including, without limitation, attorneys' fees and court costs, that may be paid by the Company as incurred), that may be made or imposed upon such persons by reason of any (1) act performed for or on behalf of the Company or in furtherance of the Company's business, (2) inaction on the part of such persons, or (3) liabilities arising under federal and state securities laws, to the extent permitted by law, so long as the Member has acted in furtherance of a good faith belief that such course of conduct was in the best interest of the Company and said conduct did not constitute gross negligence, gross misconduct, fraud, a breach of fiduciary duty, or a breach of this Agreement. To the extent that this Section 5.11 is not permitted under the Act, the Act shall control. Nevertheless, it is the intent of this Section 5.11 that the aforementioned parties be indemnified by the Company as stated in this subsection to the maximum extent permitted by Law.

      (b)   Liability For Acts Or Omissions. To the extent not inconsistent with applicable law, no Member, Manager, or their respective employees, agents, representatives, affiliates, heirs, executors, administrators, successors, or assigns, shall be liable, responsible, or accountable in damages or otherwise to the Company or any Member for any action taken or failure to act on behalf of the Company within the scope of the authority conferred upon the Member or Manager by this Agreement or by law, so long as the Member or Manager has acted in furtherance of a good faith belief that such course of conduct was in the best interest of the Company and said conduct did not constitute gross negligence, gross misconduct, fraud, a breach of fiduciary duty, or a breach of this Agreement.

      (c)   Advancement of Expenses. To the fullest extent permitted by applicable law, expenses (including legal fees) incurred by a Person indemnified under this Section in defending any claim, demand, action, suit, or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit, or proceeding upon receipt by the Company of an undertaking (including such security as may be reasonably required by the Company) by or on behalf of the Person to repay such amount if it shall be determined that the Person is entitled to be indemnified as authorized in this Section.

      5.12   Fiduciary Duty Of A Member. Each Member shall have fiduciary responsibility for the safekeeping and use of all Company Property, whether or not in the Member's immediate possession or control, and the Member shall not employ or permit another to employ such Property in any manner, except for the benefit of the Company.

29

5.13   Reserves.  The Company shall maintain reasonable reserves for normal repairs, replacement, working capital, and contingencies, that may be increased or decreased as determined by the Manager in the Manager's sole discretion.

## ARTICLE VI

## BOOKS, RECORDS, AND REPORTS

6.1   Books And Records.  The Company's books and records, this Agreement, and all amendments thereto, and any separate certificates of formation, shall be maintained at the principal office of the Company or at such other place as the Manager may determine, and all such documents shall be available for inspection and examination by any Member or a Member's duly authorized representatives at reasonable times.  Upon written request stating a proper purpose (as such term "proper purpose" has been defined or interpreted under the Pennsylvania General Corporation Law and the case law thereunder) and payment of the reasonable expense of duplication, a Member will be provided with a listing of the Members' names and addresses.  The Company's books and tax records shall be kept on the basis most favorable to the Company and the Members, as decided by the Manager after consultation with the Company's tax and accounting advisors.

6.2   Reports.  The Manager shall, at the expense of the Company, cause to be prepared and distributed to each Member, within ninety (90) days after the close of each fiscal year of the Company, all information relating to the Company that is necessary for the preparation of any Member's federal, state, and local income tax returns.

6.3   Tax Returns.  The Manager, at Company expense, shall cause to be prepared income tax returns for the Company and shall cause such returns to be timely filed with the appropriate authorities.

6.4   Filings With Regulatory Agencies.  The Manager, at Company expense, shall cause to be prepared and timely filed with appropriate federal, state, and local regulatory and administrative bodies, all reports required to be filed with such authorities under then current applicable laws, rules, and regulations.

6.5   Tax Matters.  In the event the Company is subject to administrative or judicial proceedings for the assessment and collection of deficiencies of federal taxes or for the refund of overpayments of federal taxes arising out of a Member's distributive share of income, losses, gain, credits, the Manager shall act in the capacity of a tax matters partner ("TMP") and shall have all the powers and duties assigned to a TMP under §§ 6221-6233 of the Code and the Treasury Regulations thereunder.  The Members agree to perform all acts necessary under § 6231 of the Code and the Treasury Regulations thereunder to permit the Manager to act as a TMP.

30

# EXHIBIT A – PART 2

## ARTICLE VII

## ASSIGNMENT OR SALE OF INTERESTS IN THE COMPANY

7.1    Restrictions On Transfers.  (a)  Except as may be otherwise provided in this Agreement, no Member (or assignee or transferee of a Member's Units) shall Transfer such Member's Units, or any portion thereof, to another Person.  The Company shall not recognize any Transfer not made in accordance with this Agreement. Except as otherwise provided in this Agreement, a Transfer of Units recognized under this Agreement shall confer upon the transferee the full right to participate in the management of business affairs of the Company; provided, however, that such transferee shall not become a Substitute Member without having first executed an instrument satisfactory to the other Members accepting and agreeing to be bound by all of the terms and conditions of this Agreement, having such person's spouse execute a Spousal Consent on Schedule 7.1, and assuming all of the duties and responsibilities of a Member hereunder, or otherwise shall have executed this Agreement or a counterpart of this Agreement, and without having paid to the Company a fee sufficient to cover all reasonable expenses of the Company in connection with such assignee's admission as a Substitute Member.  A Member, nevertheless, shall be permitted to condition any Transfer upon the restriction, in whole or in part, of the transferee's right to participate in the management and affairs of the Company.  Anything herein to the contrary notwithstanding, no Member shall have the right to assign or sell such Member's Units if such assignment or sale would result, directly or indirectly, in the (a) termination of the Company for state law or federal or state tax purposes; (b) violation of the 1933 Act or any rules or regulations thereunder or any applicable state securities laws or any rules or regulations thereunder; (c) violation of any investment representation given by such Member in connection with his acquisition of Units; or (d) violation of the terms of this Agreement.

(b)    Notwithstanding Section 7.1(a), in the event the Company is terminated for tax purposes, but no event of Dissolution of the Company has occurred under Article VIII, the Company's assets shall not be liquidated, the Company's liabilities shall not be paid or discharged, and the Company's affairs shall not be wound up.  Instead, solely for federal income tax purposes, the Company shall be deemed to have distributed the Company's assets in kind to the Members who shall be deemed to have assumed and taken subject to all Company liabilities, and deemed to recontribute such assets (with such liabilities), all in accordance with Treas. Reg. § 1.708-1(b) and this Agreement. If a Code § 708(b)(1)(B) termination is caused, the Member whose Interests were subject to the Transfer will indemnify the other Members and save them harmless for any increase in taxes, interest, and penalties or decreases in credits caused by such termination.  As between any Member and its Transferee, Profits and Losses for the Fiscal Year of the Company in which such assignment occurs shall be apportioned for federal income tax purposes in accordance with any convention permitted under § 706(d) of the Code and determined by the TMP.

(c)    The restrictions on Transfer shall not apply to Units owned by Robert C. Mattern or a Revocable Trust of which Robert C. Mattern is the trustor

31

WP3:862187.4                                                                              57164.1001

except that the restrictions set forth in the last sentence of Section 7.1(a) of this Agreement shall be applicable and such Units shall be subject to the provisions set forth in Sections 7.1(c), 7.4, and 7.6 of this Agreement.

      7.2    Proposed Transfers. Any Member, who receives a bona fide written offer to Transfer one or more Units (including fractional shares of Units) from a bona fide third party at a fixed and determinable purchase price in money, shall offer, in writing, such Units for sale to the Company for a thirty-day option period, after which, if the Company fails to exercise its rights hereunder or otherwise waives its rights under the option prior to the termination of the thirty-day option period, the offer shall be made in writing to the remaining Members who shall have a further thirty-day option period in which to purchase the Units. The written offer shall be made by notice setting forth all of the details of the proposed Transfer, including the name of the proposed transferee, price, payment terms, closing date, conditions and/or contingencies and other offer terms, if any (the "Proposed Offer's Terms"). If neither of the rights to purchase created under this Section 7.2 is exercised, then the Member wishing or required to transfer his Units may Transfer such Units in accordance with the terms set forth in the offer as described in the notice. If neither of the rights to purchase created under this Section 7.2 is exercised and at the end of forty-five (45) days following the expiration of the last such thirty-day option period the Units constituting the subject of the proposed Transfer have not been transferred in accordance with the terms set forth in the offer as described in the notice, the Transfer of the Units by the Member shall, once again, become subject to the restrictions of this Section 7.2. When either the Company or the other Members exercise the rights to purchase created under this Section 7.2, the purchase price and the method of payment for Units purchased pursuant to this Section 7.2 shall be determined in accordance with Sections 7.7 and 7.8, respectively. Any Member whose Units are the subject of a Transfer or a proposed Transfer, which Units have not been offered for sale pursuant to this subsection, shall be deemed to have offered such Units for sale with the first thirty-day option period beginning on the date the Manager of the Company has actual knowledge of such Transfer or proposed Transfer. The Company or remaining Members, as the case may be, may exercise their rights during the option periods set forth in this Section 7.2 by giving notice to the offering Member in accordance with Section 15.1 of this Agreement.

      7.3    Permitted Transfers To Or From Revocable Trusts.
Notwithstanding any provisions hereof to the contrary, any Member who is a natural person may Transfer Units to a Revocable Trust of which he or she is the trustor and such trust shall become a Member, provided that such trust remains revocable by the trustor, the trustee of each such Revocable Trust agrees to be bound by all terms and conditions of this Agreement and such other terms and conditions as may be reasonably required by the Manager (including the execution of an instrument agreeing to be bound by all terms and conditions of this Agreement and/or such other instruments as may be required by the Manager). Further notwithstanding any provisions hereof to the contrary, any Member which is a Revocable Trust may Transfer Units from a Revocable Trust to the trustor of such Revocable Trust, provided, however, that such transferee agrees to be bound by all terms and conditions of this Agreement and such other terms and conditions as may be reasonably required by the Manager (including the execution of an instrument agreeing to be bound by all terms and conditions of this Agreement and/or such other instruments as

32

may be required by the Manager). The occurrence of a trust no longer qualifying as a Revocable Trust (as defined herein) and/or the death of the trustor shall be deemed a retransfer to the trustor (if then living) or the death of a Member subject to the provisions of Section 7.5, as the case may be.

        7.4      Cessation of Participation Call Option; Majority Option to Purchase or Sell.

        (a)     Upon a Member or the trustor of a Revocable Trust Member no longer participating in the affairs of the Company in at least one of the capacities of Manager, officer, or common law employee by reason of (1) the Member's decision to voluntarily terminate his participation as such, (2) the Company's decision to terminate the Member's position for Cause, or (3) in the case of JOHN SEIDEL, the Company's decision to terminate his position, with or without cause, at any time on or before February 1, 2004 (in any situation described earlier in this sentence the affected Member being referred to as the "Departing Member"), the Company and other Members shall have the option to purchase the total Units then owned by the Departing Member in accordance with Section 7.2; provided, however, that Section 7.7 and Section 7.8 shall not apply and the Purchase Price shall be One Dollar ($1.00) per Unit and the method of payment for Units to be purchased under this Section 7.3 shall be in a check drawn on the Company's account; and provided, further, that the offer of the Departing Member may be accepted by the Company and/or remaining Members, as the case may be, at any time, and passage of time shall not constitute a rejection of the offer or waiver. Subsection (a)(1) of this Section 7.4(a) shall not apply to an offer made under Section 7.2 based upon a bona fide third party offer, if such offer is made and closed before the Member's decision to terminate.

        (b)     At all times, any Member or Members owning more than fifty percent (50%) of the Total Outstanding Units shall have the right to demand, in writing, the purchase of all of the other Members' (the "Terminated Member(s)") Units and, upon notice of such written demand sent in accordance with this Agreement, the Terminated Member(s) shall be deemed to have offered the Units of such Terminated Member(s) in accordance with Section 7.2.

        (c)     At any time, any Member or Members owning more than fifty percent (50%) of the Total Outstanding Units (the "Majority") may demand the transfer of all of the issued and outstanding stock by all Members (by sale, merger or otherwise) or all or substantially all of the assets of the Company to a bona fide third party in accordance with the terms of this subsection. A partial sale shall not be subject to this subsection. The Majority shall provide the other Members (the "Minority") written notice of the terms of the proposed sale. All Members shall cooperate in the sale to the bona fide third party (including the sale of all of their Units if required by the third party).

        7.5    Death Of A Member. Upon the death of a Member, or upon the death of the trustor of any Revocable Trust that is a Member, the personal representative of such deceased Member or the trustee of such Revocable Trust as the case may be, and the Company, or if the Company elects, the other Member(s), shall be obligated to

purchase all Units owned by such deceased Member or such Revocable Trust. The purchase price and the method of payment for the Units purchased pursuant to this Section 7.5 shall be determined according to the provisions of Sections 7.7 and 7.8, respectively.

      7.6     Legal Proceedings or Defaults Involving Members.

      (a)     Upon the happening of any of the events involving a Member set forth below in subsection (b), the Member, trustee of the Revocable Trust or Member's personal representative, as the case may be, shall be deemed to have offered for sale, on the date such legal proceeding is initiated, all Units owned by such Member, trustee or such Member's personal representative in accordance with Section 7.2. Such offer shall be to the Company or, if elected by the Company and accepted by all of the remaining Members, to the remaining Members on a pro rata basis; provided that the offer may be accepted by the Company and/or remaining Members, as the case may be, at any time, and passage of time shall not constitute a rejection of the offer or waiver. The Purchase Price and the method of payment for Units purchased pursuant to this section shall be determined in accordance with Sections 7.7 and 7.8, respectively.

      (b)     Subsection (a) shall apply:

      (1)     Upon the Bankruptcy of a Member;

      (2)     If a Member has any of its, his, or her Units attached or subjected to a charging order;

      (3)     If a Member breaches any provision of this Agreement and such breach (if curable) is not cured within the time required under this Agreement or, if no such period is stated, within thirty (30) days of notice of such breach and the intent to invoke this Section to the breaching Member;

      (4)     Such Member has a judgment obtained against him or her in any legal or equitable proceeding and the sale of any of his or her shares is threatened or contemplated as a result thereof;

      (5)     Such Member has an execution process issued against him or her or against his or her shares; or

      (6)     Such Member has any legal proceeding instituted by or against him or her, including, without limitation, any divorce or similar marital dissolution proceeding, in which the sale or compelled transfer of his or her shares is imminent.

      7.7     Purchase Or Redemption Price. Except as expressly stated or modified herein to the contrary, the purchase price of the subject Units for all purposes of this Agreement shall be determined in accordance with **Schedule 7.7** attached hereto and made a part hereof (the "Purchase Price").

34

## 7.8 Payment Terms.

(a) Except as provided in subsections (c) and (e) below, the Purchase Price shall be paid on the Closing Date (as hereinafter defined) by delivery of a judgment note (the "Judgment Note") in a form consistent with that set forth as **Schedule 7.8** attached hereto and made a part hereof, effective as of the Closing Date, in an amount equal to the full Purchase Price less the amount of the downpayment. Except as may be otherwise provided in subsection (c) or subsection (e) hereof or as expressly stated or modified herein to the contrary, the amount of the downpayment shall be determined by the maker of the Judgment Note provided that such amount shall be equal to or greater than twenty (20%) percent of the Purchase Price. Except as expressly stated or modified herein to the contrary, the Judgment Note shall have a repayment term selected by the maker but not exceeding three (3) years. The Judgment Note shall bear interest on the unpaid principal balance at a per annum rate of interest equal to the National Commercial Rate of interest of Wilmington Trust Company, its successors and assigns, as in effect on the Closing Date, to be adjusted as it changes from time to time on the date of each such change, plus one percent (1%) per annum.

(b) On the Closing Date, as hereinafter defined, the Company or the purchasing Member or Members, as the case may be, shall deliver to the selling Member or his personal representative, as the case may be, the downpayment amount, by certified check or wire transfer of funds, plus the Company's or purchasing Member's or Members' Judgment Note issued to the order of the selling Member, or his personal representative. In determining the amount of the downpayment, any and all amounts owed to the Company by the selling Member, or the selling Member's personal representative, whether by failure to fully pay amounts required to be paid pursuant to the capital call provisions set forth in Section 3.1, or otherwise, shall be offset, on a dollar-for-dollar basis, against the Purchase Price and shall be deemed to constitute a downpayment with respect to the payment of the Purchase Price.

(c) If the Company or the remaining Members, as the case may be, is the beneficiary of any life insurance policies on the life of such selling Member (or the person who was the trustor of a Revocable Trust which is the selling Member) and prior to the time that the entire Purchase Price has been paid in full and the selling Member (or the Person who was the trustor of a Revocable Trust which is the selling Member) dies (or the death of an insured Member or the death of an insured Person who was the trustor of a Revocable Trust prompts such purchase pursuant to this Article VII), then, notwithstanding the payment terms otherwise herein established, an amount equal to the proceeds of any such policies, not to exceed the amount due to the selling Member, shall be paid to the personal representative of such deceased Member, or the trustee of the Revocable Trust of which such deceased Person was the trustor, whose Units are being purchased hereunder as either an additional downpayment or as a prepayment of the principal of the Judgment Note referenced in Section 7.7(a) of this Agreement. If the Company receives life insurance proceeds with respect to an individual Member or the trustor of such Revocable Trust whose Units were or are thereafter purchased hereunder in whole or in part by other Members rather than by the Company, each such purchasing Member shall have an obligation to prepay an amount to the personal representative of

35

such deceased Member, or the trustee of a Revocable Trust of such Member, with respect to the Units purchased by such purchasing Member or Members with such prepayment amount to be determined by multiplying the amount of the life insurance proceeds received by the Company by a fraction, the numerator of which is the number of Units owned by such purchasing Member and the denominator of which is all of the Units of the Company (excluding Units owned by the selling Member) outstanding on the date such proceeds are received. The Company and the remaining Members shall cause the distribution or contribution of such insurance proceeds to fulfill the purpose of this Section. Except in the case of a purchase under Section 7.5, in the event any life insurance proceeds received by the Company or a Member exceeds the amount due under the Judgment Note, such excess shall be retained by the Company or the Members, as the case may be. This provision does not include group life insurance policies of which the Company is not the beneficiary.

(d)    The Judgment Note referenced in subsection (a) shall be secured by the Company or remaining Members, as the case may be, pledging all of their Units in the Company that were transferred to them pursuant to this Agreement to the selling Member or to the selling Member's personal representative, as the case may be, pursuant to the terms of the Pledge Agreement(s) (as defined in the form of Judgment Note set forth in **Schedule 7.8** hereto) of said Company or remaining Members, as the case may be, of even date with the Judgment Note. If the Company is the obligor on the Judgment Note referenced in Section 7.8(a), then the Company's obligations under the Judgment Note shall be jointly and severally guaranteed by all of the Members other than the selling Member or to the selling Member's personal representative, as the case may be.

(e)    If the purchase of a Member's Units is pursuant to the exercise of an option as described in Section 7.2, then, at the option of the Company and/or the remaining Members, whoever has exercised the option, the payment terms shall be either identical to the terms set forth in the offer as described in the notice or as provided in the other subsections of this Section, as determined by the Company and/or the purchasing Member(s).

7.9    Closing Date. Closing on the purchase and sale of any Units purchased and sold under this Agreement shall be held at 1:00 P.M., local time, no later than ninety (90) days after the Valuation Date. Closing shall be held at the offices of Young Conaway Stargatt & Taylor, LLP in Wilmington, Delaware, or at any other mutually agreeable location. Time is of the essence in the performance of this Agreement.

7.10    Impairment Of Capital. (a) The Company shall not repurchase any Units at any time under this Article to the extent that the repurchase of such Units would directly or indirectly constitute, cause, or result in a violation of the act or any law, statute, rule, regulation, policy, guideline, order, writ, injunction, decree, or judgment promulgated by any federal, state, local, or foreign court or governmental authority applicable to the Company or its property or any note, bond, indenture, credit agreement, loan agreement, capital lease, or other agreement to which the Company is a party

(collectively, a "Violation"). In such circumstances, the Company shall be permitted to repurchase that number of Units available for sale that will not result in a Violation.

(b)    If the Company is unable to repurchase Units without a Violation occurring as contemplated by subsection (a) of this Section, then the Company shall purchase from Members desiring to sell their Units to the Company the maximum number of such Units that it is able to repurchase without a Violation occurring. If the Company is prevented from lawfully purchasing Units as contemplated by this Agreement because it does not have legally available funds sufficient to effect such repurchase under the Act, then the Company and the Members shall undertake reasonable steps necessary to enable the Company to make such a purchase, including, without limitation: (i) reorganizing the capital structure of the Company; (ii) causing the Manager of the Company to revalue assets; (iii) contributing funds to the capital of the Company; or (iv) lending funds to the Company on a subordinated basis if necessary or desirable.

7.11    Operating Rules.

(a)    The Member transferring or proposing to transfer Units, or whose Units are the subject of a transfer or proposed transfer, shall not have the right to vote upon whether the Company shall exercise its right under this Article VII to purchase such Units.

(b)    The right of the remaining Members, among themselves, to exercise any purchase arising under this Agreement shall be pro rata based on the number of Units held by each Member wishing to participate in the purchase immediately before the exercise of the option.

(c)    If an offer to sell is made pursuant to Article VII of this Agreement, the offer shall be deemed to have been refused unless accepted in writing within the time period specified.

7.12    Agreement to Purchase Only Part of Units. No provision of this Agreement shall preclude the parties from agreeing to the exercise of any option under Article VII of this Agreement for less than the total number of Units owned by the withdrawing Member. Likewise, the Member may agree with the Company that the Company may acquire less than all of the Member's Units and the remaining Members shall in that case have the option under Article VII of this Agreement to purchase the balance of the Member's Units.

7.13    Restrictions Apply to Subsequently Issued Units. All Company Units hereafter issued shall be subject to this Agreement and the certificates representing such Units shall have imprinted conspicuously thereon a notice indicating that the transferability of such Units is restricted by this Agreement.

7.14    Insurance. The Company (or the Members), as determined by the Manager, in his sole and absolute discretion, shall be obligated to purchase insurance on the lives of all of its individual Members, or any Person who is the trustor of a Revocable

37

Trust which is a Member, in order to carry out its (or their) rights and/or obligations under this Agreement, the face amount of each such policy to be determined by the Manager, in his sole and absolute discretion. If the Company purchases such insurance, it shall name itself as beneficiary of such insurance.

7.15    Waiver of Restrictions. At any time, and from time to time, the Members may, by written unanimous agreement, waive transfer restrictions imposed by this Agreement.

7.16    Recognition of Transfer by Company. No Transfer, or any part thereof, that is in violation of this Agreement shall be valid or effective, and neither the Company nor the Members shall recognize the same for the purpose of making distributions pursuant to this Agreement with respect to such Company Units or part thereof. Neither the Company nor the Members shall incur any liability as a result of refusing to make any such distributions to the transferee of any such invalid Transfer. If any Member or assignee Transfers or purports to Transfer (directly or indirectly, voluntarily or involuntarily, by operation of law (including without limitation by merger, consolidation, conversion, exchange, or similar transaction) or otherwise) his Units, in breach of this Agreement, such Member (or assignee) shall have no voting rights or management rights, including, without limitation, any right to vote on an amendment to this Agreement, the dissolution of the Company, the transfer or continuance of the Company, the conversion, exchange, merger, or consolidation of the Company, the sale of all or substantially all of the assets of the Company, or the domestication of the Company.

7.17    Creditors of Members and Transferees. To the fullest extent permitted by law, no creditor of any Member (including, without limitation, any judgment creditor who obtains a charging order with respect to such Member's Units under the Act) or transferee shall, except in accordance with this Agreement, be entitled to share in any profits or losses, receive any distribution or distributions, receive any allocation of income, gain, loss, deduction, or credit or similar item or acquire, possess, or exercise any right to participate in the management of the business and affairs of the Company to which such Member or transferee, as the case may be, was, is, or will be entitled under the Pennsylvania Act, this Agreement, or otherwise. No creditor who obtains any interest in or rights with respect to all or any portion of the Units of a Member or transferee shall be admitted as a Member of the Company, or have or acquire any rights of a Member (including, without limitation, any right to participate in the management of the business and affairs of the Company), unless and until such creditor is admitted as a Substitute Member in accordance with this Agreement.

## ARTICLE VIII

### DISSOLUTION AND TERMINATION OF THE COMPANY

8.1    Dissolution. The Company shall be dissolved and terminated upon the earliest to occur of any of the events set forth in Section 1.9 of this Agreement.

WP3:862187.4                                                        57164.1001

8.2    Liquidation. In the event of dissolution as provided in Section 8.1 above, and if there has been no determination to continue the Company as provided for in this Agreement, and following any sale of the Company's assets approved pursuant to Section 8.1, the assets of the Company shall be paid and distributed in the following order:

(a)    All of the Company's debts and liabilities to persons other than a Member, but excluding secured creditors whose obligations will be assumed or otherwise transferred upon the liquidation of Company assets, shall be paid and discharged and any reserve deemed necessary by the Manager for the payment of such debts shall be set aside;

(b)    All of the Company's debts and liabilities to any Member shall then be paid and discharged; and

(c)    The balance of the assets of the Company shall then be distributed to the Members in amounts equal to the Members' positive Capital Account balances.

Upon dissolution, each Member shall look solely to the assets of the Company for the return of his or her capital contribution and shall be entitled only to a cash distribution out of Company Property and assets in return thereof, unless otherwise determined by the Manager or the unanimous consent of the Members. If the Company Property remaining after the payment or discharge of priority debts and liabilities of the Company is insufficient to return the capital contribution of each Member, Members shall have no recourse against the Manager or other Members. No Member shall be required to restore a deficit Capital Account balance.

8.3    Distribution In Kind. If the Manager, the Members by unanimous consent, or any other Person or Persons acting as liquidator determines that a portion of the Company's assets should be distributed in kind to the Members, an independent appraisal (as selected by such liquidator) of the fair market value of each asset as of a date reasonably close to the date of liquidation shall be obtained. Any unrealized appreciation or depreciation with respect to an asset to be distributed in kind shall be allocated among the Members (in accordance with the provisions of Article IV, assuming that the assets were sold for the appraised value) and taken into consideration in determining the balance in the Members' Capital Accounts as of the date of final liquidation. Distribution of any such asset in kind to a Member shall be considered a distribution of an amount equal to the asset's fair market value for purposes of Article IV. The Manager or the Members, by unanimous consent, may make in kind distribution of different property to the various Members based upon the appraised value of such property.

8.4    Termination. Immediately upon the completion of the distribution of Company assets as provided in Section 8.2 and/or Section 8.3, the Company shall terminate.

## ARTICLE IX

## REMOVAL OF MANAGER

9.1    Removal Of Manager. Except as to any Member-Manager, the Members, by the unanimous vote, may remove (without cause) the Manager. Except as provided herein to the contrary, a Member-Manager may only be removed based upon disability or for gross negligence in the management of the affairs of the Company, as such disability or gross negligence is determined by the unanimous vote of the other Members based upon reasonable grounds. Written notice of such determination, setting forth the effective date, shall be served upon the Manager and as of such effective date shall terminate all of the rights and powers of such person. Notwithstanding anything herein to the contrary, Robert C. Mattern may not be removed by the Members, unless (a) he is proved, by clear and convincing evidence, to be subject to a Disability, as defined in Section 2.14, and the other Members shall carry the burden of proof, or (b) if he is not a Member or trustor of a Revocable Trust that is a Member at such time, then in accordance with the second sentence of this Section 9.1. The removal of the Manager shall not affect any of the removed person's rights and powers as a Member; provided however, that this provision shall not affect other grounds to remove a Member's rights or powers, as may be provided herein.

9.2    Termination of Executory Contracts With Manager Or Affiliate. Upon the death, dissolution, withdrawal, removal, insolvency, or Bankruptcy of any Manager, all executory contracts between the Company and the terminating Manager or any Affiliate thereof (unless such Affiliate is also an Affiliate of a successor Manager) may be terminated by the Company effective upon sixty (60) days' prior written notice of such termination to the party being terminated. The terminating Manager or any Affiliate (unless such Affiliate is also an Affiliate of a successor Manager) thereof may also terminate and cancel any such executory contract effective upon sixty (60) days' prior written notice of such termination and cancellation given to the other remaining Manager(s), if any, the new Manager, if any, or to the Company.

9.3    Reports After Removal. Within ninety (90) days after a vote to remove the Manager, the Company shall have prepared, at Company expense, unaudited financial statements (a balance sheet, statement of income or loss, statement of Members' equity, and statement of changes in financial position) prepared in accordance with generally accepted accounting principles by an independent certified public accounting firm, and the Company shall cause such statements to be mailed to each Member as soon as possible after receipt thereof.

## ARTICLE X

## MEETINGS AND VOTING RIGHTS

10.1    Notice Of Meetings. The Manager may call a meeting or a vote of the Members at any time, said meeting to be held at such location as determined by the

Manager, in the Manager's sole discretion. In addition, the Manager shall call for a
meeting and/or vote, and give written notice thereof, within ten (10) days following
receipt of written request therefor by any Member. The Manager shall mail, postage-
paid, first-class, written notice of any such meeting or vote to all Members of record as of
the date of the mailing and to the most recent addresses shown on the records of the
Company, and such notice shall include the purpose or requested purpose of such
meeting or vote. Any such meeting or vote shall be held not less than fifteen (15) but not
more than sixty (60) days following the mailing of the notice. All expenses of the
meeting or vote and of notice thereof shall be borne by the Company. The costs of
attending the meeting incurred by any Member shall be borne by the Member.

          10.2    One Vote Per Unit. A Member shall be entitled to cast one vote
for each Unit that he owns: (a) at a meeting, in person, by written proxy, or by a signed
writing directing the manner in which he desires that his vote be cast, which writing must
be received by the Manager prior to such meeting; or (b) without a meeting, by a signed
writing directing the manner in which he desires that his vote be cast, which writing must
be received by the Manager prior to the date upon which the votes of Members are to be
counted. Only the votes of Members of record as of the date of such meeting or vote
shall be counted. The laws of the Commonwealth of Pennsylvania pertaining to the
validity and use of corporate proxies shall govern the validity and use of proxies given by
the Members. Except as may be expressly stated to the contrary, the "majority vote of
the Members" and "two-thirds vote of the Members" and "unanimous vote of the
Members", or other similar language, shall mean the duly recorded vote or written
consent of more than fifty percent (50%) and the vote of at least sixty-six and two-third
percent (66 $^{2/3}$%) and all, as the case may be, of the Total Outstanding Units entitled to be
voted (a Member or person not entitled to vote includes, without limitation, an interested
Member-Manager under the second sentence of Section 9.1), and reference to "consent
of" the Members, or other similar language (e.g., selected by, determination of, approval
of, designated by, changed by, plus decisions the Members "shall" or "may" make) shall
mean action by duly recorded vote or written consent of the Units entitled to vote as a
Member. Except as may be expressly stated to the contrary, the majority vote of the
Members shall be sufficient for and shall determine any required action or consent of the
Members. This Section is specifically intended to change any "per capita" voting rights
under the Act, and to require management and voting based upon the Members'
percentage ownership of the Units in the Company.

          10.3    Consents. Any action that may be taken by Members at a meeting
may be taken without a meeting if a consent in writing, setting forth the action so taken,
is signed by holders of Units having not less than the minimum interests that would be
necessary to authorize or take that action at a meeting. Any such consent may be signed
in counterpart.

## ARTICLE XI

## COMPANY EXPENSES

11.1    General. Except as otherwise provided herein, the Company shall reimburse the Manager or Members only for Company expenses reasonably incurred and as may be permitted under this Agreement. The Manager may be reimbursed for the actual cost to the Manager or such person's Affiliates of goods, materials, and services performed by unaffiliated parties. Any Manager that is not a Member shall be entitled to reasonable compensation for his or her services, in the reasonable discretion of the Manager.

11.2    Direct Payment Of Company Expenses. All of the Company expenses shall be billed directly to and be paid by the Company. In the event that a Member advances funds to the Company or directly pays proper expenses of the Company, he or she shall be fully reimbursed by the Company.

11.3    Payment Of Expenses Of The Company. Subject to the prior written consent of the Manager, the Company will pay the following expenses of the Company:

(a)    Expenses of Company operations, that may include, but are not limited to: (1) all costs, including employee benefits, of personnel employed by the Company and directly involved in the business of the Company, including persons who may also be employees of a Member or an Affiliate thereof; (2) all operational costs of Company Property, including rent, taxes, fuel, storage, licenses, permits, supplies, insurance, advertising, travel, transportation, and promotional expenses, cost of maintenance and repair, mortgage payments, and all costs of borrowed money, taxes, and assessments on Company Property and other taxes applicable to the Company; (3) legal, accounting, audit, brokerage, and other fees; (4) fees and expenses paid to independent contractors, mortgage bankers, brokers, and servicers, leasing agents, consultants, on site managers, real estate brokers, insurance brokers, and other agents; (5) tuition, course, and seminar registration fees, and any and all other costs of education, incurred by the Manager, any Member, or any employee of the Company, including, without limitation, travel and other costs related to such education, to the extent that the Manager determines that such education shall be of benefit to the Company; (6) expenses in connection with the acquisition and disposition of Company Property; and (7) expenses in connection with the disposition, replacement, alteration, repair, remodeling, refurbishment, leasing, and operation of Company Property; and (8) all costs and fees of the Manager or an Affiliate of the Manager, in connection with the management of the Company

(b)    Expenses of Company administration, including all accounting, documentation, professional, and reporting expenses of the Company, that may include, without limitation: (1) preparation and documentation of Company bookkeeping, accounting, and audits; (2) preparation and documentation of budgets, economic surveys, cash flow projections, and working capital requirements;

42

(3) preparation and documentation of Company state, federal, and local tax returns; (4) printing, engraving, and other expenses and taxes incurred in connection with the issuance, distribution, transfer, registration, and recording of documents evidencing ownership of interests in the Company; (5) expenses of insurance as required in connection with the business of the Company; (6) expenses in connection with Distributions made by the Company to, and communications, bookkeeping, and clerical work necessary in maintaining relations with, Members, including the cost of printing and mailing reports of the Company, preparation of proxy statements and solicitations of proxies in connection therewith, and holding meetings of Members, including travel, transportation, lodging, and meal expenses incurred in connection with such meetings; (7) expenses in connection with preparing and mailing reports required to be furnished to Members for investor, tax reporting, or other purposes and expenses associated with furnishing reports to Members that the Manager deems to be in the best interests of the Company; (8) expenses of revising, amending, converting, modifying, or terminating the Company; (9) costs incurred in connection with any litigation in which the Company is involved as well as with any dealings or litigation with any regulatory agency, including legal and accounting fees incurred in connection therewith; (10) costs of any computer equipment or services used for or by the Company; (11) costs of any accounting, statistical, or bookkeeping equipment necessary for the maintenance of the books and records of the Company; (12) the costs of preparation and dissemination of informational material and documentation relating to the potential sale, refinancing, or other disposition of Company Property; (13) supervision and expenses of professionals employed by the Company in connection with any of the foregoing, including attorneys, accountants, and appraisers; and (14) other Company administration expenses.

(c)    Other expenses necessary or advisable for the operation of the business of the Company.

11.4    Limitation on Liability of Members.  All debts and obligations of the Company shall solely be debts and obligations of the Company, and no Member shall be personally liable for the debts and obligations of the Company, unless otherwise obligated by any installment of guaranty executed in favor of any third party, including, without limitation, any guaranty made pursuant to Section 3.1 of this Agreement.

## ARTICLE XII

## AMENDMENTS OF COMPANY DOCUMENTS

12.1    Amendments.  Except as otherwise provided in this Agreement, this Agreement may be amended only by the Manager, with the unanimous vote of the Members.

## ARTICLE XIII

## BORROWINGS

13.1    Loans By Members To The Company. Any Member may, at such Member's sole option and in such Member's discretion, advance monies to the Company for use in its operations, but only on such terms as agreed to by the Manager. The aggregate amount of such advances shall be an obligation of the Company to such Member and shall be repaid to such Member in accordance with the terms of the advances on the date such loan is made out of Company funds. Interest or advances shall accrue at the National Commercial Rate of interest of Wilmington Trust Company, its successors and assigns, as in effect on the date such loan is made, and as it changes from time to time on the date of each such change, plus one (1) percentage point, or at the highest rate permitted by the applicable usury law, whichever is less. Advances shall be deemed a loan by a Member to the Company and shall not be deemed a capital contribution, and any and all unpaid advances, together with accrued and unpaid interest, shall become immediately due and payable out of the first cash available to the Company after the Company has reserved sufficient funds to meet its obligations as they become due.

13.2    Advances Related to a Loan. Before or after the occurrence of any actual or threatened "Event of Default" as such term is used in any Company loan documents, any Member shall have the right, but not the obligation, to advance funds to the Company as may be necessary under the circumstances to avert or cure such Event of Default, as the case may be, or to satisfy all or part of the Company's obligations under the loan documents then due and owing (including, if such Event of Default gives rise to the acceleration of a loan, for payment of the outstanding principal amount of the loan, together with all accrued interest thereon and other costs then due and owing in connection therewith). The right of each Member to make advances pursuant to this Section shall be ratable in accordance with the percentage of the Total Outstanding Units, provided, however, that in the event any Member elects not to advance its ratable share of such funds, the remaining Members shall have the right, but not the obligation, to advance additional funds to cover any shortfall, which additional fund advances shall be made pro rata among the advancing Members determined on the basis of their percentage of the Total Outstanding Units, without giving effect to the Unit(s) of the non-advancing Member(s).

## ARTICLE XIV

## REPRESENTATIONS AND WARRANTIES AND INDEMNIFICATION OF THE MANAGER

14.1    Manager. The Manager warrants and represents to the Members that at all times throughout the term of this Agreement he will use his best efforts, acting as a fiduciary on behalf of the Members, to: (i) perform or cause to be performed his obligations under this Agreement and all other agreements and documents executed in furtherance of or in connection with this Agreement; and (ii) will do or cause to be done

all things necessary or proper within his power or control to protect the rights of Members.

   14.2 <u>Indemnification Of The Manager</u>. The Company agrees to indemnify, hold harmless, and defend the Manager and his heirs, executors, administrators, successors, and assigns against any and all loss, damage, liability, or expense arising directly from or as a result of the Manager's acts (or failure to act) other than those found to be resulting from gross negligence, gross misconduct, breach of fiduciary duty, or breach of a material term, representation, condition, or covenant of this Agreement. To the fullest extent permitted by applicable law, expenses (including legal fees) incurred by a Manager in defending any claim, demand, action, suit or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Manager to repay such amount if it shall be determined that the Manager is entitled to be indemnified as authorized in this Section.

**ARTICLE XV**

**MISCELLANEOUS PROVISIONS**

   15.1 <u>Notices</u>.

   (a) Any written notice, offer, demand, or communication required or permitted to be given by any provision of this Agreement shall be deemed to have been given if personally delivered or mailed by certified mail, return receipt requested, or sent by overnight delivery, telex, telegram, or facsimile transmission to such Member's address as set forth on **Schedule 15.1** attached hereto, as updated from time to time by the Manager upon request by the Members.

   (b) Notices delivered personally or by overnight delivery shall be effective upon delivery. Notices properly addressed and delivered by certified mail, return receipt requested, shall be effective upon deposit with the United States Postal Service. Notices sent by telex, telecopier, or facsimile transmission shall be effective upon confirmation of transmission.

   (c) Any Member may change his address for purposes of this Agreement by giving written notice of such change to the other Members in the manner hereinbefore provided for the giving of notice.

   15.2 <u>Article And Section Headings</u>. The article and section headings in the Agreement are inserted for convenience and identification only and do not define or limit the scope, extent, or intent of this Agreement or any of the provisions hereof.

   15.3 <u>Construction</u>. As appropriate in context, whenever the singular number is used herein, the same shall include the plural, and the neuter, masculine, and feminine genders shall include each other. If any language is stricken or deleted from

45

this Agreement, such language shall be deemed never to have appeared herein and no other implication shall be drawn therefrom.

15.4    Severability. If any covenant, condition, term, or provision of this Agreement is found to be illegal, or if the application thereof to any person or any circumstance shall to any extent be judicially determined to be invalid or unenforceable, the remainder of this Agreement, or the application of such covenant, condition, term, or provision to persons or circumstances other than those to which it is held invalid or unenforceable, shall not be affected thereby, and each covenant, condition, term, and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

15.5    Governing Law. This Agreement has been executed in and shall be construed and enforced in accordance with, and governed by, the laws of the Commonwealth of Pennsylvania.

15.6    Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same Agreement.

15.7    Entire Agreement. This Agreement together with its Schedules constitutes the entire agreement of the parties. This Agreement cannot be changed, modified, or discharged orally but only by an agreement in writing. There are no representations, warranties, or agreements other than those set forth in this Agreement.

15.8    Further Assurances. The Members and any subsequently admitted Member will execute and deliver such further instruments and do such further acts as may be required to carry out the intent and purposes of this Agreement.

15.9    Successors And Assigns. Subject to the limitations on transferability contained herein, this Agreement shall be binding upon, and shall inure to the benefit of, the heirs, administrators, personal representatives, successors, and assigns of the respective parties hereto.

15.10   Creditors. None of the provisions of this Agreement shall be construed for the benefit of or enforceable by any of the creditors of the Company or the creditors of any Member.

15.11   Schedules. The Schedules referenced in this Agreement are a part of this Agreement as if set forth fully herein. All references to this Agreement shall be deemed to include the Schedules, unless the context requires otherwise.

15.12   Remedies. The rights and remedies of a Member hereunder shall not be mutually exclusive and the exercise by any Member of any right to which such Member is entitled shall not preclude the exercise of any other right possessed by such Member.

15.13  Jurisdiction; Expedited Proceedings Election; Specific
Performance.

(a)     Each Member and Manager hereby consents to the
jurisdiction of the courts of the Commonwealth of Pennsylvania as to all matters relating
to the enforcement, interpretation, or validity of this Agreement, and if such Member or
Manager is a non-resident of the Commonwealth of Pennsylvania, appoints the Secretary
of State of the Commonwealth of Pennsylvania as such Member's agent for service of
process.

(b)     It is agreed that each Member and Manager (or his
representative) shall be entitled to injunctive relief to prevent breaches of this Agreement
and to specifically enforce the terms and provisions hereof in addition to any other
remedy to which he or it may be entitled pursuant to this Agreement or at law or in
equity.

15.14  No Presumption Against the Drafter.  Each Member participated in
the drafting of this Agreement or had the opportunity to request modifications to this
Agreement upon becoming a Member, in the case of subsequently admitted Members,
and the interpretation of any ambiguity contained in the Agreement will not be affected
by the claim that a particular party drafted any provision hereof.

15.15  Agreement Drafted by Company's Attorney.  The Members each
acknowledge that the Company's and Robert C. Mattern's counsel, Young Conaway
Stargatt & Taylor, LLP, prepared this Agreement on behalf of and in the course of his
representation of the Company and Robert C. Mattern, and that prior to the execution of
this Agreement:

(a)     Each Member has been advised that a conflict of interest
may exist between a Member's individual interests and those of the Company, the
Manager, and other Members;

(b)     Each Member has been advised by the Company's and
Robert C. Mattern's counsel that this Agreement has tax consequences;

(c)     Each Member has had the opportunity to seek the advice of
independent counsel with regard to the execution of this Agreement; and

WP3:862187.4                                                              57164.1001

(d)    The Company, the Manager, and each Member waives any
conflict-of-interest resulting from Young Conaway Stargatt & Taylor, LLP's
representation of the Company and Robert C. Mattern, and consents to its representation
of the Company and Robert C. Mattern.


         IN WITNESS WHEREOF, the parties hereto have executed this
Agreement under seal effective as of date first above-written.

**WITNESS:**                    **COMPANY: MATTERN & ASSOCIATES, LLC**

                                By:_____(SEAL)
                                     ROBERT C. MATTERN, Manager

**WITNESS:**                    **MANAGER:**

                                _____(SEAL)
                                     ROBERT C. MATTERN

**WITNESS:**                    **MEMBERS:**

                                _____(SEAL)
                                     ROBERT C. MATTERN

                                _____(SEAL)
                                     JOHN SEIDEL

48

## SCHEDULE 3.1

## MATTERN & ASSOCIATES, LLC

### PROPERTY CONTRIBUTED TO COMPANY & UNITS

| MEMBER | PROPERTY | UNITS |
|---|---|---|
| ROBERT C. MATTERN | 100% of Attached Balance Sheet | 97 |
| JOHN SEIDEL | To be issued by the Company as compensation, subject to a total risk of forfeiture, a portion of which restriction will lapse on February 1, 2004 | 3 |

49

## SCHEDULE 4.7(b)

## MATTERN & ASSOCIATES, LLC

### SEIDEL GUARANTEED PAYMENT

The Seidel Guaranteed Payment under Section 4.7(b) of the Agreement to John Seidel for rendering services on a full-time basis to the Company shall be comprised of two portions, the "Base Seidel Guaranteed Payment," as described in paragraph 1 below, and the "Commissionable Seidel Guaranteed Payment," as described in paragraph 2 below.

1.    The Company shall pay to John Seidel, as the "Base Seidel Guaranteed Payment," $3,000.00 per month, payable monthly in accordance with the normal practices and procedures of the Company as the Company may from time to time establish.

2.    The Company shall pay to John Seidel, as the "Seidel Commissionable Guaranteed Payment," commissions based on the following schedule:

> Class A – 18%
> Class B – 10%
> Class C – 5%

The composition of each of the aforementioned classes shall be determined by the Manager. The Company shall pay to John Seidel, on a monthly basis, $7,000.00 (the "Draw"), as a draw against the Seidel Commissionable Guaranteed Payment. In the last pay period during each calendar year, commencing with the period from July 1, 2003 through December 31, 2003, the Seidel Commissionable Guaranteed Payment which is payable to John Seidel shall be adjusted to reflect the Seidel Commissionable Guaranteed Payment calculations set forth above in the first sentence of this numbered paragraph 2. The adjustment shall be equal to the difference between the cumulative Draws for such calendar year and the Seidel Commissionable Guaranteed Payment amount for such calendar year such that if the Seidel Commissionable Guaranteed Payment amount exceeds the Draws for such calendar year, then John Seidel shall receive that additional amount, and if the Seidel Commissionable Guaranteed Payment amount is less than the Draws for such calendar year, the Company shall reduce the aggregate Draws to be paid in the current and subsequent pay periods by the amount of such cumulative deficiency. For purposes of the calendar year ending December 31, 2003, the term "such calendar year" refers to the period from July 1, 2003 through December 31, 2003.

WP3:862187.4                                                          57164.1001

## SCHEDULE 5.9(b)

## MATTERN & ASSOCIATES, LLC

## DEVELOPMENTS EXCLUDED FROM THIS AGREEMENT

## SCHEDULE 7.1

## SPOUSAL CONSENT

I acknowledge that I have read the foregoing limited liability company agreement of MATTERN & ASSOCIATES, LLC (respectively, the "Agreement" and the "Company") and that I know and understand its contents. I am aware that by the provisions of the Agreement, my spouse agrees to hold his Units subject to certain restrictions and to sell the Units, including any marital or community property rights that I may be deemed to have acquired in them, upon the happening of certain events. In exchange for the sum of $10.00 and other good and valuable consideration, receipt of which is hereby acknowledged, I hereby approve of the provisions of such Agreement and consent to such sale; I agree in the event of any property distribution pursuant to a separation, divorce, or other dissolution of my marriage, that the value of the Units for purposes of determining the relative economic circumstances of my spouse and myself shall be the value of the Units as determined under the foregoing Agreement; and I further agree that the enforcement, interpretation, and validity of this Agreement shall be governed by Pennsylvania law.

IN WITNESS WHEREOF, I hereunto set my Hand and Seal.

WITNESS:

_____

Date: 6 - 15 - 04

_____ (SEAL)
DOROTHY S. MATTERN

WP3:862187.4                                                                   57164.1001

**SCHEDULE 7.7**

**MATTERN & ASSOCIATES, LLC**

**DETERMINATION OF PURCHASE PRICE**

This is Schedule 7.7 to the Limited Liability Company Agreement of MATTERN & ASSOCIATES, LLC (the "Agreement"), made effective as of July 1, 2003, by and among the Company and its Members.

1.      Except as provided in Section 2, Section 3 or Section 4 of this Schedule, the value of the Company's Units shall be the greater of the proceeds of calculated in the following manner, which manner sets forth the method most likely to produce a valuation equal to the fair market value of the Company's Units:

(a)     The Members contemplate that the value of the Company's Units may be stated and/or restated by agreement of the Members. Any such agreed upon stated or restated value shall be set forth in an addendum to this Schedule signed by all Members.

(b)     If the parties have not stated or restated the value of the Units of the Company within twelve (12) months of the Valuation Date, then the value of the Units shall be determined in the following manner. The independent accountant then employed by the Company (or if there is none, then such independent accountant as is selected by the Manager of the Company for this purpose) shall prepare a balance sheet as of the end of the month preceding the Valuation Date. From such balance sheet, prepared from the books after correction of errors and based on the method of accounting applied on a basis consistently followed, there shall be determined the unadjusted net book value of the Company. Such unadjusted net book value shall be then adjusted as follows:

(1)     All real property and tangible personal property having a value in excess of $10,000 (the "property") owned by the Company, if any, shall be restated on the balance sheet to reflect fair market value as of the balance sheet date. If the interested parties cannot agree with respect to such fair market value, the determination of fair market value shall be made by appraisers, one of whom shall be selected and paid by the selling Member or, if deceased, his personal representative, the second of whom shall be selected and paid by the Company or the purchasing Member(s) (if the Company is not the purchaser), and the third of whom shall be selected by the other two appraisers. If the three appraisers thus selected cannot agree with respect to any item of property subject to valuation, the average of the three determinations shall be used. The cost of the third appraiser shall be paid one-half by the selling Member or, if deceased, his personal representative, and one-half by the Company or the purchasing Member(s) (if the Company is not the Purchaser). The interested parties may agree to select one appraiser and may agree that the determination of the fair market value of the

53

WP3:862187.4                                                        57164.1001

property shall be binding and conclusive on all parties, in which case the cost of such single appraiser shall be paid one-half by the selling Member, or if deceased, his personal representative, and one-half shall be paid by the Company or the purchasing Member(s) (if the Company is not the purchaser).

(2)    All securities (i.e., stocks and bonds) owned by the Company, if any, shall be revalued as follows:

(i)    If traded, on a national exchange, at the closing price thereof on the last market day preceding the balance sheet date;

(ii)    If traded over the counter, at the average bid price thereof on the last market day preceding the balance sheet as reported in the National Daily Quotation Service or other similar service; and

(iii)    If such security is neither traded on a national security exchange nor over the counter, at book net worth, as shown on the most recent financial statement of the organization issuing the security.

(3)    For purposes of this provision, any amount for goodwill, customer lists, and covenants-not-to-compete included in the unadjusted net book value shall be restated on the balance sheet as follows: one times trailing revenues for the 12 month period ending on the last day the month prior to the Valuation Date.

(4)    If the event requiring valuation is the death of a Member, or the death of the trustor of a Revocable Trust which is a Member, there shall be excluded from the adjusted net book value of the Company any difference in amount between the cash surrender value of any insurance policies held by the Company on the life of the deceased Member or on the life of the trustor of a Revocable Trust which is a Member, as the case may be, and the proceeds realized by the Company therefrom.

(5)    The unadjusted net book value of the Company shall be increased or decreased by any difference between the unadjusted net book value of the Company on the Valuation Date and the unadjusted net book value of the Company on the Closing Date.

(6)    Any declared but unpaid distributions shall be a subtraction in determining adjusted net book value if not already treated as subtraction in calculating adjusted net book value.

(7)    The total value of the Company calculated in accordance with the provisions of paragraphs (1) through (6) above shall be multiplied by the percentage of the then issued and outstanding Units of the Company represented by the Units to be valued to determine the value of such Units.

2.    If the purchase of a Member's Units is pursuant to the exercise of an option as described in Section 7.2 of the Agreement, then, at the option of the

54

Company and/or the remaining Members, whoever has exercised the option, the value of the Units shall be either identical to the bona fide offer price for such Units as described in the notice or as provided in Section 1 of this Schedule (subject to such modifications as may exist in the Agreement).

3.     If the purchase of a Member's Units is pursuant to Section 7.5 of this Agreement, then the value of the Units shall be the greater of (a) the amount of proceeds of life insurance payable on account of the death of the deceased Member to the Company and the remaining Members, or (b) the value determined under Section 1 of this Schedule.

4.     If the purchase of a Member's Units is pursuant to the exercise of an option as described in Section 7.6 of the Agreement, the parties agree that the value of the Units, as determined hereinabove (either in Section 1(a) or Section 1(b)) shall be reduced by fifty percent (50%).

5.     All costs and fees of the independent accountant performing the valuation referenced in Section 1(b) of this Schedule shall be paid by the Company.

## [SIGNATURE PAGE FOLLOWS]

WP3:862187.4                              57164.1001

This Schedule 7.7 is made effective by the individual parties hereto and on behalf of the Company as of July 1, 2003.

**WITNESS:**

**COMPANY: MATTERN & ASSOCIATES, LLC**

By:_____(SEAL)
ROBERT C. MATTERN, Manager

**WITNESS:**

**MANAGER:**

_____(SEAL)
ROBERT C. MATTERN

**WITNESS:**

**MEMBERS:**

_____(SEAL)
ROBERT C. MATTERN

_____(SEAL)
JOHN SEIDEL

56

## SCHEDULE 7.8

## MATTERN & ASSOCIATES, LLC

### JUDGMENT NOTE

DATE:_____

_____ , a _____(limited liability company or resident)
with a mailing address of _____(hereinafter called
"Maker"), promises to pay to the order of _____(hereinafter
called "Payee"), his heirs, executors, administrators, and assigns, at
_____, or such other place as Payee may
designate, the principal sum of _____
_____ ($_____ ) legal tender of the United
States as follows:

      (a)    <u>Interest Rate</u>

            (i)    Interest shall be calculated on the basis of a year of three
hundred sixty-five (365) days and charged for the actual number of days elapsed. The
interest portion of monthly installments is for interest accrued to and including the end of
such installment.

            (ii)    Interest on principal sums owing hereunder shall be
payable from the date hereof at a rate equal to the National Commercial Rate of interest
of Wilmington Trust Company, its successors and assigns, as it changes from time to
time on the date of each such change, plus one percent (1%) per annum.

      (b)    <u>Payment Schedule</u>

            (i)    Principal and interest shall be paid in _____ (___)
consecutive equal monthly installments of principal and interest based on a ____ (_) year
amortization. The first monthly installment of principal and interest shall commence on
_____ and subsequent monthly installments shall continue
on the same day of each successive calendar month thereafter; provided, however, that if
not sooner paid, the entire unpaid principal balance of this Note, together with interest
accrued, but unpaid, thereon and other sums, if any, shall be due and payable in full on
_____, subject to acceleration upon the occurrence of an Event of Default, as
defined herein, that is not cured within any applicable cure period, as defined herein, or in
the LLC Agreement, as hereinafter defined, or in the Pledge Agreement, as hereinafter
defined. Each such monthly installment shall be applied first to the payment of interest
accrued and the balance of such installment shall be applied to the reduction of the
principal debt.

(ii)     If the date of execution of this Note is other than the first day of a calendar month, then Maker shall remain liable, on the above said date of commencement of monthly installments, for said payment of principal and interest, interest being charged for the actual number of days elapsed.

(iii)    At any time and from time to time, Maker shall have the privilege to prepay the principal  balance hereunder, in whole or in part, together with accrued and unpaid interest, on any scheduled payment date.

(c)     <u>Security</u>.  The obligations of Maker under this Note shall be secured by a pledge of all of the Units of Maker that Payee (redeemed)(purchased) and received pursuant to the (redemption)(purchase) of Units in accordance with the provisions of that certain Limited Liability Company Agreement of MATTERN & ASSOCIATES, LLC, effective as of July 1, 2003 (the "LLC Agreement"), which pledge shall be evidenced by that certain Pledge Agreement, of even date herewith (hereinafter referred to as the "Pledge Agreement").

(d)     <u>Warranties by Maker</u>.  Maker warrants and represents that this Note is lawfully executed and delivered.  Maker further covenants and agrees that until payment of all sums due under this Note, Maker:

A1.     Will promptly and faithfully observe and perform all the terms, covenants, and provisions contained herein and in the LLC Agreement and in the Pledge Agreement. All of such terms, covenants, and provisions of each of the aforesaid instruments and agreements are incorporated herein by this reference and are hereby made a part of this Note to the same extent and with the same force and effect as if fully set forth herein.

A2.     Shall within five (5) days after request in person or within ten (10) days after request by mail, furnish a written statement or declaration, duly acknowledged, of the amount due on this Note and whether any offsets or defenses exist thereto.

AND the occurrence of any of the following events shall constitute a default hereunder (hereinafter, collectively, referred to as "Events of Default" and, individually, as "Event of Default"):

B1.     Failure of Maker to pay when due any payment of interest or principal as provided in this Note or the failure to pay when due any other sums required to be paid herein, or, as the case may be, pursuant to the LLC Agreement or the Pledge Agreement;

B2.     Any proceeding under the Bankruptcy Code or any law of the United States of America or of any state or commonwealth relating to insolvency, receivership, reorganization, or debt adjustment is instituted by Maker or such proceeding is instituted against Maker and is consented to by Maker or remains undismissed for sixty (60) days; or if there is an Order for Relief entered against Maker; or if a trustee or receiver is appointed for any substantial part of the property of Maker or a custodian, as that term is defined under section 101(11) of the Bankruptcy Code, is appointed to take charge of all or less than all of the property of Maker; or Maker makes an assignment for the benefit of

creditors, or becomes insolvent (as defined in the Uniform Commercial Code as adopted in the Commonwealth of Pennsylvania); or if a nonconsensual lien is obtained upon property of Maker and is not dismissed within thirty (30) days, but only if such lien, together with all other liens against the property of Maker exceeds One Thousand Dollars ($1,000.00). Notwithstanding the foregoing, Maker shall have the right to post a bond to contest a lien in the amount thereof, and in such a case the placing of such lien upon the property shall not constitute an Event of Default hereunder;

B3. Any written statement, certification, report, representation, or warranty made or furnished by or on behalf of Maker in connection with the making of the loan evidenced by this Note and/or in compliance with the provisions hereof, the LLC Agreement, or the Pledge Agreement shall prove to have been false or erroneous in any material respect and such false or erroneous representation shall result in losses or damages to Payee;

B4. Failure of Maker to observe and perform any of the other terms, covenants, and conditions of this Note or of the LLC Agreement or the Pledge Agreement; and

B5. Any default under the Pledge Agreement.

Notwithstanding the terms of Paragraph B to the contrary, it shall not be an Event of Default with respect to a monetary default under Paragraph B1 (but not as to any other paragraphs hereunder) unless such monetary default continues for fifteen (15) days after the due date of any such payment required hereunder and with respect to curable nonmonetary default(s) under Paragraph B4 (but not as to any other paragraphs hereunder) unless and until Payee shall send written notice of default to Maker, and Maker fails to remedy all such curable nonmonetary default(s) within thirty (30) days after the notice of default is sent by Payee. If the nature of the curable nonmonetary default(s) is such that it cannot be cured within said thirty (30) days, Maker shall not be in default if Maker initiates within said period such remedy as Payee reasonably deems necessary to cure any such breach and continuously, expeditiously, and with due diligence processes such remedy to completion.

UPON the occurrence of an Event of Default, at the option of Payee, the whole unpaid principal sum and all accrued and unpaid interest thereon, and all other sums payable under this Note, under the LLC Agreement, or the Pledge Agreement, if any, shall become due and payable immediately, and Payee may, forthwith and without demand, exercise or cause to be exercised the rights and remedies as may herein be provided and the rights or remedies provided in the LLC Agreement or the Pledge Agreement, and which may be available to Payee by law, without further stay, any law, usage, or custom to the contrary notwithstanding.

MAKER does hereby authorize and empower the Prothonotary, Clerk of Court, or any attorney of any court of record of the Commonwealth of Pennsylvania, or elsewhere, upon the occurrence of an Event of Default, to appear for and confess judgment against the Maker and in favor of Payee, his heirs, executors, administrators, and assigns, as of

any term, past, present, or future, with or without declaration, for the principal sum evidenced by this Note with interest as herein provided and all other sums as may be due by the terms hereof, together with the costs of suit and reasonable attorneys' fees, with release of all errors, and on which judgment Payee may, on failure of said Maker to comply with any of the covenants, terms, provisions, and conditions of this Note, issue or cause to be issued an execution or executions, waiving appraisement as to any property levied upon by virtue of any such execution, waiving all exemption from levy and sale of a property which now or hereafter is exempt under any Act of Assembly. No single exercise of this warrant and power to confess judgment shall be deemed to exhaust this power, whether or not any such exercise shall be held by any court to be invalid, voidable, or void, but this power shall continue as diminished and may be exercised from time to time as often as Payee shall elect until this Note and all sums due hereunder shall be paid in full, and Maker has performed all of the other provisions hereunder.

MAKER further covenants and agrees as follows:

C1.    All rights and remedies hereby granted or otherwise available to Payee in the LLC Agreement or the Pledge Agreement or at law or in equity (including the warrants of attorney contained herein or therein) shall be cumulative and concurrent and may be pursued singly, successively, or together, at Payee's sole option, and may be exercised from time to time and as often as occasion therefor shall occur until the indebtedness hereby evidenced, with all interest thereon, and costs relating thereto, is paid in full; and the failure to exercise any such right or remedy shall in no event be construed as a waiver or release of same by Payee. Payee may resort to any security he holds in such order and manner as Payee sees fit.

C2.    If at any time Payee shall deem or shall be advised that any further instruments, documents, acts, or things are necessary or desirable to vest or confirm any right or remedy specifically granted herein, Maker will execute, acknowledge when appropriate, and deliver any such instrument or document and do or cause to be done any act or thing reasonably deemed necessary or desirable by Payee for any such purpose.

C3.    If Payee shall refer this Note, the LLC Agreement, or the Pledge Agreement to counsel because of any default hereunder or thereunder, then Maker shall reimburse Payee for all reasonable attorneys' fees and costs incurred, and, if at any time judgment be entered under this Note or foreclosure proceedings be commenced upon the LLC Agreement or the Pledge Agreement, then, all reasonable attorneys' fees incurred by Payee shall be payable by Maker and shall be computed upon and be recovered in addition to all principal, interest, and other recoverable sums then due, in addition to costs of suit.

C4.    If Maker fails to keep, observe, and perform any of the terms, covenants, and conditions contained herein, or in the LLC Agreement or the Pledge Agreement, Payee may, in Payee's discretion and without any obligation or duty to do so, and without waiving any default, perform any of such terms, covenants, or conditions, in part or in whole, and any sums advanced or expended by Payee toward the fulfillment of such terms, covenants, and conditions shall be due on demand and become a part of and added

to the indebtedness due under this Note and secured by the Pledge Agreement, with interest thereon at a rate equal to the National Commercial Rate of interest of Wilmington Trust Company, its successors and assigns, as it changes from time to time on the date of each such change, plus four percent (4%) (the "Excess Rate"), from the date of the respective advance or expenditure. From and after the maturity of the obligations evidenced hereby, as well as from and after the occurrence of an Event of Default, until final payment of all sums evidenced hereby, interest payable hereunder on the outstanding principal balance and all other sums due hereunder, or under the LLC Agreement or the Pledge Agreement, shall bear interest at the Excess Rate. The Excess Rate shall apply to all sums evidenced hereby after an Event of Default and also after entry of a judgment or judgments against Maker, whether or not any event described in Paragraph B2 hereof has occurred. Said judgment(s) shall bear interest at the Excess Rate until it is satisfied in full.

C5.     All demands and notices required or permitted to be given under this Note shall be in writing and shall be deemed to have been given if personally delivered or mailed by certified mail, return receipt requested, addressed to the parties at the addresses set forth hereinabove, or to such other address as may hereafter be designated, in writing, by either party to the other, and the date of the notice shall be the date of the mailing.

C6.     To the extent permitted by law, Maker hereby waives and releases all errors, defects, and imperfections in any proceedings instituted by Payee under the terms of this Note, as well as all benefits that might accrue to Maker by virtue of any present or future laws exempting any property, real or personal, or any part of the proceeds arising from any sale of any such property, from attachment, levy, or sale under execution, or providing for any stay of execution, exemption from civil process, or extension of time for payment, as well as the right of appraisement on any real estate that may be levied upon under a judgment obtained by virtue hereof, and Maker voluntarily condemns the same and authorizes the entry of such voluntary condemnation on any writ of execution issued thereon, and agrees that such real estate may be sold upon any such writ in whole or in any order desired by Payee.

C7.     Except as otherwise provided herein, Maker waives presentment for payment, protest, and demand, notice of protest, demand, and dishonor, and nonpayment of this Note, and all other notices in connection with the delivery, acceptance, performance, default, or enforcement of the payment of this Note, and agrees that its liability shall be unconditional, without regard to any extension of time, renewal, waiver, or modification granted or consented to by Payee. No extension of the time for the payment of this Note or any installment hereof made by agreement with any person or entity now or hereafter liable for the payment of this Note shall operate to release, discharge, modify, change, or affect the original liability under this Note, either in whole or in part, of any person or entity not a party to such agreement. Payee shall not be deemed, by any act of omission or commission, to have waived any of Payee's rights or remedies hereunder unless such waiver is in writing and signed by Payee, and then only to the extent specifically set forth in the writing. A waiver of one event shall not be construed as continuing or as a bar to or waiver of any right or remedy to a subsequent event.

57164.1001

C8.    The use of the words "Maker" or "Payee" shall be deemed to include the heirs, executors, administrators, personal representatives, successors, and assigns of the party or parties; the use of any gender shall include all genders; the singular number shall include the plural, or the plural, the singular, as the context may require; and if there shall be more than one Maker or party constituting Maker, the obligation of each shall be joint and several.

C9.    Words importing a particular gender mean and include every other gender, and words importing the singular number mean and include the plural number and vice-versa.

IN WITNESS WHEREOF, Makers has executed this Note, under seal, this _____ day of _____, 20___.

**WITNESS:**                              **MAKER(S):**

_____        _____(SEAL)


_____        _____(SEAL)

62

## SCHEDULE 15.1

## MATTERN & ASSOCIATES, LLC

### ADDRESSES

ROBERT C. MATTERN
4 Pennrose Talley
Boothwyn, PA 19061

JOHN SEIDEL
803 Augusta Circle
Mt. Laurel, NJ 08054

WP3:862187.4                                                    57164.1001

Certificate No. 1

## MATTERN & ASSOCIATES, LLC

### CERTIFICATE OF OWNERSHIP INTEREST

Name

No. of
Units Owned

ROBERT C. MATTERN

97

_____
ROBERT C. MATTERN, Manager

Dated: July 1, 2003

NOTICE IS HEREBY GIVEN THAT THE SALE, ASSIGNMENT, TRANSFER,
PLEDGE, OR OTHER DISPOSITION OF THE UNITS REPRESENTED BY THIS
CERTIFICATE ARE SUBJECT TO THE RESTRICTIONS IMPOSED BY THE
LIMITED LIABILITY COMPANY AGREEMENT OF MATTERN & ASSOCIATES,
LLC, DATED EFFECTIVE AS OF JULY 1, 2003.

Certificate No. 2

## MATTERN & ASSOCIATES, LLC
## CERTIFICATE OF OWNERSHIP INTEREST

Name

No. of
Units Owned

JOHN SEIDEL

3

_____
ROBERT C. MATTERN, Manager

Dated: July 1, 2003

NOTICE IS HEREBY GIVEN THAT THE SALE, ASSIGNMENT, TRANSFER,
PLEDGE, OR OTHER DISPOSITION OF THE UNITS REPRESENTED BY THIS
CERTIFICATE ARE SUBJECT TO THE RESTRICTIONS IMPOSED BY THE
LIMITED LIABILITY COMPANY AGREEMENT OF MATTERN & ASSOCIATES,
LLC, DATED EFFECTIVE AS OF JULY 1, 2003.

# EXHIBIT C

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF DELAWARE

MATTERN & ASSOCIATES, L.L.C. )
                        )
             Plaintiff, )
                        )       C.A. No. 1:06-CV-36 KAJ
    v. )
                        )
JOHN SEIDEL )
                        )
            Defendant. )
                        )
                        )
                        )

STATE OF DELAWARE   )
                       )    SS.
NEW CASTLE COUNTY   )

### AFFIDAVIT OF
### MATTERN & ASSOCIATES, L.L.C.

BE IT REMEMBERED THIS 24th DAY OF FEBRUARY, 2006, that Robert C. Mattern personally appeared before the subscriber, a notary public in and for the State and County aforesaid, and having been duly sworn according to law, did depose and state as follows:

     1.     I am the Manager of Mattern & Associates, L.L.C. ("M&A") and am authorized to make this Affidavit on its behalf.

     2.     This Affidavit is submitted in support of M&A's Answering Brief in Opposition to Defendant, John Seidel's ("Seidel") Motion to Transfer Venue. This Affidavit is offered to supplement the Affidavit concurrently filed with the Complaint in the Court of Chancery of the State of Delaware.

3.    I have reviewed the Defendant's Motion to Transfer Venue from the District Court of Delaware to either the Eastern District Court of Pennsylvania or the District Court of New Jersey.

4.    Many of the events which gave rise to the actions in this case occurred in the State of Delaware.

5.    M&A's principal place of business is located at 2036 Foulk Road, Wilmington, Delaware, 19810.

6.    Many of the witnesses are located in the State of Delaware.

7.    The above information is true and correct to the best of my knowledge and belief.

_____
Robert C. Mattern

SWORN TO and SUBSCRIBED before me this 24th day of February, 2006.

_____
Notary Public

# EXHIBIT D

Not Reported in F.Supp., 1984 WL 2752 (D.Del.)

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.
ANCHOR HOCKING CORPORATION, Plaintiff,
v.
ALADDIN SYNERGETICS, INC., Defendant.
Civ. A. No. 81-11-WKS.
Aug. 24, 1984.

F.L. Peter Stone, Harold Pezzner, Connolly, Bove, Lodge & Hutz, Wilmington, Delaware, Donald J. Libert, Robert H. Seeley, Anchor Hocking Corporation, Lancaster, Ohio, for plaintiff. David A. Anderson, Potter, Anderson & Corroon, Wilmington, Delaware; Melvin M. Goldenberg, McDougall, Hersh & Scott, Chicago, Illinois, for defendant.

### MEMORANDUM OPINION

STAPLETON, Chief Judge:

**\*1** This is a patent infringement action, instituted by plaintiff Anchor Hocking Corporation ("Anchor Hocking") against defendant Aladdin Synergetics, Inc. ("Aladdin"). Aladdin has moved under 28 U.S.C. § 1404(a) for an order **transferring** this action to the United States District Court for the Middle District of Tennessee, Nashville, Division.

Anchor Hocking is incorporated in Delaware and has its principal office and place of business in Lancaster, Ohio. Aladdin is also incorporated in Delaware and has its principal office and place of business in Nashville, Tennessee. Aladdin's allegedly infringing devices are manufactured in its Nashville plant. All Aladdin personnel with marketing and sales knowledge, and design and engineering knowledge concerning the accused devices, as well as all Aladdin records and documents relevant to this lawsuit, are located in the Nashville facility.

To prevail on its **motion** for **transfer**, Aladdin must show that it has satisfied the statutory requirements of Section 1404(a). Aladdin must therefore show that the **transfer** (1) is to another district where the action might have been brought; (2) would make litigation of the suit more convenient for the parties and witnesses; and (3) would serve the interest of justice.

The parties do **not** dispute that Anchor Hocking might have brought this infringement action in the Middle District of Tennessee. **Venue** in patent infringement actions is governed by 28 U.S.C. § 1400 (b), which provides, in pertinent part, that suit may be brought "where the defendant has committed acts of infringement and has a regular and established place of business." Aladdin's manufacture in Nashville of the allegedly infringing devices satisfies the "acts of infringement" requirement of § 1400 (b). Accordingly, Anchor Hocking might have brought this action in Nashville.

In *Shutte v. Armco Steel Corp.*, 431 F.2d 22 (3d Cir.1970), *cert. denied,*401 U.S. 910 (1971), the Third Circuit held that a plaintiff's choice of a proper forum is a "paramount **consideration**" in any determination of a **transfer** request that should **not** be "lightly disturbed" unless the balance of convenience weights " *strongly*" in favor of the defendant. *Id.* at 25 (emphasis added by Court). Because **transfer** must strongly favor the defendant, "**transfer** should be denied where the factors to be considered are evenly balanced or only slightly favor a **transfer**." *Smithkline Corp. v. Sterling Drug, Inc.*, 406 F.Supp. 52, 54-55 (D.Del.1975) (quoting *Scovill Mfg. Co. v. Sunbeam Corp.*, 357 F.Supp. 943, 946 (D.Del.1973)). However, where, as here, plaintiff has **not** brought suit on its "home turf", or in a forum otherwise connected with the subject matter of the lawsuit, the inconvenience of a **transfer** to the plaintiff will ordinarily be less, and the defendant will consequently find it easier to show that convenience favors a **transfer**. *E.g., Pall Corp. v. Bentley Laboratories, Inc.*, 523 F.Supp. 450, 452 (D.Del.1981); *General Instrument Corp. v. Mostek Corp.*, 417 F.Supp. 821, 822-23 (D.Del.1976); *Burroughs Wellcome Co. v. Giant Food, Inc.*, 392 F.Supp. 761, 763 (D.Del.1975).

**\*2** Granting Aladdin's motion would appear to create little if any inconvenience for Anchor Hocking. While Anchor Hocking is incorporated in Delaware, its principal place of business is in Lancaster, Ohio, which is actually closer to Nashville than to the present forum. Any employee witnesses and

documents that Anchor Hocking will need at trial can be just as easily rerouted to Nashville. Anchor Hocking asserts that, if required to bring suit in Nashville, it will incur the dual **cost** and inconvenience of transporting its lead **counsel** from Delaware to Tennessee, and of obtaining **local counsel** in Tennessee. This Court very recently addressed this precise issue and held, in accordance with the great weight of authority, that the "inconvenience to plaintiff caused by the **cost** of hiring **local counsel** and transporting its lead **counsel** should **not** be considered in a **transfer motion** ." *Stauffer Chemical Co. v. Monsanto Co.*, No. 83-69-MMS (D.Del. Jan. 24, 1984); see15 Wright, Miller & Cooper, *Federal Practice and Procedure* § 3850 (1976).

Thus, as far as Anchor Hocking is concerned, its convenience only slightly favors Delaware. Nevertheless its choice of forum must control unless the balance of convenience tips "strongly" in defendant's favor. *Shutte,* 431 F.2d at 25. On this record it does not.

If I were convinced that Aladdin will need a substantial number of live fact witnesses from Nashville I might conclude that the defendant had carried its burden. I am not so persuaded, however. At present this case appears to the Court to be a relatively straight-forward patent case which will be tried, at least as far as the defense is concerned, primarily with live experts perhaps supplemented by undisputed deposition testimony. If it turns out that Aladdin can hereafter demonstrate that it will need more than expert witnesses and one or two fact witnesses, it may reapply for **transfer**.[FN1] *Imperial Chemical Industries, Ltd. v. General Mills Chemicals, Inc.*, C.A. No. 78-301 (D.Del. Dec. 22, 1978).

Finally, the interest of justice does **not** appear to be a significant factor in this **transfer motion**.[FN2] Therefore, for the present time, Aladdin's motion will be denied.

    FN1. I do **not** consider the location of documents of material significance in this case.

    FN2. Anchor Hocking points out that this Court has compulsory process over two parties—a retired lawyer who prosecuted some of the patents at issue, and an allegedly infringing hospital. However, even assuming the retired attorney in question would be an unwilling witness, Anchor Hocking has failed to come forward with any showing that either of these parties will be necessary at trial. Aladdin also argues that the parties will receive a more speedy trial in Nashville on the basis of the 1983 *Federal Court Management Statistics,* which show that the Nashville forum disposes of the average case within five months of filing while this Court disposes of its average case in nine months. I think it unlikely that the parties will wish to take this case to trial in five months, however, and past experience indicates that this Court will be able to schedule trial as soon as one of the parties requests it.

D.Del.,1984.
Anchor Hocking Corp. v. Aladdin Synergetics, Inc.
Not Reported in F.Supp., 1984 WL 2752 (D.Del.)

END OF DOCUMENT

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I, GEORGE H. SEITZ, III, hereby certify that on this 24th day of February, 2006, I caused

the foregoing *Declaration of George H. Seitz in Further Support of Plaintiff Mattern &*

*Associates, L.L.C's Brief in Opposition to Defendant's Motion to Transfer Venue to Either the*

*Eastern District Court of Pennsylvania or the District Court of New Jersey* to be served via

CM/ECF and first class mail on counsel as follows:

> Paul A. Wernle, Jr., Esquire
> Law Office of Paul A. Wernle
> 92 Read's Way, Suite 106
> New Castle Corporate Commons
> New Castle, DE  19720

> */s/ George H. Seitz, III*
> _____
> GEORGE H. SEITZ, III (#667)

Dated:  February 24, 2006

52661 v1