IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| MATTERN & ASSOCIATES, L.L.C., | ) | |
| | ) | |
| Plaintiff. | ) | |
| | ) | C.A. No. 1:06-CV-36 KAJ |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| JOHN SEIDEL, | ) | |
| | ) | |
| Defendant and Third Party Plaintiff. | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| ROBERT MATTERN, | ) | |
| ABC ENTITIES 1-50, and | ) | |
| J. Does 1-50, | ) | |
| | ) | |
| Third Party Defendants. | ) | |

## PLAINTIFF'S MOTION FOR LEAVE TO AMEND THE COMPLAINT

Plaintiff Mattern & Associates, LLC ("M&A"), by and through its undersigned counsel, hereby moves this Court for leave to file an Amended Complaint so that Plaintiff may plead additional facts and assert an additional cause of action under the Delaware Uniform Trade Secrets Act, 6 Del. C. § 2001 *et seq.* In support thereof, Plaintiff avers the following:

1. On December 16, 2005, Plaintiff M&A filed a Complaint against Defendant John Seidel ("Seidel") in the Court of Chancery of the State of Delaware in and for New Castle County.

2. On January 18, 2006 Defendant Seidel removed the case to this Court.

3.     On June 2, 2006, Seidel filed an *Answer, Third Party Complaint and Counterclaim.* Seidel then filed an *Amended Counterclaim and Amended Third Party Complaint* on July 10, 2006.

4.     The parties have since engaged in factual discovery, which concluded on February 28, 2007.

5.     Through discovery, M&A has learned additional facts that support its current claims against Seidel and has determined that it has a viable claim against Seidel for Misappropriation of Trade Secrets under the Delaware Uniform Trade Secrets Act, 6 Del. C. § 2001 *et seq.*

6.     M&A's claim for Misappropriation of Trade Secrets is based on the same set of operative facts as its other claims against Seidel, and therefore, additional discovery will likely not be necessary.

7.     Even if additional discovery were necessary, this case is not currently scheduled for trial and Seidel will not be prejudiced by any delay caused by the filing of an Amended Complaint.

8.     Pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, "a party may amend the party's pleading only by leave of court or by written consent of the adverse party; *and leave shall be freely given when justice so requires*."

9.     Despite M&A's request for Seidel's consent, it has not been granted. As a result, M&A seeks leave of the Court to amend its Complaint and submits that justice so requires.

WHEREFORE, Plaintiff respectfully requests that this Court grant the instant motion, and that *Plaintiff's First Amended Complaint* (attached hereto) be accepted for filing.  A redlined version of *Plaintiff's First Amended Complaint* is attached hereto as Exhibit "1".

SEITZ, VAN OGTROP & GREEN, P.A.

/s/ *Kevin A. Guerke*

By:  _____
George H. Seitz, III, ID #667
Kevin A. Guerke, ID #4096
222 Delaware Avenue, Suite 1500
P.O. Box 68
Wilmington, DE 19899
(302) 888-0600

- and -

Imogene E. Hughes, Esquire
Andrew Shapren, Esquire
Rubin, Fortunato & Harbison P.C.
10 S. Leopard Road
Paoli, PA 19301

Attorneys for Plaintiff and Counterclaim Defendant.

DATED:  March 21, 2007

## CERTIFICATE OF SERVICE

I, Kevin A. Guerke, Esquire, hereby certify that on this 21st day of March 2007, I electronically filed the foregoing *Plaintiff's  Motion for Leave to Amend the Complaint* with the Clerk of Court using CM/ECF which will send notification of such filing to counsel of record and also upon the following by first class mail to:

Paul A. Wernle, Jr., Esquire
Law Office of Paul A. Wernle
92 Read's Way, Suite 106
New Castle Corporate Commons
New Castle, DE  19720

/s/ *Kevin A. Guerke*
_____
Kevin A. Guerke (ID No. 4096)
kguerke@svglaw.com

58418 v1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MATTERN & ASSOCIATES, L.L.C., | ) | |
| | ) | |
| Plaintiff. | ) | |
| | ) | C.A. No. 1:06-CV-36 KAJ |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| JOHN SEIDEL, | ) | |
| | ) | |
| Defendant and Third Party Plaintiff. | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| ROBERT MATTERN, | ) | |
| ABC ENTITIES 1-50, and | ) | |
| J. Does 1-50, | ) | |
| | ) | |
| Third Party Defendants. | ) | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

1.      Plaintiff, Mattern & Associates, LLC, ("M&A"), by its undersigned attorneys,

hereby brings the following Amended Complaint for injunctive relief and damages against

Defendant John Seidel ("Seidel"). M&A reasserts causes of action against Seidel for: (i) breach

of contract, namely the Limited Liability Company Agreement (the "Agreement") Seidel entered

into with M&A, and (ii) breach of the fiduciary duties of good faith, loyalty, and fair dealing.

M&A also asserts a new cause of action for: (iii) misappropriation of trade secrets. In support of

its causes of action, M&A avers as follows:

PARTIES

2.      Plaintiff Mattern & Associates, LLC ("M&A") is a Pennsylvania limited liability corporation having its principal place of business at 2036 Foulk Road, Wilmington, New Castle County, Delaware 19810.

3.      John Seidel ("Seidel") was last known to be a resident of the State of New Jersey residing at 1208B Harwood Ct., Mount Laurel, Burlington County, New Jersey 08054.

BACKGROUND FACTS

Seidel's Employment with M&A

4.      Beginning on June 1, 2001, and continuing until April 11, 2005, Seidel was employed by M&A as an independent contractor and/or an employee.

5.      Seidel became Vice President of Business Development and during his employment was entrusted with M&A's confidential information, customized techniques, and trade secrets, as well as the names and addresses of M&A's customers.

6.      On July 1, 2003, Seidel became a member of M&A and signed and accepted the terms of the Operating Agreement with M&A.  Under the terms of the Operating Agreement, Seidel agreed:

> a) to maintain privacy regarding M&A's trade secrets and all other classified information, including but not limited to: databases, customer lists, Request for Proposals, Request for Proposal templates, workflow analysis, benchmarking data, on-site questionnaires for gathering information, guides for analyzing mail, copy, fax, records operations, cost recovery systems, and the "Mattern Method®";

    b)  not to solicit business or act as an employee of a competitor of M&A operating within 100 miles of M&A's principal place of business, for a period of twenty-four (24) months after terminating employment with M&A;

    c)  not to disclose any of M&A's confidential information to a "person, firm, corporation, association, limited liability company, joint venture, or other judicial entity" without first obtaining M&A's prior written consent;

    d)  to return to M&A all confidential information and other property of M&A upon the termination of his employment; and

    e)  to pay M&A $150,000 in the event he breached the non-competition provision.

7.    As an employee, officer and shareholder of M&A, Seidel owed fiduciary duties to M&A, including duties to devote his full time and best efforts to furthering the business interests of M&A and to maintain confidentiality of all M&A Property.

Seidel's Competitive Conduct

8.    Beginning on or about December of 2004, while Seidel was still employed by M&A and holding himself out as a loyal employee, officer and shareholder, and continuing up to the time of his resignation, Seidel engaged in a course of conduct designed to misappropriate M&A's assets in violation of the Agreement.

9.    On February 16, 2005 and thereafter, Seidel engaged in a course of conduct designed to seek employment with competitors of M&A. Seidel sent and received various "E-mail" correspondences using the M&A computer system to seek employment with M&A's competitors. These e-mails included messages to Huron Consulting Group, a direct competitor

of M&A, seeking employment and offering to provide the same services M&A provides to current and prospective clients. The e-mails are attached hereto as "Exhibit B".

10. From February 16, 2005 to April 11, 2005, Seidel exchanged twelve (12) e-mails with Christopher Petrini-Poli ("Poli") regarding a position with Huron Consulting Group in furtherance of his scheme to seek employment in direct competition with M&A in violation of the Agreement. Seidel even offered to work out an independent contractor arrangement with Huron in a misguided effort to circumvent his non-competition obligations to M&A.

11. Seidel's plan to compete with M&A, in violation of his Agreement, is reflected in an April 11, 2005 e-mail from Poli, stating that "our legal has indicated that it's a pretty stringent agreement. The[y] only solution would be for you to obtain a waiver from [M]attern on these issues. I wanted to get your thoughts on this before we proceeded any further. I don't want to compromise your current situation."

12. Seidel, during this period, also exchanged emails with Kevin Kennedy of Pitney Bowes Management Services, another direct competitor of M&A, seeking employment.

13. Seidel traveled to Stamford, Connecticut for an interview with Pitney Bowes Management Services on March 23, 2005 and charged M&A $235.00 for the cost of his expenses under the false pretense that he was meeting with a potential client.

Seidel's Misuse of M&A Funds & Resignation

14. During this same period, Seidel's job performance at M&A continued on a downward spiral and he failed to meet company goals. On April 8, 2005, Robert Mattern, Manager of M&A, confronted Seidel about his poor job performance and continuous use of the Company credit card to pay for, or reimburse himself for the cost of, personal expenses.

15. Seidel responded by mentioning his intent to resign from M&A.

16.     On April 11, 2005, Seidel advised Mattern that he was resigning.

17.     Prior to Seidel's resignation, he agreed to reimburse M&A for personal expenses he charged to the Company and delivered a personal check in the amount of $1,748.78 to cover this expense. The bank returned the check to M&A due to insufficient funds. Seidel has never reimbursed M&A for personal expenses charged to the firm's credit card.

18.     As a result of his resignation, Seidel also owes M&A for the net liability due to M&A to the extent his monthly draws and health insurance costs exceeded his actual commissions earned. These amounts are $8,188.18 from 2004 and $11,919.63 from 2005.

19.     Seidel has failed to surrender his Ownership Units as required under the terms of the Agreement upon resignation from M&A.

20.     Despite repeated requests, Seidel has refused to reimburse M&A for these expenses or to return his Ownership Units.

Seidel's Continued Competition

21.     Following his resignation, Seidel continued to act in breach of the Agreement by accepting employment with Konica Minolta Business Solutions U.S.A., Inc., a competitor of M&A, located at 300 Stevens Drive, Philadelphia, Pennsylvania, and the facility is within a 100 mile radius of M&A's Wilmington, Delaware office.

22.     As more specifically stated in the Affidavit ("Exhibit C") under "The M&A Business" heading, M&A is in the field of support services consulting, document management, and cost recovery analysis primarily focused on law firms and other companies. Konica Minolta Business Solutions U.S.A., Inc. is in direct competition with M&A's business.

23.     In October of 2005, while working for Konica Minolta Business Solutions U.S.A., Inc., Seidel solicited one of M&A's current clients for business and offered them $50 if they would listen to his company's sales pitch.

24.     In October 2006, after working for Konica for over a year, Seidel accepted employment with another M&A competitor, Stewart Business Systems, LLC, which is located at 105 Connecticut Drive, Burlington, NJ 08016, well within a 100 mile radius of M&A's Wilmington, Delaware office.

25.     Seidel currently remains employed with Stewart competing with M&A in violation of the Agreement.  Upon information and belief, Seidel also continues to solicit M&A's prospective customers in violation of the Agreement.

Seidel's Misappropriation of M&A Information

26.     Seidel, as former Vice President of Business Development for M&A, has valuable insider knowledge about M&A's business and its customers.

27.     Prior to resigning from M&A, Seidel made a copy of the entire hard drive of the M&A owned laptop computer that he used to conduct business for M&A.  This hard drive not only contained M&A's customer contact list, but also additional confidential and competitively sensitive information such as client proposals, requests for proposal, client requirements, chargeback reports, chargeback system questions, M&A's various checklists, question sheets, reports and surveys, consulting agreements, workflow analyses, the Mattern Method On-Site Observation Checklists & Questions and M&A marketing material.

28.     Although Seidel returned the laptop computer to M&A upon his resignation, he kept a copy of the hard drive and the voluminous M&A proprietary information contained thereon.

29.    On four separate occasions M&A, through its counsel, wrote to Seidel and/or his attorney demanding he cease and desist from any activities in violation of the Agreement, reimburse M&A for monies received in violation of the Agreement, and requesting the return of all M&A property, including but not limited to: trade secrets, databases, customer lists, Request for Proposals, Request for Proposal templates, workflow analysis, benchmarking data, on-site questionnaires for gathering information, guides for analyzing mail, copy, fax, records operations, cost recovery systems, and the "Mattern Method®", taken in violation of the LLC Agreement. The correspondences are attached hereto as "Exhibit D".

30.    On October 27, 2005, Seidel, through counsel, finally admitted to possessing the back-up copy of Seidel's laptop's hard drive and promised to return it to M&A, along with written confirmation that Seidel has not retained any copies of it nor is he in possession of any other confidential or proprietary information belonging to M&A.

31.    Two months later, and approximately nine months after his resignation, Seidel finally returned the copy of the M&A hard drive.

32.    M&A believes, and therefore avers, that both prior to and subsequent to his resignation from M&A, Seidel misappropriated, misused and converted M&A's confidential, trade secret information for his own use and benefit, by using said information to solicit employment from competitors of M&A and to solicit current and prospective customers of M&A to do business with Seidel.

33.    Seidel's activities in breach of the Agreement, as set forth herein, have caused and will continue to cause irreparable injury to M&A unless Seidel is enjoined.

34.    M&A has no adequate remedy at law, as previously agreed to by Seidel at the time of the Agreement.

## Count I

### Breach of Contract - Injunctive Relief

35.    Plaintiff repeats the allegations in paragraphs 1 through 34 above.

36.    Under the terms of the M&A Operating Agreement, Seidel agreed that a Member's material or immaterial breach will cause irreparable harm to M&A, rendering monetary damages alone insufficient, and thereby affording the non-breaching party with various remedies under the Agreement, including: compensatory damages, punitive damages, specific performance, and injunctive relief.   [Exhibit A §5.9(g)(1)]

37.    Defendant's refusal to abide by the non-competition provision with M&A, as set forth in the Agreement, is a breach of the contract between the parties.   As a result of Defendant's breach, Plaintiff will suffer irreparable harm.

38.    There is reason to believe that Defendant is in possession of, or continues to use, privileged information belonging to M&A, including but not limited to: trade secrets, databases, customer lists, Request for Proposals, Request for Proposal templates, workflow analysis, benchmarking data, on-site questionnaires for gathering information, guides for analyzing mail, copy, fax, records operations, cost recovery systems, and the "Mattern Method®", all in violation of the LLC Agreement Defendant signed with M&A.

39.    As a result of Defendant's breach, Plaintiff will be damaged and will lose economic and business opportunities within its area of competition.

40.    As more specifically set forth above, Plaintiff's ability to maintain, solicit, and sell its copyrightable material presents a unique business opportunity from which the Plaintiff expects to derive benefits.

41.    As a result of Defendant's failure to comply with the terms of the contract, the Plaintiff has been irreparably harmed.

42.    Because Seidel has violated his Agreement throughout the two year period set forth therein, Plaintiff is entitled to extend the restrictive covenants to include such period of time as Seidel has violated them.

43.    Plaintiff is entitled to injunctive relief requiring the Defendant: to stop competing within a 100 mile radius of M&A for up to an additional two years from the date Seidel begins to comply with the Agreement; to return all confidential and proprietary information to M&A; to refrain from the distribution of and/or use of M&A's trade secrets; and to identify any individuals or entities to whom Seidel distributed such information.

### Count II

### Breach of Contract - Damages

44.    Plaintiff repeats the allegations in paragraphs 1 through 43 above.

45.    Defendant has breached the Agreement by soliciting competitors of M&A for employment opportunities.

46.    Defendant has breached the Agreement by using M&A's credit card to pay for expenses incurred in seeking employment with M&A's competitors and also to pay for personal expenses, and in failing to reimburse M&A for these charges.  Seidel is also in breach of the Agreement for failing to reimburse M&A for these charges and overpayments of his monthly draws and health insurance costs from 2004 and 2005.

47.    Defendant has breached the Agreement by competing, both directly and indirectly, with M&A within the geographic and time periods during which such activities are prohibited, in violation of Sections 5.9(d) and 5.9(e) of the Agreement.

48.    Defendant has breached the Agreement by failing to return M&A's confidential information and property upon his resignation from M&A.

49.    As a result of these breaches, M&A has been harmed and is entitled to recover damages not less than $172,091.59.  As a result of Seidel's continued competitive conduct and use of M&A's proprietary information, all in violation of the Agreement, M&A is further threatened with additional damages consisting of lost profits resulting from the loss of existing and potential clients.

## Count III

### Breach of Fiduciary Duties

50.    Plaintiff repeats the allegations in paragraphs 1 through 49 above.

51.    As an employee, officer, and member of M&A, Seidel owed M&A a duty of good faith, loyalty, and fair dealing.

52.    Seidel breached his fiduciary duties of good faith, loyalty, and fair dealing owed to M&A by engaging in a course of conduct designed to divert M&A's assets, to compete directly with M&A, and to damage its relationship with existing and potential clients.

53.    As a result of Seidel's breach of his fiduciary duties, M&A has been harmed and is entitled to damages representing economic harm caused to M&A's business interests.

## Count IV

## Misappropriation of Trade Secrets
*Delaware Uniform Trade Secrets Act*
*6 Del. C. § 2001 et seq.*

54.   Plaintiff repeats the allegations in paragraphs 1 through 53 above.

55.   The data, information, books and records of M&A and the confidential information contained therein concerning, *inter alia*, M&A's customers, prospects, methods, systems and operations are deserving of trade secret status and protection.

56.   This information derives independent economic value by not being accessible, through proper means, to competitors who can profit from its use or disclosure.

57.   M&A has taken reasonable measures under the circumstances to maintain the secrecy of this information.

58.   The foregoing conduct of Seidel constitutes a misappropriation of M&A's confidential, trade secret information.

59.   Seidel's misappropriation of M&A's trade secrets was willful and malicious, as Seidel not only copied the entire hard drive from his M&A laptop computer, but also failed and refused to return M&A's trade secrets for approximately nine months and despite repeated demands.

60.   As a result of Seidel's misappropriation of M&A's trade secrets, M&A and its shareholders have been harmed and are entitled to any damages which the corporation did suffer or may have suffered.  M&A is also entitled to exemplary damages and attorney's fees as a result of Seidel's willful and malicious misappropriation.

**WHEREFORE**, Mattern & Associates, LLC prays that this Court:

1)    Permanently enjoin Defendant John Seidel from owning, engaging in, or being associated with, either as a partner, member, stockholder, employee, subcontractor agent or otherwise, any business which competes with M&A and operates within a 100 mile radius of Wilmington, Delaware for a period of two (2) years from the date Seidel begins to comply with his non-competition obligations;

2)    Order Defendant to return to M&A all Ownership Units, any trade secrets, databases, customer lists, Request for Proposals, Request for Proposal templates, workflow analysis, benchmarking data, on-site questionnaires for gathering information, guides for analyzing mail, copy, fax, records operations, cost recovery systems, the back-up copy of the laptop's hard drive, and the "Mattern Method®" taken in violation of the Agreement;

3)    Order Defendant to account for all fees and income obtained by him or anyone working in concert with him in violation of the Agreement;

4)    Award Plaintiff damages in an amount of not less than $170,000 plus such sum that will be proved at trial representing the actual loss caused by Defendant's wrongful conduct and breach of the Agreement;

5)    Award Plaintiff exemplary double damages on Count IV of this Amended Complaint;

6)    Award Plaintiff its costs and expenses incurred in this action, including reasonable attorneys' fees; and,

7)     Award Plaintiff such other and further relief as the Court deems equitable under the circumstances.

**SEITZ, VAN OGTROP & GREEN, P.A.**

/s/ *Kevin A. Guerke*

GEORGE H. SEITZ, III, ESQ. (No.667)
KEVIN A. GUERKE, ESQ. (No. 4096)
222 Delaware Avenue, Suite 1500
Wilmington, DE 19899
(302) 888-0600

- and -

Imogene E. Hughes, Esquire
Andrew Shapren, Esquire
Rubin, Fortunato & Harbison P.C.
10 S. Leopard Road
Paoli, PA 19301

Attorneys for Plaintiff and Counterclaim Defendant

Dated: March 21, 2007

# EXHIBIT  A

AMENDED AND RESTATED

LIMITED LIABILITY COMPANY AGREEMENT

OF

MATTERN & ASSOCIATES, LLC

A Pennsylvania Limited Liability Company

Dated effective as of July 1, 2003

**AMENDED AND RESTATED**
**LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**MATTERN & ASSOCIATES, LLC**

TABLE OF CONTENTS

### ARTICLE I   GENERAL PROVISIONS

| | | |
|---|---|---|
| 1.1 | Formation Of The Company. | 1 |
| 1.2 | Name Of The Company. | 1 |
| 1.3 | Purpose. | 1 |
| 1.4 | Fictitious Business Name. | 1 |
| 1.5 | Other Acts/Filings. | 1 |
| 1.6 | Principal Place Of Business And Office Of The Company. | 2 |
| 1.7 | Registered Office; Registered Agent. | 2 |
| 1.8 | Manager; Management Committee. | 2 |
| 1.9 | Term. | 2 |
| 1.10 | No State Law Partnership. | 3 |

### ARTICLE II DEFINITIONS

| | | |
|---|---|---|
| 2.1 | "Affiliate" | 3 |
| 2.2 | "Agreement" | 3 |
| 2.3 | "Bankruptcy" | 3 |
| 2.4 | "Capital Account" | 4 |
| 2.5 | "Capital Contributions" | 4 |
| 2.6 | "Cash Flow" | 4 |
| 2.7 | "Cause" | 5 |
| 2.8 | "Certificate" | 5 |
| 2.9 | "Control" | 5 |
| 2.10 | "Closing Date" | 5 |
| 2.11 | "Code" | 5 |
| 2.12 | "Company" | 5 |
| 2.13 | "Company Property" or "Property" | 5 |
| 2.14 | "Disability" | 5 |
| 2.15 | "Distributions" | 6 |
| 2.16 | "Hypothetical Tax Amount" | 6 |
| 2.17 | "Hypothetical Tax Rate" | 6 |
| 2.18 | "Law" | 6 |
| 2.19 | "Majority Vote" | 6 |
| 2.20 | "Manager" | 6 |
| 2.21 | "Member" or "Members" | 6 |
| 2.22 | "Net Cash Flow" | 6 |
| 2.23 | "1933 Act" | 7 |
| 2.24 | "Operating Expenses" | 7 |
| 2.25 | "Person" | 7 |

i

57164.1001

2.26  "Purchase Price" ...................................................................................7
2.27  "Refinancing" .......................................................................................7
2.28  "Revocable Trust"................................................................................7
2.29  "Sale" ....................................................................................................7
2.30  "Total Outstanding Units" ..................................................................7
2.31  "Transfer" .............................................................................................7
2.32  "Treasury Regulations".......................................................................8
2.33  "Unit" or "Units" .................................................................................8
2.34  "Valuation Date" .................................................................................8
2.35  "Working Capital" ...............................................................................8

## ARTICLE III  CAPITAL CONTRIBUTIONS, MEMBERSHIP, AND RELATED MATTERS

3.1  Capital Contributions By The Members. .............................................8
3.2  No Withdrawal Of Capital Contributions. ..........................................9
3.3  Return Of Capital. ...............................................................................9
3.4  No Interest or Salary On Capital Contributions...................................9
3.5  Membership Rights ..............................................................................9
3.6  Representations and Warranties...........................................................9
3.7  Creation of Additional Units..............................................................11
3.8  Default Capital Contribution..............................................................11

## ARTICLE IV  TAX PROVISIONS: ALLOCATION OF TAXABLE INCOME AND TAX LOSSES, DISTRIBUTIONS TO MEMBERS, AND ELECTIONS

4.1  Taxable Income Or Tax Loss.  ..........................................................13
4.2  Allocation Of Annual Taxable Income Or Tax Losses. .....................13
4.3  Special Allocation Of Credits. ...........................................................15
4.4  Allocation Of Taxable Income Or Tax Losses Arising From A Sale Or
      Refinancing Or Dissolution Of The Company ...................................15
4.5  Allocation In The Event of Transfer. .................................................16
4.6  Authority Of Manager To Vary Allocations To
      Preserve And Protect Members' Interests............................................17
4.7  Guaranteed Payments..........................................................................18
4.8  Distributions........................................................................................18
4.9  Limitation Upon Distributions............................................................18
4.10  Section 754 Election. .........................................................................19
4.11  Withholding Taxes..............................................................................19

## ARTICLE V  MANAGEMENT OF THE COMPANY

5.1  Appointment of Manager....................................................................19
5.2  The Management Powers Of The Manager. .......................................19
5.3  Delegation Of Authority And Duties. ................................................22
5.4  Approval Or Ratification Of Acts Or Contracts By Members. ...........22

WP3:862187.4

57164.1001

5.5     Limitations On Authority Of The Manager. .................................................23
5.6     Right Of Third Parties To Rely On Authority Of The Manager ...........................23
5.7     Limitations On Authority ..............................................................................24
5.8     Duty To Devote Time. ...................................................................................24
5.9     Restrictive Covenants. ..................................................................................24
5.10    Dealing With The Company. ..........................................................................28
5.11    Indemnity. ..................................................................................................29
5.12    Fiduciary Duty Of A Member ........................................................................29
5.13    Reserves. ...................................................................................................30

## ARTICLE VI  BOOKS, RECORDS, AND REPORTS

6.1     Books And Records. ....................................................................................30
6.2     Reports. .....................................................................................................30
6.3     Tax Returns. ...............................................................................................30
6.4     Filings With Regulatory Agencies. .................................................................30
6.5     Tax Matters. ...............................................................................................30

## ARTICLE VII  ASSIGNMENT OR SALE OF INTERESTS
## IN THE COMPANY

7.1     Restrictions On Transfers. ............................................................................31
7.2     Proposed Transfers ......................................................................................32
7.3     Permitted Transfers To Or From Revocable Trusts ...........................................32
7.4     Cessation of Participation Call Option; Majority Option to Purchase or Sell .......33
7.5     Death Of A Member. ....................................................................................33
7.6     Legal Proceedings Involving Members or Defaults. ..........................................34
7.7     Purchase Or Redemption Price. .....................................................................34
7.8     Payment Terms. ..........................................................................................35
7.9     Closing Date ...............................................................................................36
7.10    Impairment Of Capital .................................................................................36
7.11    Operating Rules. ..........................................................................................37
7.12    Agreement to Purchase Only Part of Units. .....................................................37
7.13    Restrictions Apply to Subsequently Issued Units. .............................................37
7.14    Insurance. ..................................................................................................37
7.15    Waiver of Restrictions. .................................................................................38
7.16    Recognition of Transfer by Company ..............................................................38
7.17    Creditors of Members and Transferees ............................................................38

## ARTICLE VIII  DISSOLUTION AND TERMINATION OF
## THE COMPANY

8.1     Dissolution. ................................................................................................38
8.2     Liquidation. ................................................................................................39
8.3     Distribution In Kind. ....................................................................................39
8.4     Termination. ...............................................................................................39

WP3:862187.4                                                                    57164.1001

## ARTICLE IX  REMOVAL OF MEMBERS OF
## MANAGEMENT COMMITTEE

9.1    Removal Of Manager. ...............................................................................40
9.2    Termination of Executory Contracts With Manager Or Affiliate. .........................40
9.3    Reports After Removal. .............................................................................40

## ARTICLE X  MEETINGS AND VOTING RIGHTS

10.1    Notice Of Meetings. ................................................................................40
10.2    One Vote Per Unit. ................................................................................41
10.3    Consents. ...........................................................................................41

## ARTICLE XI  COMPANY EXPENSES

11.1    General. ..............................................................................................42
11.2    Direct Payment Of Company Expenses. ......................................................42
11.3    Payment Of Expenses Of The Company. .....................................................42
11.4    Limitation on Liability of Members ............................................................43

## ARTICLE XII  AMENDMENTS OF COMPANY DOCUMENTS

12.1    Amendments. ........................................................................................43

## ARTICLE XIII  BORROWINGS

13.1    Loans By Members To The Company. ..........................................................44
13.2    Advances Related to a Loan ......................................................................44

## ARTICLE XIV  REPRESENTATIONS AND WARRANTIES AND
## INDEMNIFICATION OF THE MANAGER

14.1    Manager. ..............................................................................................44
14.2    Indemnification Of The Manager. ..............................................................45

## ARTICLE XV  MISCELLANEOUS PROVISIONS

15.1    Notices. ...............................................................................................45
15.2    Article And Section Headings. ...................................................................45
15.3    Construction. ........................................................................................45
15.4    Severability. .........................................................................................46
15.5    Governing Law. .....................................................................................46
15.6    Counterparts. ........................................................................................46
15.7    Entire Agreement. ..................................................................................46
15.8    Further Assurances. ................................................................................46

WP3:862187.4                                            57164.1001

15.9    Successors And Assigns. ...................................................................46
15.10   Creditors........................................................................................46
15.11   Schedules. ......................................................................................46
15.12   Remedies.........................................................................................46
15.13   Jurisdiction; Expedited Proceedings Election; Specific Performance. ...........47
15.14   No Presumption Against the Drafter..................................................47
15.15   Agreement Drafted by Company's Attorney. .......................................47

SCHEDULE 3.1.....................................................................................49
SCHEDULE 4.7(a) .................................................................................50
SCHEDULE 5.9(b) .................................................................................51
SCHEDULE 7.1.....................................................................................52
SCHEDULE 7.7.....................................................................................53
SCHEDULE 7.8.....................................................................................57
SCHEDULE 15.1....................................................................................63

WP3:862187.4

57164.1001

### AMENDED AND RESTATED

### LIMITED LIABILITY COMPANY AGREEMENT

### MATTERN & ASSOCIATES, LLC

THIS AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT (the "Agreement") is made effective as of the 1st day of July, 2003, by and between ROBERT C. MATTERN and JOHN SEIDEL, as the Members, ROBERT C. MATTERN, as the Initial Manager, and MATTERN & ASSOCIATES, LLC, a Pennsylvania limited liability company (the "Company"), and shall be binding upon such other individuals and Members as may be added pursuant to the terms of this Agreement. JOHN SEIDEL agrees and acknowledges that the offer of ownership in the Company was contingent on his execution of this Agreement and all of the provisions contained herein.

### ARTICLE I

### GENERAL PROVISIONS

1.1    Formation Of The Company.  By execution of this Agreement, the Members hereby ratify the filing of that certain certificate of organization (the "Certificate") filed with the Secretary of Commonwealth of the Commonwealth of Pennsylvania on June 16, 2000, for the purpose of forming the Company, under the Pennsylvania Limited Liability Company Act, 15 *Pa. Cons. Stat.* § 8901 *et seq.* (the "Act"), and hereby amend and restate the Company's operating agreement dated June 16, 2000.

1.2    Name Of The Company.  The name of the company to be stated in the Certificate and the limited liability company governed by this Agreement shall be "MATTERN & ASSOCIATES, LLC."

1.3    Purpose.  The purpose of the Company is to undertake any and all other activities permitted under the Act, and to undertake any and all other activities incidental thereto or as may be necessary to the foregoing.

1.4    Fictitious Business Name.  The Manager is directed and authorized to execute, file, and cause to be published with the proper authorities in each jurisdiction in which the Company conducts business such certificates or documents as required by the fictitious business statement acts or similar statutes in effect in each jurisdiction.

1.5    Other Acts/Filings.  The Members shall from time to time execute or cause to be executed all such certificates and other documents and do or cause to be done all such filings, recordings, publishings, and other acts as the Manager may deem necessary or appropriate to comply with the requirements of law for the formation and operation of the Company in all jurisdictions in which the Company desires to conduct business.

1.6     Principal Place Of Business And Office Of The Company. As of July 1, 2003, the principal place of business of the Company shall be located at 2036 Foulk Road, Wilmington, Delaware 19810, or such other place or places as the Manager may from time to time designate. The Company may also maintain such other offices as the Manager may from time to time deem advisable.

1.7     Registered Office; Registered Agent. The registered office of the Company required by the Act to be maintained in the Commonwealth of Pennsylvania shall be changed pursuant to a filing with the Department of State of the Commonwealth of Pennsylvania such that it is 4 Pennrose Talley, Boothwyn, Delaware County, Pennsylvania 19061, or such other office as the Manager may designate from time to time in the manner provided by the Act. The registered agent of the Company in the Commonwealth of Pennsylvania shall be Mattern & Associates, LLC or such other Person as the Manager may designate from time to time in the manner provided by the Act.

1.8     Manager. At all times, there shall be a manager to manage the Company as set forth in Section 5.1 of this Agreement. The Manager shall be responsible for any and all such duties as the Members may choose to confer upon the Manager. The Manager(s) may, but need not, be a Member, and to the extent that he or she acquires membership units, he or she shall be treated as a Member with respect to such units. It is acknowledged and agreed that **ROBERT C. MATTERN** will continue to serve as the initial Manager.

1.9     Term.

(a)     The Company shall have perpetual existence.

(b)     Notwithstanding the provisions of Section 1.9(a), above, the Company shall dissolve and its affairs shall be wound-up in accordance with the Act upon the first to occur of the following events:

(1)     The unanimous decision of all Members to dissolve Company;

(2)     The date the Company may be otherwise dissolved by operation of law or judicial decree; or

(3)     The occurrence of an event that terminates the continued membership of the last remaining Member; provided, however, that if an event described in this Section 1.9(b)(3) shall occur, the Company shall not be dissolved and its affairs shall not be wound-up if, within ninety (90) days after the occurrence of the event that terminated the continued membership of the last remaining Member, the personal representative of the last remaining Member agrees in writing to continue the Company and to the admission of the personal representative of such Member, or its nominees or designee, to the Company as a Member, effective as of the occurrence of the event that terminated the continued membership of the last remaining Member.

2

empowered to execute and deliver any and every such instrument or document for and on behalf of the Company.

      5.7    <u>Limitations On Authority</u>. The authority of the Manager over the conduct of the affairs of the Company shall be subject only to such limitations as are expressly stated in this Agreement or in the Act (to the extent this Agreement does not supersede provisions of the Act).

      5.8    <u>Duty To Devote Time</u>. Unless otherwise agreed in writing, the Members shall devote such time to the Company as the Members determine is reasonably necessary to accomplish the Company's business and affairs. Members shall use their best efforts to observe and perform each and every obligation that they have, or will, make to the Company and Members.

      5.9    <u>Restrictive Covenants</u>. Unless otherwise agreed in writing, no Member may engage (directly or indirectly) in any activity or opportunity in direct competition with the business of the Company or its subsidiary entities or the obligations of the Members to the Company, or which could be taken by the Company, without first presenting such investment or business opportunity to the Company and the Company providing written authorization indicating that the Member may engage in such activity and the extent to which the Company shall have an interest, if any, in and to such other business venture or the income or profits derived therefrom. The following restrictive covenants shall apply to each Member (and, for purposes of this Section 5.9, the term "Member" shall include the trustor of a Revocable Trust which is a Member):

      (a)    <u>"Affiliates" Defined</u>. For purposes of this Agreement, the term "Affiliates" shall mean, collectively, and each individually, the Company, any subsidiary of the Company, and any entity owned by all of the Members.

      (b)    <u>Ownership of Inventions and Developments</u>. (1) All ideas, inventions or developments that a Member may conceive or create, in whole or in part, either alone or jointly with others, during such Member's ownership of Units in the Company and any prior employment with the Company (collectively "Developments") will be the sole property of the Company. The Company will be the sole owner of all patents, copyrights, trade secrets and other proprietary rights in and with respect to such Developments. To the fullest extent permitted by law, such Developments will be deemed works made for hire. Each Member hereby transfers and assigns to the Company any proprietary rights which such person may have or acquire in any such Developments without further compensation, and each Member waives any moral rights or other special rights that such person may have or that may accrue therein. At the request and cost of the Company, each Member agrees to execute any documents and take any actions that may be required to effect and confirm such transfer and assignment and waiver. Each Member agrees to disclose promptly to the Company, or to any persons designated by it, all Developments which are or may be subject to the provisions of this subsection (b). The provisions of this subsection (b) shall apply to all ideas, inventions and developments that are conceived or developed during the term of each Members ownership of Units and any prior employment with the Company, whether before or after the date of this Agreement, and whether or not further development or reduction to practice may take

24

place after termination of ownership, for which purpose it will be presumed that any ideas, inventions or developments conceived by the Member that are reduced to practice within one year after termination of the Member's ownership were conceived during the term of ownership and/or employment (and are therefore "Developments" within the meaning of this subsection) unless such Member is able to establish a later conception date by clear and convincing evidence. The provisions of this subsection shall not apply, however, to the ideas, inventions or developments disclosed in **Schedule 5.9(b)** attached to this Agreement and accepted by Company, which schedule represents ideas, inventions or developments acknowledged by the Company to have been made by such Member (as may be designated on the schedule) prior to or outside the scope of such Member's relationship with the Company, as defined by this Section 5.9. By entering in to this Agreement, the Company does not waive and expressly retains its shop rights, works for hire, implied licenses and other rights resulting from the Members or Manager.

(2) <u>Obtaining and Enforcing Proprietary Rights</u>. Each Member agrees to assist the Company, at the Company's request and expense, to obtain and enforce patents, copyrights and other proprietary rights with respect to any Developments. Each Member will execute all documents reasonably necessary or appropriate for this purpose. This obligation will survive the termination of ownership or this Agreement, provided the Company will compensate at a reasonable rate after such termination for time actually spent by such former Member at the Company's request on such assistance. In the event that the Company is unable for any reason whatsoever to secure a Member's signature to any document reasonably necessary or appropriate for any of the foregoing purposes (including renewals, extensions, continuations, divisions or continuations in part), each Member hereby irrevocably designates and appoints the Company, Manager and their duly authorized officers and agents as such Member's agents and attorneys-in-fact to act for such Member and on his or her behalf, but only for the purpose of executing and filing any such document and doing all other lawfully permitted acts to accomplish the foregoing purposes with the same legal force and effect as if executed by such Member.

(c) <u>Use of Confidential Information</u>. Each Member acknowledges that in the course of the Member's activities with the Company, he or she will become acquainted with confidential information belonging to the Affiliates and/or any of the customers, prospects or third party business relationships of the Affiliates. This information may relate to persons, firms, corporations, or other entities that already are or will become clients, customers, or accounts of the Affiliates during the term of this Agreement. A Member shall not, during or after the term of the Member's ownership of Units, disclose said confidential information, or any part thereof, to any person, firm, corporation, association, limited liability company, joint venture, or other juridical entity, for any reason or purpose whatsoever, without the prior written consent of the Company. The parties agree that the party asserting that information is not "confidential information" shall have the burden of proof, and the term "confidential information" shall not include any knowledge or information which (i) is or becomes generally available to the public other than as a result of a disclosure by the Member, (ii) information that becomes available on a non-confidential basis from a source that is not prohibited from disclosing such information by a legal, contractual or fiduciary obligation to the other

25

57164.1001

parties to this Agreement, (iii) information that is developed independent of any disclosure by any party to this Agreement, and (iv) information that was in the possession or known by a party to this Agreement prior to its receipt of such information. Without limiting the generality of the foregoing, the Member shall not disclose (or assist in disclosure) to any person or entity any of the following information:

       (1)    The name(s) or address(es) of any current or prospective customers and information regarding any current or prospective accounts of any of the Affiliates, including methods of soliciting and retaining clients, customers, and accounts;

       (2)    The project development techniques and/or technology utilized by the Affiliates;

       (3)    Any invoicing/billing information and any other information reflecting the Affiliates' pricing practices;

       (4)    The Affiliates' confidential financial information and operational budgets and plans of the Affiliates; and

       (5)    Any other confidential information of the Affiliates, including information deemed confidential or proprietary by the clients, customers, and accounts of the Affiliates.

For the purposes of Section, confidential information may be kept in any form, including, but not limited to, computer files, papers, documents, contracts, letters, communications and other things, tangible and intangible. Upon the conclusion or termination of ownership of Units, the Member shall immediately return to the Affiliates all confidential information and other property of the Affiliates in such Member's possession or subject to such Member's control.

       (d)    <u>Non-Competition</u>. During the term of the Member's ownership of Units and for a period of twenty-four (24) months following termination, for whatever reason, the Member shall not, without Company's prior written consent, own, manage, control, be employed by, participate in, engage in, or be connected in any manner with any independent business enterprise which competes directly or indirectly with the Affiliates or which is located within 100 miles of 2036 Foulk Road, Wilmington, Delaware, and is similar to the business of an Affiliate, unless the Company authorized such activity in accordance with this Section; provided, however, that nothing herein shall prohibit a Member, following termination, from taking a position with a competing enterprise that is primarily technical in nature and does not involve participation in any substantial sales solicitation activities, provided the terminated Member provides the Company 30 day's advance written notice of such employment. Each Member acknowledges the extreme importance being placed on the time and geographic scope of the covenants set forth in the preceding sentence and fully agrees to these restrictions. Moreover, each Member shall not use any confidential information (as defined above) for his personal gain or in an independent business enterprise that competes directly or indirectly with the Affiliates.

26

(e)     Non-Solicitation of Customers.

(1)     Each Member acknowledges and agrees that the Affiliates have a legitimate interest in preventing the exploitation or appropriation of the goodwill of a customer, client, or account that has been created or maintained at the Affiliates' expense. A Member shall not during the term of Member's ownership of Units and for a period of twenty-four (24) months from the date of termination, directly or indirectly, on the Member's own behalf or in the service or on behalf of others, solicit active or prospective clients, customers, or accounts of the Affiliates.

(2)     For purposes of this Agreement, a prospective client, customer, or account (a "prospect") is any third party with whom any of the Affiliates or their agents have been in individual contact, either in person, by mail, telephone, telecopy, or in any other way other than mass mailings, advertisements and such, in the twelve (12) months preceding Member's termination of ownership of Units in an effort to make that third party an active client, customer, or account.

(f)     Non-Solicitation of Employees. Each Member acknowledges and agrees that the Affiliates provide services through the personnel who have close relationships with the Affiliates' clients, customers, and accounts and that such relationships are created and maintained at the Affiliates' expense. Each Member further acknowledges and agrees that the Affiliates have a legitimate interest in a stable and experienced workforce. A Member shall not, during the term of Member's ownership of Units and for a period of twenty-four (24) months from the date of termination, directly or indirectly, on the Member's own behalf or in the service or on behalf of others, hire, solicit, induce, take away, or attempt to hire, solicit, induce, or take away any employee, independent contractor, or other personnel of the Affiliates, or their clients, customers, or accounts.

(g)     Remedies for Breach.

(1)     Each Member agrees that this Agreement creates rights that cannot solely be protected by an award of money damages. Each Member agrees, in the event of any breach of this Agreement, material or immaterial, that the Company will suffer irreparable harm and will not have an adequate remedy at law. Each Member agrees, in the event of a breach of any of the terms of this Section, that specific performance shall lie for any breach, and the Company (or the particular Affiliate affected by the breach in the case of one of the other Affiliates) (hereinafter the "Injured Affiliate") shall be entitled to secure an order in any suit brought for that purpose to enjoin the Member from further violating any of the provisions of this Section. Pending the hearing and decision of the application for such an order, the Company or the Injured Affiliate shall be entitled to a temporary restraining order or injunctive relief without prejudice to any other legal or equitable remedy available to the Company or the Injured Affiliate. Nothing herein shall be construed as prohibiting the Company or the Injured Affiliate from pursuing any other remedies available to it for such breach or threatened breach, including the recovery of compensatory and punitive damages, costs, and reasonable attorneys' fees from a Member.

27

(2)    In consideration of John Seidel receiving an ownership interest in the Company and the development of such Member's expertise in the Company's business, in the event that he, directly or indirectly, violates Section 5.9(d) within the twenty-four (24) months following the termination of his ownership of Units, for whatever reason, he agrees to pay Company the amount of $150,000.00 (the "initial base amount"), as increased (but not decreased) each January 1st by the annual positive unadjusted change, if any, in the December Chained Consumer Price Index for All Urban Consumers (C-CPI-U) for all items as reported by the United States Department of Labor Bureau of Statistics for the immediately preceding December (the "Index"), so that each January 1st a new base amount shall be established. If the Index is less than zero, the Index shall be deemed to be zero. The initial base amount and subsequent base amounts shall be increased (but not decreased) each January 1st by multiplying such initial base amount or subsequent base amount, as the case may be, by the product of (a) one plus (b) the Index multiplied by 1/100 (.01) (for example, the December, 2002 Index was 2.1, which would result in a factor of 1.021 to be multiplied by the applicable base amount).

(3)    Nothing herein shall be construed as prohibiting the Company from pursuing other remedies available to it for a breach or threatened breach of this Agreement, including without limitation, the recovery of damages.

(h)    <u>Interpretation</u>. Each Member acknowledges that the law concerning restrictive covenants is based on facts and circumstances; therefore, each Member specifically agrees that if any court or board of arbitration to which a dispute over these restrictions is referred shall find any of these restrictions overbroad or unreasonable, then the Member authorizes the court or board to enforce the restrictions to the greatest extent it deems reasonable.

(i)    <u>Tolling Period</u>. The non-disclosure, non-competition, and non-solicitation obligations contained herein shall be extended by the length of time during which the Member shall have been in breach of any said provisions.

(j)    <u>Outside Remuneration</u>. Each Member shall turn over to Company any and all remuneration received, directly or indirectly, and in whatever form, duly endorsed for assignment or with an executed assignment to Company, from all sources (excepting proper distributions from Company) from any activities or duties contemplated under this Agreement, except as may be excluded under the introductory paragraph of this Section 5.9.

(k)    <u>Survival</u>. Except as may be expressly provided to the contrary in a separate written agreement with the Company, the provisions of this Section shall survive the termination of a Member's withdrawal from the Company and/or the termination of this Agreement.

5.10    <u>Dealing With The Company</u>. Subject to the limitations set forth in this Agreement, any Member and any Affiliates shall have the right to contract or otherwise deal with the Company for the sale or lease of property or goods, the rendition

of services, and for all other purposes, and to receive payments and fees from the
Company in connection therewith as the Manager shall determine, provided that such
payments and fees are comparable to the payments and fees that would be paid to
unrelated Persons providing the same property, goods, or services to the Company.

    5.11   Indemnity.

    (a)   General. To the extent not inconsistent with the Act and
other applicable law, the Company, its receiver, or its trustee, shall indemnify each
Member and each Member's employees, agents, affiliates, heirs, executors,
administrators, successors, and assigns, against and save them harmless from any claim,
demand, judgment, or liability and against and from any loss, cost, or expense (including,
without limitation, attorneys' fees and court costs, that may be paid by the Company as
incurred), that may be made or imposed upon such persons by reason of any (1) act
performed for or on behalf of the Company or in furtherance of the Company's business,
(2) inaction on the part of such persons, or (3) liabilities arising under federal and state
securities laws, to the extent permitted by law, so long as the Member has acted in
furtherance of a good faith belief that such course of conduct was in the best interest of
the Company and said conduct did not constitute gross negligence, gross misconduct,
fraud, a breach of fiduciary duty, or a breach of this Agreement. To the extent that this
Section 5.11 is not permitted under the Act, the Act shall control. Nevertheless, it is the
intent of this Section 5.11 that the aforementioned parties be indemnified by the
Company as stated in this subsection to the maximum extent permitted by Law.

    (b)   Liability For Acts Or Omissions. To the extent not
inconsistent with applicable law, no Member, Manager, or their respective employees,
agents, representatives, affiliates, heirs, executors, administrators, successors, or assigns,
shall be liable, responsible, or accountable in damages or otherwise to the Company or
any Member for any action taken or failure to act on behalf of the Company within the
scope of the authority conferred upon the Member or Manager by this Agreement or by
law, so long as the Member or Manager has acted in furtherance of a good faith belief
that such course of conduct was in the best interest of the Company and said conduct did
not constitute gross negligence, gross misconduct, fraud, a breach of fiduciary duty, or a
breach of this Agreement.

    (c)   Advancement of Expenses. To the fullest extent
permitted by applicable law, expenses (including legal fees) incurred by a Person
indemnified under this Section in defending any claim, demand, action, suit, or
proceeding shall, from time to time, be advanced by the Company prior to the final
disposition of such claim, demand, action, suit, or proceeding upon receipt by the
Company of an undertaking (including such security as may be reasonably required by
the Company) by or on behalf of the Person to repay such amount if it shall be
determined that the Person is entitled to be indemnified as authorized in this Section.

    5.12   Fiduciary Duty Of A Member. Each Member shall have fiduciary
responsibility for the safekeeping and use of all Company Property, whether or not in the
Member's immediate possession or control, and the Member shall not employ or permit
another to employ such Property in any manner, except for the benefit of the Company.

29

(d)    The Company, the Manager, and each Member waives any conflict-of-interest resulting from Young Conaway Stargatt & Taylor, LLP's representation of the Company and Robert C. Mattern, and consents to its representation of the Company and Robert C. Mattern.


IN WITNESS WHEREOF, the parties hereto have executed this Agreement under seal effective as of date first above-written.

**WITNESS:**

Lisa A. Schneider

**COMPANY: MATTERN & ASSOCIATES, LLC**

By: _____ (SEAL)
    ROBERT C. MATTERN, Manager

**WITNESS:**

Lisa A. Schneider

**MANAGER:**

_____ (SEAL)
    ROBERT C. MATTERN

**WITNESS:**

Lisa A. Schneider

Lisa A. Schneider

**MEMBERS:**

_____ (SEAL)
    ROBERT C. MATTERN

_____ (SEAL)
    JOHN SEIDEL

WP3:862187.4

57164.1001

**SCHEDULE 3.1**

**MATTERN & ASSOCIATES, LLC**

**PROPERTY CONTRIBUTED TO COMPANY & UNITS**

| MEMBER | PROPERTY | UNITS |
|---|---|---|
| ROBERT C. MATTERN | 100% of Attached Balance Sheet | 97 |
| JOHN SEIDEL | To be issued by the Company as compensation, subject to a total risk of forfeiture, a portion of which restriction will lapse on February 1, 2004 | 3 |

WP3:862187.4

57164.1001

This Schedule 7.7 is made effective by the individual parties hereto and on behalf of the Company as of July 1, 2003.

**WITNESS:**

*Lisa A. Schneider*
Lisa. A. Schneider

**WITNESS:**

*Lisa A. Schneider*
Lisa A. Schneider

**WITNESS:**

*Lisa A. Schneider*
Lisa A. Schneider

*Lisa A. Cohn*
Lisa. A. Schneider

**COMPANY: MATTERN & ASSOCIATES, LLC**

By:_____(SEAL)
ROBERT C. MATTERN, Manager

**MANAGER:**

_____(SEAL)
ROBERT C. MATTERN

**MEMBERS:**

_____(SEAL)
ROBERT C. MATTERN

_____(SEAL)
JOHN SEIDEL

WP3:862187.4

57164.1001

Certificate No. 2

## MATTERN & ASSOCIATES, LLC
## CERTIFICATE OF OWNERSHIP INTEREST

|  | No. of |
|---|---|
| Name | Units Owned |
| JOHN SEIDEL | 3 |

ROBERT C. MATTERN, Manager

Dated: July 1, 2003

NOTICE IS HEREBY GIVEN THAT THE SALE, ASSIGNMENT, TRANSFER, PLEDGE, OR OTHER DISPOSITION OF THE UNITS REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THE RESTRICTIONS IMPOSED BY THE LIMITED LIABILITY COMPANY AGREEMENT OF MATTERN & ASSOCIATES, LLC, DATED EFFECTIVE AS OF JULY 1, 2003.

# EXHIBIT B

**E-Mails forwarded to Robert Mattern from John Seidel's workstation on and after April 11, 2005. At the top of the e-mails it appears they were sent from John Seidel to Robert Mattern, but in actuality Robert Mattern forwarded them to his computer.**

## Robert C. Mattern

**From:**     John Seidel [jseidel@matternassoc.com]
**Sent:**     Friday, April 15, 2005 7:24 AM
**To:**       rmattern@matternassoc.com
**Subject:** FW: FW: John Seidel - Follow-up

-----Original Message-----
**From:** John Seidel [mailto:jseidel@matternassoc.com]
**Sent:** Sunday, April 10, 2005 5:56 PM
**To:** 'Kevin.Kennedy@pb.com'
**Subject:** RE: FW: John Seidel - Follow-up

Kevin,

Thank you very much for getting back to me.  I appreciate the update and will wait to hear back from you.  I am also very interested in continuing our discussions and look forward to it.  Most likely, the best way to reach me later in the week will be via cell at 856-392-9463.

Take care,

John

     -----Original Message-----
     **From:** Kevin.Kennedy@pb.com [mailto:Kevin.Kennedy@pb.com]
     **Sent:** Sunday, April 10, 2005 5:11 PM
     **To:** John Seidel
     **Subject:** Re: FW: John Seidel - Follow-up

     John - we are a couple of weeks behind schedule in moving forward with some of the things we spoke about - I am still very interested in pursuing opportunities with you - I will try and get with you before the end of the week to let you know where we stand. Thanks for your continued interest.

     Kevin P. Kennedy
     President, Enterprise Accounts & US Sales and Marketing
     Pitney Bowes Management Services
     23 Barry Place, MSC 03-04
     Stamford, CT 06926-0710
     (203) 326 - 6255 - Phone
     (203) 357-7022 - Facsimile
     Asst. - Petita Jimenez @ 203.326.6419
     =

## Robert C. Mattern

**From:** John Seidel [jseidel@matternassoc.com]
**Sent:** Friday, April 15, 2005 7:24 AM
**To:** rmattern@matternassoc.com
**Subject:** FW: Seidel Resume



ResumeUpdateJSei
del021905.doc

    -----Original Message-----
From:      John Seidel [mailto:jseidel@matternassoc.com]
Sent: Sunday, April 10, 2005 5:48 PM
To:    'hakan329@verizon.net'
Subject:    Seidel Resume

Hoke,

If you could hold onto this electronic version of my resume until I have a
place to store it, that would be great.

Thanks,

John

1

## Robert C. Mattern

**From:** Christopher Petrini-Poli [cpetrini-poli@huronconsultinggroup.com]
**Sent:** Monday, April 11, 2005 10:52 AM
**To:** John Seidel
**Subject:** RE: John Seidel Follow-up

John,

Sorry this took so long. Our legal has indicated that its a pretty stringent agreement. They only solution would be for you to obtain a waiver from mattern on these issues. I wanted to get your thoughts on this before we proceeded any further. I don't want to compromise your current situation. Please advise how best to proceed.

Chris

-----Original Message-----
**From:** John Seidel [mailto:jseidel@matternassoc.com]
**Sent:** Thursday, March 10, 2005 10:27 PM
**To:** Christopher Petrini-Poli
**Subject:** RE: John Seidel Follow-up

Chris,

Thanks for getting back to me. I will wait to hear from you again. Do you have any idea how long it might take for your legal department to review the situation?

John

-----Original Message-----
**From:** Christopher Petrini-Poli [mailto:cpetrini-poli@huronconsultinggroup.com]
**Sent:** Thursday, March 10, 2005 6:34 PM
**To:** jseidel@matternassoc.com
**Cc:** Loren Trimble
**Subject:** Re: John Seidel Follow-up

John,

Thanks for your message. We are awaiting a review from our legal dept regarding the potential issues. One I have that back I will reach out to you.

Talk to you soon.

Chris

-----Original Message-----
**From:** John Seidel <jseidel@matternassoc.com>
**To:** Christopher Petrini-Poli <cpetrini-poli@huronconsultinggroup.com>
**CC:** Loren Trimble <ltrimble@huronconsultinggroup.com>
**Sent:** Thu Mar 10 07:33:15 2005
**Subject:** FW: John Seidel Follow-up

Chris,

I wanted to follow-up with you to see if you have given any further consideration to the discussions we had last week and if you are interested in speaking further. If you could let me know one way or another that

10/11/2005

Re: John Seidel Follow-up

would be great, as I have a couple of other opportunities to explore but would like to get a better feel for your thoughts first.

Take care,

John

-----Original Message-----
From: John Seidel [mailto:jseidel@matternassoc.com]
Sent: Thursday, March 03, 2005 6:25 PM
To: 'Christopher Petrini-Poli'
Cc: 'ltrimble@huronconsultinggroup.com'
Subject: RE: John Seidel Follow-up


Chris,

It was great to get a chance to meet with you this morning and to also speak with Loren. Adam also gave me a pretty good feel for how your typical engagements work and the climate of the company.

It does sound like there would be a possible good fit between my background and your particular situation, particularly as it applies to training your existing staff on the mail processing, digital output and off-site records storage services, and I look forward to hearing back from you regarding your thoughts.

One thing I was thinking about was that if you feel the non-compete issue is not something Huron feels they want to get involved with at this point, as far as me being a direct employee of the company, perhaps we could work out some type of independent contractor/consultant role that would enable you to gain the training assistance you might need from me, while at the same type assisting with revenue growth. Obviously, we would have to work out the details, but it might be something for you and Loren to think about.

Again, thanks for the time this morning and I look forward to speaking with you further.

Take care,

John

-----Original Message-----
From: Christopher Petrini-Poli [mailto:cpetrini-poli@huronconsultinggroup.com]
Sent: Wednesday, March 02, 2005 10:55 AM
To: John Seidel
Subject: RE: John Seidel Follow-up


John,

   That will work fine. See you then.

-----Original Message-----
From: John Seidel [mailto:jseidel@matternassoc.com]
Sent: Wednesday, March 02, 2005 10:59 AM
To: Christopher Petrini-Poli
Subject: John Seidel Follow-up


Chris,

Just checking to make sure that we are still on for tomorrow at 10am. When you get a chance, please let me know.

Thanks,

John

10/11/2005

Re: John Seidel Follow-up

-----Original Message-----
From: Christopher Petrini-Poli [mailto:cpetrini-poli@huronconsultinggroup.com]
Sent: Thursday, February 17, 2005 1:33 PM
To: John Seidel
Subject: RE: Follow Up

If that works for you.  Otherwise we can talk via phone.

Chirs

-----Original Message-----
From: John Seidel [mailto:jseidel@matternassoc.com]
Sent: Thursday, February 17, 2005 1:45 PM
To: Christopher Petrini-Poli
Subject: RE: Follow Up

Chris,

That works for me.  Are we planning on meeting at your NYC office?

John

-----Original Message-----
From: Christopher Petrini-Poli [mailto:cpetrini-poli@huronconsultinggroup.com]
Sent: Thursday, February 17, 2005 1:27 PM
To: John Seidel
Subject: RE: Follow Up

Thanks John.  Lets plan on 3/3  at 10:00 EST.  Please confirm

-----Original Message-----
From: John Seidel [mailto:jseidel@matternassoc.com]
Sent: Wednesday, February 16, 2005 10:07 PM
To: Christopher Petrini-Poli
Subject: RE: Follow Up

Chris,

Thanks for the note.  I just returned from a West Coast trip tonight, have meetings all day tomorrow and
Friday and I am on vacation in Mexico all of next week and really will not be able to get together until the
following week. The days of 3/2, 3/3 and 3/4 are wide open right now.  You pick the day and time and I will
make it happen.  Also, I appreciate you keeping this extremely confidential.  In case you would like to talk my
cell number is 856-392-9463.

Thanks and I look forward to getting together,

John

-----Original Message-----
From: Christopher Petrini-Poli [mailto:cpetrini-poli@huronconsultinggroup.com]
Sent: Wednesday, February 16, 2005 4:44 PM
To: jseidel@matternassoc.com
Subject: Re: Follow Up

Re: John Seidel Follow-up

John,

    Loren indicated you and he had talked a few days ago and I was able to connect the name today.  Think it would be good if we found a time to get together.   I'm in most of next week.  Please advise if here are some days/times that might work.

Thanks

Chris

Chris Petrini-Poli
Huron Consulting Group
1301 Avenue of the Americas - 6th Floor
New York, NY 10019
P: (646) 277-2282
E-mail: cpetrini-poli@huronconsultinggroup.com

10/11/2005

# EXHIBIT C

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| MATTERN & ASSOCIATES, L.L.C. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| JOHN SEIDEL | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

| | | |
|---|---|---|
| STATE OF DELAWARE | ) | |
| | ) | SS. |
| NEW CASTLE COUNTY | ) | |

## AFFIDAVIT OF
## MATTERN & ASSOCIATES, L.L.C.

BE IT REMEMBERED THIS 9th DAY OF DECEMBER, 2005, that Robert C. Mattern personally appeared before the subscriber, a notary public in and for the State and County aforesaid, and having been duly sworn according to law, did depose and state as follows:

1.    I am the Manager of Mattern & Associates, L.L.C. ("M&A") and am authorized to make this Affidavit on its behalf.

2.    I submit this Affidavit in support of M&A's Complaint against John Seidel ("Seidel") seeking to recover sums in excess of $170,000.00 on claims arising out of Seidel's breach of the non-competition provision with M&A.

**The M&A Business**

3.     M&A is in the business of finding the most economical and efficient means for law firms and other companies to manage their copying, faxing, centralized filing, document management, mail, office supplies, and cost recovery systems.  M&A recommends the most cost-effective uses for a client's equipment, software, and personnel and offers Requests for Proposals for more limited services, which include: records management, office supplies, multi-functional (copiers)/ workflow products, cost recovery systems, as well as outsourcing services. M&A either recommends the services be provided in-house at their direction and with their assistance or prepares a Request for Proposal allowing the companies who offer these services (i.e., Pitney Bowes, IKON, Xerox, Williams Lea, and IST) to bid on them.  M&A then assists the firm with this process and educates them on how to bill for these services through cost-recovery analysis.

4.     M&A has developed unique mechanisms for analyzing the various methods used to increase productivity, such as utilizing scanning to eliminate the need for copying and hand delivering documents, including pleadings, correspondences, and discovery material.

5.     M&A developed the "Mattern Method®" consisting of proprietary information used to analyze the services of: records management, office supplies analysis, multi-functional/ workflow selection, cost recovery analysis, in-house support services, and outsourcing and equipment, hereinafter referred to as the "Mattern Support Services."

**Seidel's Employment with M&A**

6.     M&A hired Seidel on June 1, 2001 and entrusted him with and trained him on M&A's confidential information, customized techniques, and trade secrets, as well as the names and addresses of M&A's customers.

7.     On July 1, 2003 Seidel was elected as an officer and member of M&A.  He signed and accepted M&A's Limited Liability Company Agreement ("Agreement").

8.     The Agreement required Seidel:

   a) to maintain the privacy of M&A's trade secrets and all other classified information, including but not limited to: databases, customer lists, Request for Proposals, Request for Proposal templates, workflow analysis, benchmarking data, on-site questionnaires for gathering information, guides for analyzing mail, copy, fax, records operations, cost recovery systems, and the "Mattern Method®";

   b) not to solicit business or act as an employee of a competitor of M&A operating within 100 miles of M&A's principal place of business, for a period of twenty-four (24) months after terminating employment with M&A;

   c) not to disclose any of M&A's confidential information to a "person, firm, corporation, association, limited liability company, joint venture, or other judicial entity" without first obtaining M&A's prior written consent; and

   d) to pay M&A $150,000 in the event he breaches the non-competition provision.

**Seidel's Competitive Conduct**

9.     Beginning on or before February 16, 2005, and continuing thereafter, Seidel sent and received various "E-mail" correspondences from his company computer, soliciting M&A's competitors and evidencing his intent to compete.  These included forwarding e-mails to Huron Consulting Group, a direct competitor of M&A, seeking employment providing the same services M&A provides to current and prospective clients.  Seidel also sought employment with

Pitney Bowes Management Services, as evidenced by his e-mails to and from Kevin Kennedy on April 10, 2005, as set forth in paragraph 8 of the Complaint.

10.     M&A's records also revealed that Seidel, during the pre-resignation period, diverted M&A's assets for his personal use, including:

a) the use of the Company credit card, prior to or as of December 2004, to pay for, or reimburse himself for the cost of, personal expenses incurred from soliciting business ventures from M&A's competitors;

b) Seidel traveling to Stamford, Connecticut on March 23, 2005 for an interview with Pitney Bowes Management Services and charging M&A $235.00 for the cost of his expenses under the false pretense that he was meeting with a potential client.

11.     Seidel offered to train M&A's competitors' employees in services offered by M&A. Seidel approached Huron Consulting Group, Pitney Bowes Management Services, and Konica Minolta Business Solutions U.S.A., Inc. about possible employment opportunities, all in direct competition with M&A.

12.     Seidel eventually was employed with Konica Minolta Business Solutions U.S.A., Inc., located at 300 Stevens Drive, Philadelphia, Pennsylvania, and within a 100 mile radius of M&A's principal place of business in Wilmington, Delaware.

13.     Konica Minolta Business Solutions U.S.A., Inc. website states, "[o]ur focus is improving your business by bringing people, process, and technology together in a seamless manner. Professional Services Group Consulting performs an in-depth analysis of your business' document flows, business processes, technology implementation, and corporate

direction." Seidel is in direct competition with M&A, not only as far as existing customers are concerned, but also with respect to potential clients.

14. While employed with Konica Minolta Business Solutions U.S.A., Inc., Seidel solicited one of M&A's current clients for business and offered them $50 if they would listen to his company's sales pitch.

15. Seidel, as former Vice President of Business Development for M&A, has valuable insider knowledge about M&A's business and its customers.

16. During interviews with Huron Consulting Group, Pitney Bowes Management Services, and Konica Minolta Business Solutions U.S.A., Inc., Seidel may very well have disclosed, offered, or provided a copy of the "Mattern Method®" to M&A's competitors at the time Seidel was soliciting their business.

17. Seidel, through his counsel, admitted on October 27, 2005 to having a back-up copy of his laptop's hard drive within his possession and offered to return it to M&A along with written confirmation indicating he is not in possession of any other confidential or proprietary information belonging to M&A. Despite Seidel's offer and my request, through counsel, these documents have yet to be received.

18. Seidel has admitted to being in possession of a copy of M&A's C drive which contains not only the known proprietary information, including the 5800 customer contact list, but also the information that could have been copied from the network drives by Seidel, including but not limited to: confidential computer files detailing the "Mattern Method®", a 20 step analysis for each of the six Mattern Support Services provided, and proposal and contract templates. Seidel's possession of client files containing confidential and proprietary customer information, including client cost information, could place M&A at a harmful disadvantage by

enabling Seidel to contact M&A's clients, solicit their business, and underbid M&A on its current and future sales agreements.

**Misuse of M&A Assets & Resignation**

19.    On or about April 11, 2005, I confronted Seidel with his misuse of company assets, and shortly thereafter, Seidel resigned from M&A. He agreed to reimburse M&A for personal expenses charged to the Company. He delivered a check in the amount of $1,748.78 in payment for these charges, but Wilmington Trust returned it due to insufficient funds. Seidel has yet to reimburse M&A for these charges.

20.    Seidel continues to owe M&A $8,188.18 from 2004 and $11,919.63 from 2005. These figures represent the net liability due from Seidel to M&A when his monthly draws and health insurance costs exceeded his actual commissions earned.

21.    I have reviewed M&A's Complaint and all Exhibits filed on behalf of M&A concurrently herewith.

22.    The statements with respect to monetary damages owed to M&A, as set forth in the Complaint and the Exhibits, accurately reflect the sums owed as a result of Seidel's breach of the Agreement.

_____
Robert C. Mattern


SWORN TO and SUBSCRIBED before me this 9th day of December, 2005.

_____
Notary Public

# EXHIBIT  D

# Young Conaway Stargatt & Taylor, LLP

BRUCE M. STARGATT
BEN T. CASTLE
SHELDON N. SANDLER
RICHARD A. LEVINE
RICHARD A. ZAPPA
FREDERICK W. IOBST
RICHARD H. MORSE
DAVID C. MCBRIDE
JOSEPH M. NICHOLSON
CRAIG A. KARSNITZ
BARRY M. WILLOUGHBY
JOSY W. INGERSOLL
ANTHONY G. FLYNN
JEROME K. GROSSMAN
EUGENE A. DIPRINZIO
JAMES L. PATTON, JR.
ROBERT L. THOMAS
WILLIAM D. JOHNSTON
TIMOTHY J. SNYDER
BRUCE L. SILVERSTEIN
WILLIAM W. BOWSER
LARRY J. TARABICOS
RICHARD A. DILIBERTO, JR.
MELANIE K. SHARP
CASSANDRA F. ROBERTS
RICHARD J.A. POPPER
TERESA A. CHEEK
NEILLI MULLEN WALSH
JANET Z. CHARLTON
ROBERT S. BRADY
JOEL A. WAITE
BRENT C. SHAFFER
DANIEL P. JOHNSON
CRAIG D. GREAR
TIMOTHY JAY HOUSEAL
BRENDAN LINEHAN SHANNON
MARTIN S. LESSNER
PAULINE K. MORGAN
C. BARR FLINN
NATALIE WOLF
LISA B. GOODMAN
JOHN W. SHAW
JAMES P. HUGHES, JR.
EDWIN J. HARRON
MICHAEL R. NESTOR
MAUREEN D. LUKE
ROLIN P. BISSELL
SCOTT A. HOLT

JOHN T. DORSEY
M. BLAKE CLEARY
———
ATHANASIOS E. AGELAKOPOULOS
JOSEPH M. BARRY
SEAN M. BEACH
DONALD J. BOWMAN, JR.
TIMOTHY P. CAIRNS
CURTIS J. CROWTHER
MARGARET M. DIBIANCA
ERIN EDWARDS
KENNETH J. ENOS
IAN S. FREDERICKS
JAMES J. GALLAGHER
DANIELLE GIBBS
ALISON G.M. GOODMAN
SEAN T. GREECHER
KARA S. HAMMOND
DAWN M. JONES
RICHARD S. JULIE
KAREN E. KELLER
JENNIFER M. KINKUS
EDWARD J. KOSMOWSKI
JOHN C. KUFFEL
TIMOTHY E. LENGKEEK
MATTHEW B. LUNN
JOSEPH A. MALFITANO
GLENN C. MANDALAS
ADRIA B. MARTINELLI
MICHAEL W. MCDERMOTT
MATTHEW B. MCGUIRE
MARIBETH L. MINELLA
EDMON L. MORTON
D. FON MUTTAMARA-WALKER
JENNIFER R. NOEL
JOHN J. PASCHETTO
ADAM W. POFF
SETH J. REIDENBERG
FRANCIS J. SCHANNE
MICHELE SHERRETTA
MICHAEL P. STAFFORD
JOHN E. TRACEY
ALFRED VILLOCH, III
MARGARET B. WHITEMAN
CHRISTIAN DOUGLAS WRIGHT
SHARON M. ZIEG

THE BRANDYWINE BUILDING
1000 WEST STREET, 17TH FLOOR
WILMINGTON, DELAWARE 19801

P.O. BOX 391
WILMINGTON, DELAWARE 19899-0391

(302) 571-6600
(800) 253-2234 (DE ONLY)
FAX: (302) 571-1253

WRITER'S DIRECT DIAL NUMBERS
VOICE: (302) 571-6685
FAX: (302) 576-3297

E-MAIL: jgrossman@ycst.com

H. ALBERT YOUNG
1929-1982
H. JAMES CONAWAY, JR.
1947-1990
WILLIAM F. TAYLOR
1954-2004
———
STUART B. YOUNG
EDWARD B. MAXWELL, 2ND
OF COUNSEL
———
JOHN D. MCLAUGHLIN, JR.
ELENA C. NORMAN (NY ONLY)
PATRICIA A. WIDDOSS
SPECIAL COUNSEL

GEORGETOWN OFFICE
110 WEST PINE STREET
P.O. BOX 594
GEORGETOWN, DELAWARE 19947
(302) 856-3571
(800) 255-2234 (DE ONLY)
FAX: (302) 856-9338

April 14, 2005

**BY CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Mr. John Seidel
803 Augusta Circle
Mount Laurel, NJ 08054

Re:    <u>Mattern & Associates, LLC (the "Company")</u>

Dear Mr. Seidel:

        This letter constitutes notice pursuant to Section 15.1 of that certain Amended and Restated Limited Liability Company Agreement of Mattern & Associates, LLC, dated effective as of July 1, 2003 (the "LLC Agreement"). Based on information provided to me by Mr. Robert C. Mattern ("Mr. Mattern"), you have breached the LLC Agreement in multiple respects, to wit:

        1.   Section 5.9 of the LLC Agreement provides, in its preamble, that "[u]nless otherwise agreed in writing, no Member may engage (directly or indirectly) in any activity or opportunity in direct competition with the business of the Company or its subsidiary entities or the obligations of the Members to the Company, or which could be taken by the Company without first presenting such investment or business opportunity to the Company and the Company providing written authorization indicating that the Member may engage in such activity and the extent to which the Company shall have an interest, if any, in and to such other business venture or the income or profits therefrom."

WP3:1102428.1

57164.1001

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Mr. John Seidel
April 14, 2005
Page 2

2.   Section 5.9(c) of the LLC Agreement provides, in pertinent part, as follows: "a Member shall not, during or after the term of the Member's ownership of Units, disclose said confidential information, or any part thereof, to any person, firm, corporation, association, limited liability company, joint venture, or other juridical entity, for any reason or purpose whatsoever, without the prior written consent of the Company." Your attention is directed to the definition of "confidential information" set forth in Section 5.9(c) of the LLC Agreement.

3.   Section 5.9(d) of the LLC Agreement provides, in pertinent part, as follows: "during the term of the Member's ownership of Units and for a period of twenty-four (24) months following termination, for whatever reason, the Member shall not, without Company's prior written consent, own, manage, control, be employed by, participate in, engage in, or be connected in any manner with any independent business enterprise which compete directly or indirectly with the Affiliates or which is located within 100 miles of 2036 Foulk Road, Wilmington, Delaware, and is similar to the business of an Affiliate, unless the Company authorizes such activity in accordance with this Section . . ."

4.   Section 5.9(g) of the LLC Agreement sets forth the remedies for breach of the Agreement. Such remedies include, without limitation, all legal and equitable remedies, including, without limitation, injunctive relief and the recovery of compensative and punitive damages, costs, and reasonable attorneys' fees. Furthermore, Section 5.9(g)(2) provides that if you violate Section 5.9(d) within 24 months following the termination of your ownership of Units, for whatever reason, you agree "to pay Company the amount of $150,000.00 . . ., as increased (but not decreased) each January 1st by the annual positive unadjusted change, if any, in the December Chained Consumer Price Index . . ."

Based on information and belief, including documentation from "E-Mail" messages sent by you and to you, using Company equipment and resources, without authorization, you have breached Section 5.9 of the LLC Agreement in numerous respects. Furthermore, it appears that you have used Company financial resources to pay for, or to reimburse yourself for the cost of, personal expenses incurred by you in seeking a position other than one which is affiliated with the Company.

With respect to the breaches of Section 5.9 of the LLC Agreement, please be advised that, without waiving any rights whatsoever pertaining to prior breaches of Section 5.9 by you, or continuing breaches of Section 5.9 by you, any action by you in violation of the provisions of Section 5.9 will result in the Company enforcing all of its rights under the LLC Agreement including, without limitation, seeking enforcement of the liquidated damages provision set forth in Section 5.9(g)(2).

With respect to your use of Company funds for personal purposes, the Company hereby demands reimbursement, in full, for any and all personal expenses paid by the Company to or on your behalf, said repayment to be made, in good funds, by no later than Friday, April 22, 2005, by 5:00 p.m.

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Mr. John Seidel
April 14, 2005
Page 3

Having voluntarily terminated your participation in the affairs of the Company, pursuant to Section 7.4(a) of the LLC Agreement, the Company has "the option to purchase the total Units then owned by the Departing Member. . . and the Purchase Price shall be One Dollar ($1.00) per Unit . . ." Enclosed is an Assignment instrument pursuant to which you assign the three Units of the Company owned by you to the Company. Please sign and date the Assignment where indicated and have your signature witnessed. Upon receipt of the fully-executed Assignment, Mr. Mattern will execute the Assignment, individually and on behalf of the Company, and the Company will issue a check to you, for $3.00, representing payment, in full, of the Purchase Price, as determined pursuant to Section 7.4(a) of the LLC Agreement.

All Company property, equipment, software, intellectual property, and information, whether such information is in written, electronic, or any other medium, must be returned to Mr. Mattern by no later than Friday, April 22, 2005, by 5:00 p.m. You are not permitted to retain any copies, whether in written, electronic, or any other medium. Furthermore, you are directed to cease and desist from any further disclosures of confidential information. If you disclose confidential information, injunctive relief in the Court of Chancery may be sought. A complete list of the names of persons and firms, along with their addresses, telephone numbers, and "E-Mail" addresses, to whom you have already disclosed confidential information must be provided to Mr. Mattern by Friday, April 22, 2005, by 5:00 p.m.

I am informed that you still owe the Company $8,188.18 from 2004 and $11,919.63 from 2005. Payment of such amounts, in good funds, must be received by Mr. Mattern, by no later than Friday, April 22, 2005, by 5:00 p.m.

Very truly yours,

Jerome K. Grossman

JKG:kle
cc:    Mr. Robert C. Mattern (by "E-Mail")

57164.1001

# YOUNG CONAWAY STARGATT & TAYLOR, LLP

BRUCE M. STARGATT
BEN T. CASTLE
SHELDON N. SANDLER
RICHARD A. LEVINE
RICHARD A. ZAPPA
FREDERICK W. IOBST
RICHARD H. MORSE
DAVID C. MCBRIDE
JOSEPH M. NICHOLSON
CRAIG A. KARSNITZ
BARRY M. WILLOUGHBY
JOSY W. INGERSOLL
ANTHONY G. FLYNN
JEROME K. GROSSMAN
EUGENE A. DIPRINZIO
JAMES L. PATTON, JR.
ROBERT L. THOMAS
WILLIAM D. JOHNSTON
TIMOTHY J. SNYDER
BRUCE L. SILVERSTEIN
WILLIAM W. BOWSER
LARRY J. TARABICOS
RICHARD A. DILIBERTO, JR.
MELANIE K. SHARP
CASSANDRA F. ROBERTS
RICHARD J.A. POPPER
TERESA A. CHEEK
NEILLI MULLEN WALSH
JANET Z. CHARLTON
ROBERT S. BRADY
JOEL A. WAITE
BRENT C. SHAFFER
DANIEL P. JOHNSON
CRAIG D. GREAR
TIMOTHY JAY HOUSEAL
BRENDAN LINEHAN SHANNON
MARTIN S. LESSNER
PAULINE K. MORGAN
C. BARR FLINN
NATALIE WOLF
LISA B. GOODMAN
JOHN W. SHAW
JAMES P. HUGHES, JR.
EDWIN J. HARRON
MICHAEL R. NESTOR
MAUREEN D. LUKE
ROLIN P. BISSELL
SCOTT A. HOLT

JOHN T. DORSEY
M. BLAKE CLEARY
———————
ATHANASIOS E. AGELAKOPOULOS
JOSEPH M. BARRY
SEAN M. BEACH
DONALD J. BOWMAN, JR.
TIMOTHY P. CAIRNS
CURTIS J. CROWTHER
MARGARET M. DIBIANCA
ERIN EDWARDS
KENNETH J. ENOS
IAN S. FREDERICKS
JAMES J. GALLAGHER
DANIELLE GIBBS
ALISON G.M. GOODMAN
SEAN T. GREECHER
KARA S. HAMMOND
DAWN M. JONES
RICHARD S. JULIE
KAREN E. KELLER
JENNIFER M. KINKUS
EDWARD J. KOSMOWSKI
JOHN C. KUFFEL
TIMOTHY E. LENGKEEK
MATTHEW B. LUNN
JOSEPH A. MALFITANO
GLENN C. MANDALAS
ADRIA B. MARTINELLI
MICHAEL W. MCDERMOTT
MATTHEW B. MCGUIRE
MARIBETH L. MINELLA
EDMON L. MORTON
D. FON MUTTAMARA-WALKER
JENNIFER R. NOEL
JOHN J. PASCHETTO
ADAM W. POFF
SETH J. REIDENBERG
FRANCIS J. SCHANNE
MICHELE SHERRETTA
MICHAEL P. STAFFORD
JOHN E. TRACEY
ALFRED VILLOCH, III
MARGARET B. WHITEMAN
CHRISTIAN DOUGLAS WRIGHT
SHARON M. ZIEG

THE BRANDYWINE BUILDING
1000 WEST STREET, 17TH FLOOR
WILMINGTON, DELAWARE 19801

P.O. BOX 391
WILMINGTON, DELAWARE 19899-0391

(302) 571-6600
(800) 253-2234 (DE ONLY)
FAX: (302) 571-1253

WRITER'S DIRECT DIAL NUMBERS
VOICE: (302) 571-6685
FAX: (302) 576-3297

E-MAIL: jgrossman@ycst.com

H. ALBERT YOUNG
1929-1982

H. JAMES CONAWAY, JR.
1947-1990

WILLIAM F. TAYLOR
1954-2004

STUART B. YOUNG
EDWARD B. MAXWELL, 2ND
OF COUNSEL

JOHN D. MCLAUGHLIN, JR.
ELENA C. NORMAN (NY ONLY)
PATRICIA A. WIDDOSS
SPECIAL COUNSEL

GEORGETOWN OFFICE
110 WEST PINE STREET
P.O. BOX 594
GEORGETOWN, DELAWARE 19947
(302) 856-3571
(800) 255-2234 (DE ONLY)
FAX: (302) 856-9338

June 8, 2005

**VIA FACSIMILE TRANSMISSION (856) 914-9420**

Patricia A. Barasch, Esquire
Schall & Barasch, LLC
66 East Main Street
Morrestown, NJ 08057-3353

     Re:   <u>Seidel v. Mattern & Associates, LLC</u>

Dear Patricia:

     As we have discussed, I am in receipt of your letter, dated April 22, 2005, responding to my letter addressed to John Seidel, dated April 14, 2005. As I mentioned in one of my "Voice Mail" messages, based on information provided by Mr. Mattern, this letter will demonstrate the inaccuracies of most, if not all, of the assertions set forth in your letter.

     First, your client resigned during the course of a meeting on Friday, April 8, 2005 with Mr. Mattern. Following the announcement of Mr. Seidel's resignation to the company as a whole, Mr. Seidel again confirmed that it was his intent to resign. Four other individuals from the company were present in the meeting and can confirm that Mr. Seidel resigned. Following confirmation of the resignation from Mr. Seidel, Mr. Mattern requested that he reconsider his choice to resign over the course of that weekend. Mr. Mattern also indicated that the resignation would not be effective until the following Monday. On Monday, April 11, 2005, Mr. Seidel came into the office and again confirmed that he wanted to resign and his resignation was accepted at that point.

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Patricia A. Barasch, Esquire
June 8, 2005
Page 2

    With respect to the assertion that there are outstanding commissions owed to Mr. Seidel, this is directly contrary to the company's records. Mr. Seidel has always received his commissions when the company received payment from its clients to whom Mr. Seidel had made proposals that were accepted. As was indicated in my letter to Mr. Seidel, it is the company's position that Mr. Seidel owes the company $8,188.18 for 2004 and $11,919.63 for 2005. These amounts are the net liability due from Mr. Seidel when his monthly draws and health insurance costs are compared to the actual commissions earned by Mr. Seidel. In other words, his monthly draws and the cost of his health insurance to the company exceeded the commissions earned by Mr. Seidel by $8,188.18 in 2004 and $11,919.63 in January through April 2005. The company can provide reconciliations from the years in question and email correspondence between Mr. Mattern and Mr. Seidel that confirm the total amount owed by Mr. Seidel to the company.

    The company disagrees with both of your assertions in connection with Mr. Seidel's 401(k) account. You allege that the company failed to make its contribution to Mr. Seidel's 401(k) account for amounts owed to his account from 2004. The employer contribution to Mr. Seidel's 401(k) account was made on April 13, 2005. Our client can produce a Federal Express receipt and a check evidencing these contributions, although I believe that your client can independently confirm the contribution.

    Additionally, you allege that Mr. Mattern directed the administrators of the account to refuse Mr. Seidel access to his account. This is a factual inaccuracy. Mr. Mattern received a call from Clifford R. Berg, Jr., CLU, ChFC, AEP, MSFS, of the Financial House, the administrator of the 401(k) account, on April 19, 2005. Mr. Berg indicated that he had received a telephone call from Mr. Seidel, who falsely represented himself as a trustee of the 401(k) plan and requested an immediate liquidation of his personal 401(k) account. Any potential delay with respect to the distribution of Mr. Seidel's account stems from his misrepresentation when he spoke with Mr. Berg, because Mr. Seidel was not a trustee of the 401(k) account. The 401(k) administrator cannot distribute the funds to Mr. Seidel solely on his direction pursuant to the applicable tax laws. Mr. Mattern has directed Financial House to provide Mr. Seidel with the appropriate paperwork and has represented that he will execute the paperwork as a trustee of the plan upon receipt. If you need further evidence relating to the underlying issue, Mr. Seidel's misrepresentation, the 401(k) administrator records its telephone conversations with participants. Accordingly, if necessary, we can seek copies of the audiotapes from these telephone calls.

    It was discovered in December, 2004 that Mr. Seidel was using his company credit card for personal business. In December, Mr. Seidel was instructed that the company credit card was to be used for business expenses only and that his use of it for personal items would not be tolerated. His personal use of the credit card continued. Prior to his departure from the company on April 8, Mr. Seidel presented a personal check to the company for repayment of amounts charged for personal items. That check was returned by the bank due to insufficient funds in Mr. Seidel's account. As a result, the company demands that Mr. Seidel repay the amount of $1,748.78, representing his personal charges on the company credit card of $1,741.58 plus a $7.00 returned check fee, to reimburse the company for these charges, in addition to the other amounts that are due as set forth herein. In the event that you need further verification of

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Patricia A. Barasch, Esquire
June 8, 2005
Page 3

these facts, we can provide you with copies of the applicable credit card statements, as well as the notice from Wilmington Trust that the check bounced.

Similarly, it has come to the company's attention that Mr. Seidel utilized the company credit card to purchase train tickets and pay parking charges for a visit to Pitney Bowes Management Services located in Stanford, Connecticut. He submitted an expense report that indicated that the ticket and the parking charges related to an alleged sales call to Baker Hostetler. The company has confirmed that Baker Hostetler is neither a potential client of the company, nor do they have an office located in Stamford, Connecticut. Mr. Seidel also represented to the company that he had conducted various sales activities and prepared proposals that were set forth on his April 8, 2005 sales report. The company has followed up with various alleged contacts set forth on Mr. Seidel's sales report and this follow-up has indicated that Mr. Seidel never met with either the law firms or the individuals listed on his report and no proposals were actually presented to these potential clients. Mr. Seidel falsified company records to cover up charges he placed on the company credit card in violation of the policy against the utilization of the credit card for personal charges. To the extent that you require copies of the credit card statements to verify Mr. Seidel's use of the credit card for personal purposes, the company can pull these and we can send copies to you for your review. On April 8, 2005, prior to his departure, Mr. Seidel and Mr. Mattern did not discuss Mr. Seidel's use of the company credit card for Mr. Seidel's job interviews, because the company only discovered the interview charges after he resigned. Thus, the company hereby demands repayment of $235.00 for the personal travel for interviews that Mr. Seidel charged to the company credit card.

Finally, with respect to your assertion that Mr. Seidel did not violate any of the provisions of the company's LLC Agreement, Mr. Seidel sent and received emails to his company email account that indicate that he did, in fact, violate the provisions of the LLC Agreement. First, Mr. Seidel sent an email to Huron Consulting, a competitor of the company, confirming an interview with them and offering to train their consultants with respect to services that are offered by the company. In addition, Mr. Seidel sent an email from his company email address pursuant to which he thanked Pitney Bowes for an interview and requested follow up therefrom. Pitney Bowes Management Services is another competitor of the company. I would ask that you first request that your client be forthcoming with you so that our client may avoid the costs involved with reviewing all of its records to pull all of the necessary documentation. In the event that your client is uncooperative, it may be necessary for us to request that Mr. Seidel compensate the company for the costs it incurs in producing the records in question.

Because Mr. Seidel did, in fact, resign his position with the company and because he did not have any outstanding unpaid commissions for 2004 or 2005, I reiterate the position of the company that was set forth in my letter to Mr. Seidel dated April 14, 2005. Thus, the company hereby demands that Mr. Seidel make payment to the company in the amounts of $8,188.18 and $11,919.63 for his "underage" for 2004 and 2005. The company further demands payments of $1,748.78 for the personal charges and $235.00 for personal travel charges for interviews that appeared on the company credit card. In addition, it has since come to the company's attention that Mr. Seidel had a deficit in his equity account as of December 31, 2004.

57164.1001

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Patricia A. Barasch, Esquire
June 8, 2005
Page 4

These funds must be repaid to the company in conformity with the Internal Revenue Code and the Treasury regulations promulgated thereunder. The amount of the deficit balance in Mr. Seidel's equity account at that time was $13,577.00. This amount should be repaid to the company in addition to the other amounts set forth above. Because Mr. Seidel's course of conduct relating to Pitney Bowes and Huron clearly breaches the terms of the LLC Agreement as outlined in my earlier letter, the company further demands payment of the penalty provided in Section 5.9(g) of the LLC Agreement, $150,000.00.

I have enclosed an additional copy of the Assignment, Consent and Acceptance for Mr. Seidel's signature to return his three units of the LCC to the company. Upon receipt of an executed copy of this document, we will arrange to issue a check in the amount of $3.00 in payment for his interest in the LLC as provided in the LLC Agreement.

I look forward to hearing from you at your convenience in order to discuss a resolution to this matter.

Very truly yours,

Jerome K. Grossman

JKG:md
Enclosure
cc:   Mr. Robert C. Mattern

WP3:1118698.3

57164.1001

SEITZ, VAN OGTROP & GREEN, P.A.

ATTORNEYS AND COUNSELLORS AT LAW

222 DELAWARE AVENUE, SUITE 1500
POST OFFICE BOX 68
WILMINGTON, DELAWARE 19899

BERNARD A. VAN OGTROP
GEORGE H. SEITZ, III
JAMES S. GREEN
R. KARL HILL
PATRICIA P. McGONIGLE
KEVIN A. GUERKE

Writer's Direct Dial:   (302) 888-7602
Writer's E-Mail Address:  gseitz@svglaw.com
www.lawyers.com/svglaw

(302) 888-0600
FAX: (302) 888-0606

October 24, 2005

John Seidel
803 Augusta Circle
Mount Laurel, NJ 08054

RE:  *Mattern & Associates, LLC v. Seidel*

Dear Mr. Seidel:

We have received information from Patricia Barasch that you are no longer represented by Schall & Barasch, L.L.C.  If you have retained another attorney please provide us with that information.  Our firm has been retained to represent Robert Mattern in this case.  From this point forward please direct all future correspondences regarding this case to my attention.

At this time there is reason to believe that you are in possession of trade secrets, databases, customer lists, Request for Proposals, Request for Proposal templates, workflow analysis, benchmarking data, on-site questionnaires for gathering information, guides for analyzing mail, copy, fax, records operations, cost recovery systems, and the "Mattern Method" all in violation of the LLC Agreement you signed with Mattern & Associates.  This is a written request for all confidential information regarding Mattern & Associates, their clients, and prospective clients to be returned no later than October 31, 2005.  If you maintain the position that you have not violated the LLC Agreement with Mattern & Associates, then it is expected that you will provide written verification to that effect.

Very truly yours,

George H. Seitz, III

cc: Mr. Robert C. Mattern



CHS
DN

**ATTORNEYS AT LAW**

Laurel Corporate Center
8000 Midlantic Drive, Suite 300
Mt. Laurel, New Jersey 08054
Phone 856.234.6800
Fax 856.235.2786
www.capehart.com

## FAX TRANSMITTAL COVER SHEET

**DATE:** 10/27/2005 3:27:32 PM

**Please deliver the following page(s) to:**

**NAME:**    George H. Seitz III

**COMPANY:**

**FAX #:**   (302) 888-0606

**FROM:**   Robert Hagerty

**TOTAL NUMBER OF PAGES (including cover sheet):** 2

If you do not receive all the pages, please call back as soon as possible.

Operator: Robert Hagerty
Date & Time Sent: 10/27/2005 3:27:32 PM

**Message:**

## CONFIDENTIALITY NOTE:

The documents accompanying this telephone transmission contain information from the law firm of Capehart & Scatchard, P.A., which is confidential and/or legally privileged. The information is intended only for the use of the individual or entity named on this transmission sheet. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this telecopied information is strictly prohibited, and that the documents should be returned to this firm immediately. In this regard, if you have received this telecopy in error, please notify us by telephone immediately so that we can arrange for the return of the original documents to us at no cost to you.

Robert J. Hagerty
856.914.2076
rhagerty@capehart.com

October 27, 2005

**Via Telecopier Only**

Mr. George H. Seitz III
Seitz, Van Ogtrop & Green
222 Delaware Avenue, Suite 1500
P. O. Box 68
Wilmington, DE  19899

Re:     Seidel, John v. Mattern & Associates, LLC

Dear Mr. Seitz:

     I am writing in response to your letter of October 25, 2005 addressed to John Seidel to advise
you that I have been retained to represent him.  I have consulted with my client and I am advised that the
only "document" in his possession is a back-up copy of his laptop's hard drive.  He has no use for this
item, and we will be happy to send it to you, along with written confirmation that Mr. Seidel has not
retained any copies (or portions thereof) of this back-up, nor does he have any confidential or
proprietary information belonging to your client in his possession.  Please advise how you would like to
proceed.  Thank you.

Very truly yours,

CAPEHART & SCATCHARD, P.A.

Robert J. Hagerty

RJH/rjh
84273.doc
cc:     Mr. John Seidel (via email only)

# SEITZ, VAN OGTROP & GREEN, P.A.

### ATTORNEYS AND COUNSELLORS AT LAW

222 DELAWARE AVENUE, SUITE 1500
POST OFFICE BOX 68
WILMINGTON, DELAWARE 19899

BERNARD A. VAN OGTROP
GEORGE H. SEITZ, III
JAMES S. GREEN
R. KARL HILL
PATRICIA P. McGONIGLE
KEVIN A. GUERKE

Writer's Direct Dial:  (302) 888-7602
Writer's E-Mail Address:  gseitz@svglaw.com
www.lawyers.com/svglaw

(302) 888-0600
FAX: (302) 888-0606

November 2, 2005

Robert J. Hagerty
Capehart & Scatchard, P.A.
Laurel Corporate Center
8000 Midatlantic Drive, Suite 300
Mt. Laurel, NJ 08054

RE:  *Mattern & Associates, LLC  v. Seidel*

Dear Mr. Hagerty:

I am in receipt of your letter dated October 27, 2005.  It is expected that the back-up copy of the laptop's hard drive will be returned to Mattern & Associates as soon as possible.  In addition, I am renewing my request for written certification indicating Mr. Seidel is not in possession of any confidential or proprietary information belonging to Mattern & Associates.

Please do not hesitate to contact me if you have any questions or concerns.

Very truly yours,

George H. Seitz, III

cc:    Mr. Robert C. Mattern

50819 v1

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MATTERN & ASSOCIATES, L.L.C.,       )
                                    )
    Plaintiff.                      )
                                    )        C.A. No. 1:06-CV-36 KAJ
                                    )
         v.                      )
                                    )
                                    )
JOHN SEIDEL,                        )
                                    )
    Defendant and Third Party Plaintiff.  )
                                    )
                                    )
         v.                      )
                                    )
                                    )
ROBERT MATTERN,                     )
ABC ENTITIES 1-50, and              )
J. Does 1-50,                       )
                                    )
    Third Party Defendants.         )

## ~~VERIFIED COMPLAINT~~
## PLAINTIFF'S FIRST AMENDED COMPLAINT

    <u>1.</u>    ~~1.    This is an action, *inter alia,* to enforce a Limited Liability Company~~

~~Agreement (the "Agreement") and, in particular, a non-competition provision of the Agreement.~~

~~A true and correct copy of the relevant portions of the Agreement is attached hereto as "Exhibit~~

~~A". As set forth below, Defendant John Seidel has breached the Agreement, has breached his~~

~~fiduciary duties of good faith, loyalty, and fair dealing, and Seidel's actions demand specific~~

~~enforcement.~~<u>Plaintiff, Mattern & Associates, LLC, ("M&A"), by its undersigned attorneys,</u>

<u>hereby brings the following Amended Complaint for injunctive relief and damages against</u>

<u>Defendant John Seidel ("Seidel"). M&A reasserts causes of action against Seidel for: (i) breach</u>

of contract, namely the Limited Liability Company Agreement (the "Agreement") Seidel entered into with M&A, and (ii) breach of the fiduciary duties of good faith, loyalty, and fair dealing. M&A also asserts a new cause of action for: (iii) misappropriation of trade secrets.  In support of its causes of action, M&A avers as follows:

PARTIES<del>arties</del>

2.      Plaintiff Mattern & Associates, LLC ("M&A") is a Pennsylvania limited liability corporation having its principal place of business at 2036 Foulk Road, Wilmington, New Castle County, Delaware 19810.

3.      John Seidel ("Seidel") was last known to be a resident of the State of New Jersey residing at ~~803 Augusta Circle, Mount Laurel, Burlington County, New Jersey 08054.  Seidel may be served by serving the Secretary of State pursuant to 10 Del. C. § 3104~~ 1208B Harwood Ct., Mount Laurel, Burlington County, New Jersey 08054.

BACKGROUND FACTS

Seidel's Employment with M&A

4.      Beginning on June 1, 2001, and continuing until April 11, 2005, Seidel was employed by M&A as an independent contractor and/or an employee.

5.    Seidel became Vice President of Business Development and during his employment was entrusted with M&A's confidential information, customized techniques, and trade secrets, as well as the names and addresses of M&A's customers.

6.    On July 1, 2003, Seidel became a member of M&A and signed and accepted the terms of the Operating Agreement with M&A.  Under the terms of the Operating Agreement, Seidel agreed:

   a) to maintain privacy regarding M&A's trade secrets and all other classified information, including but not limited to: databases, customer lists, Request for Proposals, Request for Proposal templates, workflow analysis, benchmarking data, on-site questionnaires for gathering information, guides for analyzing mail, copy, fax, records operations, cost recovery systems, and the "Mattern Method®";

   b) not to solicit business or act as an employee of a competitor of M&A operating within 100 miles of M&A's principal place of business, for a period of twenty-four (24) months after terminating employment with M&A;

   c) not to disclose any of M&A's confidential information to a "person, firm, corporation, association, limited liability company, joint venture, or other judicial entity" without first obtaining M&A's prior written consent;

   d) to return to M&A all confidential information and other property of M&A upon the termination of his employment; and~~and;~~

   e~~d~~) to pay M&A $150,000 in the event he breached the non-competition provision.

7.    As an employee,- officer and shareholder of M&A, Seidel owed fiduciary duties to M&A, including duties to devote his full time and best efforts to furthering the business interests of M&A and including an obligation to maintain confidentiality of all M&A Property.

Seidel's Competitive Conduct

8.    Beginning on or about December of 2004, while Seidel was still employed by M&A and holding himself out as a loyal employee, officer and shareholder, and continuing up to the time of his resignation, Seidel engaged in a course of conduct designed to misappropriate M&A's assets in violation of the Agreement.

9.    On February 16, 2005 and thereafter, Seidel engaged in a course of conduct designed to seek employment with competitors of M&A.  Seidel sent and received various "E-mail" correspondences using the M&A computer system to seek employment with M&A's competitors.  These e-mails included messages to Huron Consulting Group, a direct competitor of M&A, seeking employment and offering to provide the same services M&A provides to current and prospective clients.  The e-mails are attached hereto as "Exhibit B".

10.    From February 16, 2005 to April 11, 2005, Seidel exchanged twelve (12) e-mails with Christopher Petrini-Poli ("Poli") regarding a position with Huron Consulting Group in furtherance of his scheme to seek employment in direct competition with M&A in violation of the Agreement.  Seidel even offered to work out an independent contractor arrangement with Huron in a misguided effort to circumvent his non-competition obligations to M&A.

11.    Seidel's plan to compete with M&A, in violation of his Agreement, is reflected in an April 11, 2005 e-mail from Poli, stating that "our legal has indicated that it's a pretty stringent agreement.  The[y] only solution would be for you to obtain a waiver from [M]attern on these

4

issues. I wanted to get your thoughts on this before we proceeded any further. I don't want to compromise your current situation."

12.     Seidel, during this period, also exchanged emails with Kevin Kennedy of Pitney Bowes Management Services, another direct competitor of M&A, seeking employment.

13.     Seidel traveled to Stamford, Connecticut for an interview with Pitney Bowes Management Services on March 23, 2005 and charged M&A $235.00 for the cost of his expenses under the false pretense that he was meeting with a potential client.

Seidel's Misuse of M&A Funds & Resignation

14.     During this same period, Seidel's job performance at M&A continued on a downward spiral and he failed to meet company goals. On April 8, 2005, Robert Mattern, Manager of M&A, confronted Seidel about his poor job performance and continuous use of the Company credit card to pay for, or reimburse himself for the cost of, personal expenses.

15.     Seidel responded by mentioning his intent to resign from M&A.

16.     On April 11, 2005, Seidel advised Mattern that he was resigning.

17.     Prior to Seidel's resignation, he agreed to reimburse M&A for personal expenses he charged to the Company and delivered a personal check in the amount of $1,748.78 to cover this expense. The bank returned the check to M&A due to insufficient funds. Seidel has never reimbursed M&A for personal expenses charged to the firm's credit card.

18.     As a result of his resignation, Seidel also owes M&A for the net liability due to M&A to the extent his monthly draws and health insurance costs exceeded his actual commissions earned. These amounts are $8,188.18 from 2004 and $11,919.63 from 2005.

19.     Seidel has failed to surrender his Ownership Units as required under the terms of the Agreement upon resignation from M&A.

5

20.    Despite repeated requests, Seidel has refused to reimburse M&A for these expenses or to return his Ownership Units.

Seidel's Continued Competition

21.    Following his resignation, Seidel continued to act in breach of the Agreement by accepting employment with Konica Minolta Business Solutions U.S.A., Inc., a competitor of M&A, located at 300 Stevens Drive, Philadelphia, Pennsylvania, and the facility is within a 100 mile radius of M&A's Wilmington, Delaware office.

22.    As more specifically stated in the Affidavit ("Exhibit C") under "The M&A Business" heading, M&A is in the field of support services consulting, document management, and cost recovery analysis primarily focused on law firms and other companies. Konica Minolta Business Solutions U.S.A., Inc. is in direct competition with M&A's business.

23.    In October of 2005, while working for Konica Minolta Business Solutions U.S.A., Inc., Seidel solicited one of M&A's current clients for business and offered them $50 if they would listen to his company's sales pitch.

24.    In October 2006, after working for Konica for over a year, Seidel accepted employment with another M&A competitor, Stewart Business Systems, LLC, which is located at 105 Connecticut Drive, Burlington, NJ 08016, well within a 100 mile radius of M&A's Wilmington, Delaware office.

25.    Seidel currently remains employed with Stewart competing with M&A in violation of the Agreement. Upon information and belief, Seidel also continues to solicit M&A's prospective customers in violation of the Agreement.

Seidel's Misappropriation of M&A Information

2<u>6</u>4.    Seidel, as former Vice President of Business Development for M&A, has valuable insider knowledge about M&A's business and its customers.

27.    <u>Prior to resigning from M&A, Seidel made a copy of the entire hard drive of the M&A owned laptop computer that he used to conduct business for M&A.  This hard drive not only contained M&A's customer contact list, but also additional confidential and competitively sensitive information such as client proposals, requests for proposal, client requirements, chargeback reports, chargeback system questions, M&A's various checklists, question sheets, reports and surveys, consulting agreements, workflow analyses, the Mattern Method On-Site Observation Checklists & Questions and M&A marketing material.</u>

28.    <u>Although Seidel returned the laptop computer to M&A upon his resignation, he kept a copy of the hard drive and the voluminous M&A proprietary information contained thereon.</u>

2<u>9</u>5.    On four separate occasions M&A, through its counsel, wrote to Seidel and/or his attorney demanding he cease and desist from any activities in violation of the Agreement, reimburse M&A for monies received in violation of the Agreement, and requesting the return of all M&A property, including but not limited to: trade secrets, databases, customer lists, Request for Proposals, Request for Proposal templates, workflow analysis, benchmarking data, on-site questionnaires for gathering information, guides for analyzing mail, copy, fax, records operations, cost recovery systems, and the "Mattern Method®", taken in violation of the LLC Agreement.  The correspondences are attached hereto as "Exhibit D".

30<s>26</s>.    On October 27, 2005, <s>Although</s> Seidel, through counsel, <u>finally admitted</u> –to possessing the back-up copy of Seidel's laptop's hard drive and promised to return it to M&A,

along with written confirmation that Seidel has not retained any copies of it nor is he in possession of any other confidential or proprietary information belonging to M&A, ~~M&A has yet to receive either of these documents.~~

3~~27~~1.    ~~To date, Seidel has refused to comply with these requests.~~ Two months later, and approximately nine months after his resignation, Seidel finally returned the copy of the M&A hard drive.

32.    M&A believes, and therefore avers, that both prior to and subsequent to his resignation from M&A, Seidel misappropriated, misused and converted M&A's confidential, trade secret information for his own use and benefit, by using said information to solicit employment from competitors of M&A and to solicit current and prospective customers of M&A to do business with Seidel.

33~~28~~.    Seidel's activities in breach of the Agreement, as set forth herein, have caused and will continue to cause irreparable injury to M&A unless Seidel is enjoined.

34~~29~~.    M&A has no adequate remedy at law, as previously agreed to by Seidel at the time of the Agreement.

## Count I

### Breach of Contract - Injunctive Relief

35~~0~~.    Plaintiff repeats the allegations in paragraphs 1 through 34~~29~~ above.

3~~1~~6.    Under the terms of the M&A Operating Agreement, Seidel agreed that a Member's material or immaterial breach will cause irreparable harm to M&A, rendering monetary damages alone insufficient, and thereby affording the non-breaching party with various remedies under the Agreement, including: compensatory damages, punitive damages, specific performance, and injunctive relief.   [Exhibit A §5.9(g)(1)]

37~~2~~. Defendant's refusal to abide by the non-competition provision with M&A, as set forth in the Agreement, is a breach of the contract between the parties. As a result of Defendant's breach, Plaintiff will suffer irreparable harm.

38~~3~~. There is reason to believe that Defendant is in possession of, or continues to use, privileged information belonging to M&A, including but not limited to: trade secrets, databases, customer lists, Request for Proposals, Request for Proposal templates, workflow analysis, benchmarking data, on-site questionnaires for gathering information, guides for analyzing mail, copy, fax, records operations, cost recovery systems, and the "Mattern Method®", all in violation of the LLC Agreement Defendant signed with M&A.

34~~9~~. As a result of Defendant's breach, Plaintiff will be damaged and will lose economic and business opportunities within its area of competition.

40~~35~~. As more specifically set forth above, Plaintiff's ability to maintain, solicit, and sell its copyrightable material presents a unique business opportunity from which the Plaintiff expects to derive benefits.

41~~36~~. As a result of Defendant's failure to comply with the terms of the contract, the Plaintiff has been irreparably harmed.

42. Because Seidel has violated his Agreement throughout the two year period set forth therein, Plaintiff is entitled to extend the restrictive covenants to include such period of time as Seidel has violated them.

43. Plaintiff is entitled to injunctive relief requiring the Defendant: to stop competing within a 100 mile radius of M&A for up to an additional two years from the date Seidel begins to comply with the Agreement;

37.     ~~Plaintiff is entitled to injunctive relief requiring the Defendant to stop competing~~ ~~within a 100 mile radius of M&A for the remainder of the two years as set out in the Agreement,~~ to return all confidential and proprietary information to M&A;~~,~~ to refrain from the distribution of and/or use of M&A's trade secrets;~~,~~ ~~to disclose any confidential and proprietary information,~~ and to ~~release and~~ identify any individuals or entities to whom Seidel distributed such information.

**Count II**

**Breach of Contract - Damages**

44~~38~~.   Plaintiff repeats the allegations in paragraphs 1 through 43~~37~~ above.

43~~9~~5.   Defendant has breached the Agreement by soliciting competitors of M&A for employment opportunities.

40~~6~~.   Defendant has breached the Agreement by using M&A's credit card to pay for expenses incurred in seeking employment with M&A's competitors and also to pay for personal expenses, and in failing to reimburse M&A for these charges.  Seidel is also in breach of the Agreement for failing to reimburse M&A for these charges and overpayments of his monthly draws and health insurance costs from 2004 and 2005.

41~~7~~.   Defendant has breached the Agreement by <u>competing, both directly and indirectly,</u> ~~performing or assisting in the rendering of professional consulting services in competition~~ with M&A within the geographic and time periods during which such activities are prohibited, in violation of Sections 5.9(d) and 5.9(e) of the Agreement.

48.   <u>Defendant has breached the Agreement by failing to return M&A's confidential information and property upon his resignation from M&A.</u>

49~~2~~.    As a result of these breaches, M&A has been harmed and is entitled to recover damages not less than $172,091.59.  As a result of Seidel's continued competitive conduct and use of M&A's proprietary information, all in violation of the Agreement, M&A is further threatened with additional damages consisting of lost profits resulting from the loss of existing and potential clients.

Count III

Breach of Fiduciary Duties

50~~43~~.    Plaintiff repeats the allegations in paragraphs 1 through 49~~2~~ above.

51~~44~~.    As an employee, officer, and member of M&A, Seidel owed M&A a duty of good faith, loyalty, and fair dealing.

52~~45~~.    Seidel breached his fiduciary duties of good faith, loyalty, and fair dealing owed to M&A by engaging in a course of conduct designed to divert M&A's assets, to compete directly with M&A, and to damage its relationship with existing and potential clients.

53~~46~~.    As a result of Seidel's breach of his fiduciary duties, M&A has been harmed and is entitled to damages representing economic harm caused to M&A's business interests.

**Count IV**

**Misappropriation of Trade Secrets**
*Delaware Uniform Trade Secrets Act*
*6 Del. C. § 2001 et seq.*

54.    Plaintiff repeats the allegations in paragraphs 1 through 53 above.

55.   The data, information, books and records of M&A and the confidential information contained therein concerning, *inter alia*, M&A's customers, prospects, methods, systems and operations are deserving of trade secret status and protection.

56.   This information derives independent economic value by not being accessible, through proper means, to competitors who can profit from its use or disclosure.

57.   M&A has taken reasonable measures under the circumstances to maintain the secrecy of this information.

58.   The foregoing conduct of Seidel constitutes a misappropriation of M&A's confidential, trade secret information.

59.   Seidel's misappropriation of M&A's trade secrets was willful and malicious, as Seidel not only copied the entire hard drive from his M&A laptop computer, but also failed and refused to return M&A's trade secrets for approximately nine months and despite repeated demands.

60.   As a result of Seidel's misappropriation of M&A's trade secrets, M&A and its shareholders have been harmed and are entitled to any damages which the corporation did suffer or may have suffered.  M&A is also entitled to exemplary damages and attorney's fees as a result of Seidel's willful and malicious misappropriation.

**WHEREFORE**, Mattern & Associates, LLC prays that this Court:

1)    Permanently enjoin Defendant John Seidel from owning, engaging in, or being associated with, either as a partner, member, stockholder, employee, subcontractor agent or otherwise, any business which competes with <u>M&A</u> and operates within a 100 mile radius of Wilmington, Delaware for a period of two (2) years from <u>the date Seidel begins to comply with his non-competition obligations</u>~~April 11, 2005~~;

2)    Order Defendant to return to M&A all Ownership Units, any trade secrets, databases, customer lists, Request for Proposals, Request for Proposal templates, workflow analysis, benchmarking data, on-site questionnaires for gathering information, guides for analyzing mail, copy, fax, records operations, cost recovery systems, the back-up copy of the laptop's hard drive, and the "Mattern Method®" taken in violation of the Agreement;

3)    Order Defendant to account for all fees and income obtained by him or anyone working in concert with him in violation of the Agreement;

4)    Award Plaintiff damages in an amount of not less than $170,000 plus such sum that will be proved at trial representing the actual loss caused by Defendant's wrongful conduct and breach of the Agreement;

5)    <u>Award Plaintiff exemplary double damages on Count IV of this Amended Complaint;</u>

~~5)~~<u>6)</u>    Award Plaintiff its costs and expenses incurred in this action, including reasonable attorneys' fees; and,

13

6)7)    Award Plaintiff such other and further relief as the Court deems equitable under
the circumstances.



**SEITZ, VAN OGTROP & GREEN, P.A.**


_____
GEORGE H. SEITZ, III, ESQ. (No.667)
222 Delaware Avenue, Suite 1500
Wilmington, DE  19899
(302) 888-0600
**Attorneys for Plaintiff**


Dated: March___December 16, 20075

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MATTERN & ASSOCIATES, L.L.C.,     )
    )
    Plaintiff.     )
    )     C.A. No. 1:06-CV-36 KAJ
    )
    v.     )
    )
    )
JOHN SEIDEL,     )
    )
    Defendant and Third Party Plaintiff.     )
    )
    )
    v.     )
    )
    )
ROBERT MATTERN,     )
ABC ENTITIES 1-50, and     )
J. Does 1-50,     )
    )
    Third Party Defendants.     )

## <u>ORDER</u>

**AND NOW,** this _____ day of _____ 2007, upon consideration of the

Plaintiff's Motion for Leave to Amend the Complaint, it is hereby **ORDERED** that

Plaintiff's Motion is **GRANTED**.

BY THE COURT:

_____

    J.

58439 v1