# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MATTERN & ASSOCIATES, L.L.C., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 06-36-SLR |
| | ) |
| JOHN SEIDEL, | ) |
| | ) |
| Defendant and Third-Party Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ROBERT MATTERN, et al., | ) |
| | ) |
| Third-Party Defendants. | ) |

George H. Seitz, III, Esquire, and Kevin A. Guerke, Esquire, of Seitz, Van Ogtrop & Green, P.A., Wilmington, Delaware.  Counsel for Plaintiff and Third-Party Defendants. Of Counsel:  Michael J. Fortunato, Esquire, of Rubin, Fortunato & Harbison, P.C., Paoli, Pennsylvania.

Paul A. Wernle, Esquire, of the Law Office of Paul A. Wernle, New Castle, Delaware. Counsel for Defendant and Third-Party Plaintiff.  Of Counsel:  Robert J. Hagerty, Esquire, of Capehart & Scatchard, Mount Laurel, New Jersey.

## MEMORANDUM OPINION

Dated:  January 14, 2010
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

This is a civil action brought by plaintiff Mattern & Associates, L.L.C. ("M&A") against its former employee defendant John Seidel ("Seidel") for his actions after the employment relationship ended. On December 19, 2005, M&A filed a complaint in the Chancery Court of Delaware to enforce a Limited Liability Company Agreement. The complaint asserted three causes of action against Seidel, including: (i) breach of contract, (ii) breach of fiduciary duties of good faith, loyalty and fair dealing, and (iii) misappropriation of trade secrets. Seidel removed the action to this court on January 18, 2006.[1] (D.I. 1) Seidel answered the complaint and asserted counterclaims against M&A as well as a third-party complaint against M&A's principal, Robert Mattern ("Mattern"), seeking both the value of Seidel's 3% share in M&A and allegedly outstanding wages. (D.I. 15; D.I. 19)

A jury trial was held on October 16, 17 and 20, 2008. On October 20, 2008, the jury returned a verdict in favor of M&A on all counts. (D.I. 87) The parties each filed several post trial motions that are currently pending before the court. Seidel filed a motion for judgment as a matter of law ("JMOL") or, in the alternative, for a new trial (D.I. 98), as well as a motion to stay execution of the judgment (D.I. 109). Also presently before the court are M&A's motions to amend the judgment to include the monetary award found in the jury verdict (D.I. 108), to amend the judgment to include exemplary damages (D.I. 96) and for attorney fees (D.I. 94). The court has jurisdiction over these issues pursuant to 28 U.S.C. §§ 1332 and 1441.

---

[1]Seidel then unsuccessfully moved to transfer venue to the Eastern District of Pennsylvania. (D.I. 2)

## II. BACKGROUND

M&A is a Pennsylvania limited liability corporation having its principal place of business in Delaware. (D.I. 74 at 2) Mattern is the principal and majority shareholder of M&A. (*Id.*) M&A counsels law firms and other companies on the management and optimization of copying, faxing, centralized filing, document management, mail, office supplies and cost recovery systems. (*Id.*) These consulting services involve either making recommendations for the cost effective use of existing in-house facilities, or requesting bids from companies that specialize in the aforementioned systems. (*Id.*) M&A further counsels clients on how to bill for those services through cost recovery analysis. (*Id.*) This approach, known as the Mattern Method®, consists of allegedly unique and proprietary mechanisms that allow M&A to pinpoint inefficiencies and increase productivity. (*Id.* at 3)

Prior to his employment with M&A, Seidel, a citizen of New Jersey, worked with various copier companies selling copiers or selling outsourcing services[2] to corporate clients. (D.I. 114 at 134-35) In June of 2001, Mattern hired Seidel to lead the sales operations of M&A. (D.I. 74 at 3) As a prerequisite to employment with M&A, Mattern required Seidel to execute a confidentiality agreement which prohibited the solicitation of M&A customers for eighteen months after the termination of the employment relationship. (JTX 37) Soon after, Mattern promoted Seidel to Vice President of Business Development. (D.I. 74 at 3) During the course of his employment with M&A,

---

[2]From the record, it appears as if M&A solicited bids for essentially the same outsourcing services that Seidel directly sold in his employment prior to his position with M&A. (*Id.*)

2

Seidel received training and information to facilitate his sales efforts on behalf of M&A. (*Id.*) Through this training and information sharing, Seidel was privy to M&A's customer lists, the Mattern Method® and other allegedly sensitive company information. (*Id.*)

On July 1, 2003, Seidel executed an Amended and Restated Limited Liability Company Agreement of Mattern & Associates, LLC ("the LLC Agreement"), which made him a 3% shareholder of M&A. (JTX 1) As consideration for the shares he received, Seidel agreed to employment restrictions of a greater scope than those contained in his original employment agreement. (*Id.* at 24-29) Among other such restrictive covenants, Seidel agreed: (1) not to use or disclose any confidential information of M&A; (2) not to work for any business enterprise which competes directly or indirectly with M&A for a period of twenty-four months following the date of the termination of his employment within a one hundred (100) mile radius of M&A's principal place of business; and (3) not to directly or indirectly solicit any active or prospective clients, customers or accounts of M&A for a period of twenty-four months following the date of the termination of his employment. Seidel further agreed that he would pay M&A $150,000 in the event of a breach by him of the covenant not to compete.[3] (*Id.* at 28) Seidel alleges that he specifically asked Mattern and Mattern's attorney, Jerry Grossman ("Grossman"), whether the non-compete clause would prevent him from selling outsourcing services or copiers, both of whom assured Seidel that it would not.[4]

---

[3]After Seidel expressed concern over a higher amount originally due in the event of a breach, Mattern reduced the fee to $150,000. The parties could not recall the exact amount originally called for. (D.I. 114 at 142-43)

[4]Neither Mattern nor Grossman recalled this conversation at trial. (D.I. 113 at 117; D.I. 114 at 65)

(D.I. 113 at 116-17)

Seidel alleges that Mattern began to pressure him to increase sales, which created doubt in Seidel's mind as to the stability of his employment relationship with M&A. (D.I. 114 at 152-53) Beginning in December 2004, Seidel sent a series of emails from his M&A computer account seeking alternate employment opportunities. (D.I. 74 at 4) During this time period, Seidel corresponded with Huron Consulting Group, an admitted competitor of M&A, and with Pitney Bowes Management Services, over whom the parties contest the label of competitor. (Id.) Seidel billed a portion of the expenses he incurred during these employment negotiations to M&A, attributing the costs to client development.[5] (Id.) Ultimately, no offer of employment materialized from these negotiations.

The parties dispute Seidel's manner of departure from M&A on April 8, 2005.[6] In September 2005, Seidel obtained a position selling photocopiers with Konica Minolta Business Solutions ("Konica"). (Id.) While employed by Konica, Seidel contacted

---

[5]Seidel admitted to charging certain other personal expenses to M&A and had arranged to repay these expenses prior to his departure. (Id.) The personal check that Seidel delivered to M&A in satisfaction of this debt, however, was returned by the bank due to insufficient funds. (Id.)

[6]Pursuant to the LLC Agreement, the value of Seidel's 3% interest in M&A depends upon whether Seidel resigned or was fired. If Seidel resigned, he would receive only $3.00. If Mattern fired Seidel, he would receive a much greater sum.

Seidel claims that Mattern fired him and that Seidel requested additional time to find suitable replacement work. Mattern allegedly stated that he would think about it over the weekend, but ultimately refused this request. (D.I. 114 at 158, 160) By contrast, Mattern contends that Seidel resigned on April 8th and that Mattern implored Seidel to think about it over the weekend. (D.I. 113 at 135) Mattern maintains that Seidel persisted in his decision to resign. The parties do not dispute that, at a company meeting on April 8th, Mattern announced that Seidel had resigned and Seidel did not object to the statement. (D.I. 74 at 5)

4

several customers of M&A. (D.I. 113 at 170-71) Seidel eventually moved on to Stewart Business Systems in a similar capacity, where he continued to work after the covenant contained in the LLC Agreement expired on April 11, 2007.

Neither party contests that Seidel created and departed with an image of the hard drive of the M&A-owned laptop computer that he used in his sales efforts. (Id. at 5) The laptop contained, inter alia, M&A's customer contact list, client proposals, requests for proposal, client requirements and various forms associated with the Mattern Method®. (Id.) On October 27, 2005, after counsel for M&A demanded that Seidel return all M&A property and confidential information, Seidel admitted to possessing an image of the hard drive and arranged for its return to M&A.[7] (Id.)

At trial, M&A alleged that Seidel used this confidential information to solicit M&A's customers during his post-M&A employment. M&A also alleged that it later discovered that Seidel had falsified sales during his employment with M&A. Specifically, M&A contended that Seidel created false sales logs of customer contacts and meetings. (Id.) When M&A contacted the alleged prospective customers, most denied ever speaking to Seidel. (Id.)

The jury found that Seidel breached his contractual obligations under the LLC Agreement, that he breached the fiduciary duties of good faith, loyalty, and/or fair dealing that he owed to M&A, and that he misappropriated confidential or proprietary trade secret information in violation of the Delaware Uniform Trade Secrets Act ("DUTSA"). (D.I. 87) Seidel's misappropriation of M&A's trade secret information was

_____

[7]Prior to this admission, M&A alleges that its counsel wrote to Seidel on four separate occasions requesting the return of all M&A property.

5

found to be willful and malicious. (*Id.*) With respect to the allocation of damages, the jury awarded M&A $150,000 for breach of contract, $22,084.59 for breach of fiduciary duties and no damages for misappropriation of trade secrets. (*Id.*) The jury further found against Seidel with respect to his counterclaims. (*Id.*)

## III. LEGAL STANDARDS

### A. Judgment as a Matter of Law

To prevail on a renewed motion for judgment as a matter of law following a jury trial under Federal Rule of Civil Procedure 50(b), the moving party must demonstrate that the jury's findings are not supported by sufficient evidence. *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993). In assessing the sufficiency of the evidence, the court must give the non-moving party, "as [the] verdict winner, the benefit of all logical inferences that could be drawn from the evidence presented, resolve all conflicts in the evidence in his favor, and in general, view the record in the light most favorable to him." *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1348 (3d Cir. 1991). Essentially, the court must determine whether "the record is critically deficient of the minimum quantum of evidence from which a jury might reasonably afford relief." *Con-Way Transp. Servs. v. Regscan, Inc.*, 242 Fed. Appx. 823, 827 (3d Cir. 2007) (quoting *Denneny v. Siegel*, 407 F.2d 433, 439 (3d Cir. 1969)).

### B. New Trial

The decision to grant or deny a new trial is within the sound discretion of the trial court and, unlike the standard for determining judgment as a matter of law, the court need not view the evidence in the light most favorable to the verdict winner. *See Allied*

*Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980). Federal Rule of Civil Procedure

59(a) provides, in pertinent part:

> A new trial may be granted to all or any of the parties and on all or part of the issues in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States.

New trials are commonly granted in the following situations: (1) where the jury's

verdict is against the clear weight of the evidence, and a new trial must be granted to

prevent a miscarriage of justice; (2) where newly-discovered evidence surfaces that

would likely alter the outcome of the trial; (3) where improper conduct by an attorney or

the court unfairly influenced the verdict; or (4) where the jury's verdict was facially

inconsistent. *See Zarow-Smith v. N.J. Transit Rail Operations*, 953 F. Supp. 581, 584

(D.N.J. 1997) (citations omitted). The court, however, must proceed cautiously and not

substitute its own judgment of the facts and assessment of the witnesses' credibility for

the jury's independent evaluation. Nevertheless,

> [w]here a trial is long and complicated and deals with a subject matter not lying within the ordinary knowledge of jurors a verdict should be scrutinized more closely by the trial judge than is necessary where the litigation deals with material which is familiar and simple, the evidence relating to ordinary commercial practices. An example of subject matter unfamiliar to a layman would be a case requiring a jury to pass upon the nature of an alleged newly discovered organic compound in an infringement action.

*Lind v. Schenley Indus. Inc.*, 278 F.2d 79, 90-91 (3d Cir. 1960).

## IV. DISCUSSION

### A. Judgment as a Matter of Law

Seidel proffers several issues, properly preserved by pre-verdict motion, as

candidates for judgment as a matter of law: (1) unenforceability of the $150,000

7

remedy contained in the LLC Agreement; (2) unenforceability of the non-compete provision; (3) if enforceable, no proof of breach of the non-compete provision; (4) no proof of liability or damages required to sustain a finding of breach of fiduciary duty; (5) no proof of damages required to sustain a finding of violation of DUTSA. The court addresses each in turn.

### 1. Enforceability of the liquidated damages provision

Seidel contends that the \$150,000 payment called for by LLC Agreement in the event of a breach of the non-compete provision violates Pennsylvania's[8] well settled policy against enforcement of penalties in contract actions. *See Insley v. State Mut. Life Assurance Co.*, 5 A.2d 544, 547 (Pa. 1939) (explaining that a court may set aside a stipulated amount of unreasonable magnitude); *Kunkel v. Wherry*, 42 A. 112 (Pa. 1899) (noting that "compensation and not forfeiture is the equitable rule."). Specifically, Seidel claims that the parties impermissibly intended to both deter a breach of the non-compete provision and to punish any such transgression.

Pennsylvania courts have defined liquidated damages as "'the sum a party to a contract agrees to pay if he breaks some promise, and which, having been arrived at by a good faith effort to estimate in advance the actual damage that will probably ensue from the breach, is legally recoverable . . . if the breach occurs.'" *Pantuso Motors, Inc. v. Corestates Bank, N.A.*, 798 A.2d 1277, 1282 (Pa. 2002) (quoting *Westmount Country Club v. Kameny*, 197 A.2d 379, 382 (N.J. Super. App. Div. 1964)). Liquidated damages allow parties to account for situations where uncertainty would prevent or otherwise

---

[8]The LLC Agreement contains a choice-of-law provision designating "the laws of the Commonwealth of Pennsylvania" as governing. (JTX 1 at 46)

8

inhibit the post hoc determination of actual damages. *See Pantuso Motors*, 798 A.2d at 1282. To distinguish a provision that serves a compensatory function from an unenforceable penalty, the court must examine "the intention of the parties, drawn from the words of the whole contract . . . in light of its subject matter and its surroundings," as well as "the relation which the sum stipulated bears to the exact injury which may be caused by the [breach] provided against [and] the ease or difficulty of measuring a breach in damages." *Holt's Cigar Co. v. 222 Liberty Assoc.*, 404 Pa. Super. 578, 587 (Pa. Super. 1991).

The principles discussed above govern the propriety of stipulated damages provisions generally; however, within the narrower confine of restrictive covenants contained in employment agreements, a more specific analysis also applies. In this context, such a provision will survive scrutiny if: (1) the damages would be wholly uncertain and incapable or very difficult of being ascertained; (2) a party binds himself not to carry on any particular trade, business, or profession, within certain limits or within a specified period of time; (3) the sum fixed as security for the performance must not be overbroad in that it applies to a number of stipulations of widely different importance; and (4) the covenant is for abstaining from acts that are not measurable by any exact pecuniary standard. *See Geisinger Clinic v. Di Cuccio*, 414 Pa. Super. 85, 99 (Pa. Super. 1992).

With respect to Seidel's allegations of the nefarious intent embodied in this provision, the court finds that the record is at least equally consistent with a finding that the parties intended the provision to serve a compensatory function. Specifically, Seidel agreed to the sum of $150,000 after asking for a reduction from the original

9

amount. The negotiation over this provision, limited as it was, evinces a mutual appreciation of the importance of having a compensatory measure in place should Seidel depart M&A, after gaining insight to its customer contacts and proprietary methods, to work for a competitor. The LLC Agreement embodies this mutual appreciation, which provides, in relevant part, that "[e]ach Member acknowledges the **extreme importance** of the restrictions being placed on the time and geographic scope of the covenants set forth . . . ." (JTX 1 at 26) (emphasis added)  Furthermore, the court cannot conclude that the amount called for bears an unreasonable relationship to the injury that Seidel caused to M&A through his breach of the non-compete provision.

The record also sufficiently supports the existence of each factor enunciated by the court in *Geisinger Clinic* such that the jury properly characterized the $150,000 as an enforceable liquidated damages provision. First, as previously noted, the determination of actual damages resulting from a breach of the non-compete provision would be a wholly speculative exercise. Indeed, the parties would be hard pressed to quantify, with any degree of precision, the business losses associated with Seidel's "direct or indirect" competition with M&A's commercially sensitive and proprietary business. Second, by executing the LLC Agreement and in consideration of a 3% interest in M&A, Seidel bound himself not to carry on any business that "competes directly or indirectly" with M&A or carry on a business similar to the business of M&A within 100 miles of M&A's principal place of business for a period of twenty-four months. The award satisfies the third factor in that the $150,000 sum is triggered only upon a breach of the non-compete provision; it does not apply to a number of stipulations of varying importance. Finally, the non-compete provision prohibits Seidel

10

from engaging in business with competitors and from using confidential and proprietary

information - neither one of these transgressions lends itself to measurement by any

pecuniary standard.  On the basis of the record before the court, a reasonable jury

could conclude that the $150,000 stipulated amount represents an enforceable

liquidated damages provision.

## 2. Enforceability of the non-compete provision

Seidel next argues that the jury awarded $150,000 to M&A pursuant to an

unenforceable non-compete provision.  The non-compete provision contained in the

LLC Agreement provides that

[d]uring the term of the Member's ownership of Units and for a period of twenty-four (24) months following termination, for whatever reason, the Member shall not, without [M&A's] prior written consent, own, manage, control, be employed by, participate in, engage in, or be connected in any manner with any independent business enterprise which competes directly or indirectly with [M&A] or which is located within 100 miles of [M&A's principal place of business], and is similar to the business of [M&A], unless [M&A] authorized such activity in accordance with this Section;

(JTX 1 at 26)  The court notes at the outset the reasonable nature of the 100-mile

geographic limitation and two-year duration imposed upon Seidel by this provision.[9]

Furthermore, Seidel's 3% interest in M&A provided adequate consideration to support

---

[9]See, e.g., National Bus. Servs. v. Wright, 2 F. Supp. 2d 701, 707 (E.D. Pa. 1998) (upholding a nationwide restrictive covenant because "both [the former employer] and [the new employer] are nationwide businesses, and [the employee], while employed by [the former employer], had extensive contacts with customers all over the nation."); Novus Franchising, Inc. v. Taylor, 795 F. Supp. 122, 127 (M.D. Pa. 1992) (enforcing a two-year limitation); Alexander & Alexander, Inc. v. Drayton, 378 F. Supp. 824, 834 (E.D. Pa. 1974) (finding reasonable a two-year and 100-mile geographic limitation encompassing Philadelphia).

the non-compete provision. *See M. S. Jacobs & Associates, Inc. v. Duffley*, 303 A.2d 921, 923 (Pa. 1973) (noting that "a beneficial change in . . . employment status" was sufficient consideration to support a restrictive covenant).

A non-competition agreement must also bear a reasonable relationship "to the protection of a legitimate business interest. Generally, American courts insist that an employer may not enforce a post-employment restriction on a former employee simply to eliminate competition per se; the employer must establish a legitimate business interest to be protected." *Hess v. Gebhard & Co.*, 808 A.2d 912, 918 (Pa. 2002). The employer's legitimate business interest must, upon balance, both outweigh the employee's interest in practicing a chosen profession and accord with the interest of the public. *See id.* at 920.

A reasonable jury could infer that M&A sought to protect several legitimate business interests through the non-compete provision. The legitimate business interests present in the record before the court include, among other commercially sensitive information and trade secrets, the Mattern Method® and M&A's list of customer contacts. *See id.* at 918 (explaining that "[i]nterests that can be protected through covenants include trade secrets, confidential information, good will, and unique or extraordinary skills.").

Seidel contends that his interest in earning a livelihood in his chosen trade outweighs any legitimate business interest held by M&A. In support of this claim, Seidel alleges that, in light of the attenuated relationship between such, his post-employment role as a copy machine salesman in no way encroaches upon M&A's consulting business. While M&A did not sell copy machines, it did provide consulting services on

12

reducing the costs associated with copying. M&A also acted as an intermediary for the purchase of copy equipment through its requests for proposal. Each firm that chose to purchase a copier from Seidel effectively foreclosed M&A from providing at least these aspects of its business. The jury could thus properly infer that a sufficient nexus exists between Seidel's post-employment acts and M&A's legitimate business interests to warrant the protection of a non-compete provision. In light of the foregoing, the court declines to disturb the jury's determination that the LLC Agreement contained an enforceable non-compete provision.

### 3. Breach of the non-compete provision

The non-compete provision governs two activities of varying scope. The first clause prohibits Seidel's involvement with M&A's "competitors" for a period of two years. Merriam Webster defines a "competitor" as "one selling or buying goods or services in the **same market as another**." *Merriam-Webster Online Dictionary*, http://www.merriam-webster.com/dictionary/competitor (emphasis added). According to this definition, Seidel could seek employment with another business engaged in activities similar or identical to M&A, as long as this business operated in a different market. The second clause further protects M&A by prohibiting Seidel from seeking employment with a company engaged in activities similar to M&A and existing within 100 miles of the principal place of business of M&A. Taken as a whole, the non-compete provision allows Seidel to associate with both non-competing but similar businesses that exist outside of the 100-mile geographic limitation and non-competing, dissimilar businesses (with no attendant geographic limitation).

13

The record supports a finding that Seidel breached the first clause in his subsequent employment with Konica.  While employed by Konica, Seidel contacted several of M&A's customers with the intent to sell copiers.  These acts had a direct effect upon M&A's market because, as previously discussed, each firm that chose to purchase a copier directly from Konica no longer needed M&A's consultation or intermediary services.  Because the sale of copiers affected M&A's market, the jury could reasonably find that Seidel sought and found employment with a company that competed with M&A in violation of the non-compete provision.

### 4. Breach of fiduciary duty

Pennsylvania law dictates that an employee, as the agent of his employer, owes his employer a duty of loyalty.  *Crown Coal & Coke Co. v. Compass Point Res., LLC*, 2009 U.S. Dist. LEXIS 26556 (W.D. Pa. 2009).  Pursuant to this duty, an employee may not "act[] for a person or entity whose interests conflict[] with [the employer]."  *Reading Radio, Inc. v. Fink*, 833 A.2d 199, 211 (Pa. Super. 2003).  At trial, the jury was instructed that M&A's burden to prevail on its claim of breach of fiduciary duty consisted of showing that Seidel "(1) negligently or intentionally failed to act with loyalty and in good faith and solely for the benefit of [M&A] in all matters for which he was employed; (2) [M&A] suffered injury; and (3) [Seidel's] failure to act solely for [M&A's] benefit was a real factor in bringing about [M&A's] injuries."  (D.I. 84 at 18)  *See Sylvester v. Beck*, 178 A.2d 755, 757 (Pa. 1962).

A near litany of events show that, during his employment with M&A, Seidel consistently acted pursuant to his own personal interest and against the interests of

14

M&A. Specifically, Seidel: provided M&A with false sales reports; collected overpayments of draws against commissions; charged personal expenses to M&A's line of credit; misused confidential information; and misappropriated trade secrets.[10] Furthermore, these actions resulted in actual harm to M&A. Seidel's false sales logs created an illusory pipeline of business that surely altered M&A's perception of its finances. M&A suffered easily quantifiable harm in Seidel's unearned commission receipts and the personal expenses that Seidel charged to M&A's line of credit (some incurred as a result of Seidel's job search). Finally, the confidential and proprietary nature of M&A's operations, along with the business relationships it cultivated over the years with its customers, provide M&A with immeasurable value by distinguishing M&A from its competitors. Seidel showed a callous disregard for M&A's interests when he created and departed with an image containing this information. The record also supports an inference that Seidel appreciably harmed M&A's business through his

---

[10]Seidel also plausibly breached his duty of loyalty by seeking employment with admitted competitors of M&A while still employed by M&A. Because the result of this search could have resulted in a violation of the non-compete provision, the search itself could be construed as contrary to the express interests of M&A. Seidel cites to *Spring Steels, Inc. v. Molloy*, 162 A.2d 370 (Pa. 1960), for the premise that Seidel's search amounted to only an inactionable attempted breach of fiduciary duty. The court in *Molloy* explained that, "[a]fter the termination of his agency, **in the absence of a restrictive agreement**, the agent can properly compete with his principal as to matters for which he has been employed . . . Even before the termination of the agency, he is entitled to make arrangements to compete, except that he cannot properly use confidential information peculiar to his employer's business and acquired therein." *Id.* at 375. (quoting Restatement (Second) of Agency § 393 cmt. e (1958)) (emphasis added). *Molloy* is seemingly inapposite to the case at bar where an employee, bound by a restrictive covenant, makes preparations to compete with his current employer.

15

solicitation of M&A's clients.[11] At trial, the jury determined that these breaches resulted in damages total $22,084.59. (D.I. 87 at 2) For the above reasons, Seidel has failed to demonstrate an evidentiary deficiency with respect to the jury's conclusion that Seidel breached his fiduciary duties.

## 5. Violation of DUTSA

A trade secret is "information, including a formula, pattern, compilation, program, device, method, technique or process," that both "[d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use" and is subject to reasonable efforts "to maintain its secrecy." 6 Del. C. § 2001(4). A customer list that meets these criteria constitutes a trade secret. *See Liveware Publ'g, Inc. v. Best Software, Inc.*, 252 F. Supp. 2d 74, 85 (D. Del. 2003) (noting that a customer list is "precisely the type of business information which is regularly accorded trade secret status . . . ."); *Delaware Exp. Shuttle, Inc. v. Older*, 2002 WL 31458243, *18 (Del. Ch. 2002).

To prevail on a claim of trade secret misappropriation under DUTSA, a plaintiff must show the following elements:

"[T]he [a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means," or alternatively, the "[d]isclosure or use of a trade secret of another without express or implied consent" by a person who either: (1) acquired the secret by improper means; (2) knew or had reason to know that their knowledge of the trade secret was (A) derived by another who acquired it by improper means, (B) "[a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use,"

___

[11]Mattern alleged that M&A lost clients due to Seidel's acts of solicitation. (D.I. 113 at 168-69)

16

or (C) acquired by accident or mistake.

*Accenture Global Servs. GMBH v. Guidewire Software, Inc.*, 581 F. Supp. 2d 654, 662
(D. Del. 2008) (quoting 6 Del. C. § 2001(2)).

The jury could reasonably conclude that much of the information contained in
Seidel's image of the M&A laptop hard drive qualifies for trade secret protection. This
image contained M&A's customer contact list, client proposals, requests for proposal,
client requirements, and various items associated with the Mattern Method®. While the
court cannot properly conclude that, taken alone, M&A's list of 26 law firms in the
greater Philadelphia area would suffice as a trade secret, the combination of M&A's
commercially sensitive information and its customer list creates an economically
valuable compilation that warrants protection as a trade secret. *See Merck & Co. v.
SmithKline Beecham Pharm. Co., 1999 WL 669354, *15* (Del. Ch. 1999) (noting that a
commercial process composed of publicly known elements may constitute a trade
secret "so long as it is a unique process which is not known in the industry" and that
"[t]he mere fact that aspects of a trade secret process can be found in publications
does not mean that the process is not a trade secret."); *accord Rohm & Haas Co. v.
Adco Chemical Co.*, 689 F.2d 424, 433 (3d Cir. 1982) (applying the trade secret laws of
Pennsylvania and New Jersey to reach a similar conclusion).[12] The evidence adduced
at trial supports the inference that, when Seidel contacted the law firm clients of M&A,

---

[12]These cases stand for the proposition that carefully arranged public information
can result in a uniquely powerful economic advantage deserving of trade secret
protection. A natural corollary extends to the case at bar, leaning even more heavily
towards trade secret protection, where a compilation largely comprises, and derives
most of its independent value from, information that remains concealed from the public.

17

he did so armed with an acute understanding of individual client needs and requirements.

Seidel asks the court to vacate the finding of liability with respect to trade secret misappropriation, arguing that the jury's failure to allocate any damages equates to a finding that M&A suffered no injury from Seidel's acts in this regard. Injury is required to state an actionable claim under DUTSA. *See Accenture Global Servs. GMBH*, 581 F. Supp. 2d at 662. In this case, the jury's preferred allocation of damages bears little relationship to this element, as the harm suffered by M&A with respect to its claim under DUTSA coincides with the harm resulting from Seidel's breach of the LLC Agreement.[13]

Accordingly, the record supports the conclusion that Seidel misappropriated trade secrets in violation of DUTSA.

## B. New Trial

Alternatively, Seidel requests a new trial on the basis that improper testimony and erroneous jury instructions resulted in a tainted verdict. In support of this request, Seidel points to four grounds that, had the court ruled otherwise, allegedly would have produced a different outcome: (1) an improper instruction regarding liquidated damages; (2) the court's failure to rule on the enforceability of the non-compete provision prior to permitting the jury to decide if it was breached; (3) the court's failure to

_____

[13]Indeed, Mattern's testimony at trial alleged a number of harms that M&A suffered as a result of Seidel's misappropriation including, inter alia, a loss of clientele and a loss of competitive advantage through exposure to vendors. (D.I. 113 at 169-70) These harms arose out of the same common nucleus of facts that support M&A's claim for breach of contract.

18

rule on the enforceability of the liquidated damages provision prior to permitting the jury to award it; and (4) the court's allowance of testimony regarding M&A's loss of $100,000 in sales following Seidel's departure.

The court finds no error in its liquidated damages instruction to the jury. The language in this instruction regarding penalties, added upon Seidel's request, sufficiently illustrated to the jury the difference between these concepts. (D.I. 115 at 14-15; D.I. 84 at 30) After careful deliberation, the jury reasonably characterized the $150,000 remedy as an enforceable liquidated damages provision. As previously discussed, substantial evidence supports both this characterization and the enforceability of the non-compete provision. Moreover, Seidel suffered no identifiable prejudice from the testimony regarding the loss of $100,000 in sales.[14] In sum, none of the grounds alleged provide any basis for a new trial.

## C. Remaining Motions

### 1. M&A's motion for exemplary damages under DUTSA

In addition to finding misappropriation of M&A's trade secrets, the jury determined that Seidel's actions in this regard were both willful and malicious. Pursuant to DUTSA, the court may award exemplary damages for the willful and malicious misappropriation of a trade secret. See 6 Del. C. § 2003(b). Delaware courts have defined willfulness as "an awareness, either actual or constructive, of one's conduct

---

[14]Seidel argues that, because the court could have struck both the non-compete and liquidated damages provisions as unenforceable, the jury would never have heard this testimony. Notwithstanding the validity of these provisions, the court remains unconvinced that testimony of this nature would not also be highly relevant to both M&A's DUTSA claim and its breach of fiduciary duty claims.

and a realization of its probable consequences," and malice as "ill-will, hatred or intent to cause injury." *Nucar Consulting, Inc. v. Doyle*, 2005 WL 820706, at *1100 (Del. Ch. 2005). The jury's finding derives substantial support from Seidel's intentional removal of M&A's trade secrets, as well as his refusal to acquiesce to the repeated demands to return this confidential information made by M&A's counsel.

Exemplary damages may not exceed twice the amount of compensatory damages awarded for trade secret misappropriation. *See* 6 Del. C. § 2003(b). As previously mentioned, the jury found liability for trade secret misappropriation, but allotted no damages to this count. Instead, the jury chose to award the $150,000 stipulated amount for breach of contract, which arises from a factual context almost identical to Seidel's willful and malicious misappropriation of M&A's trade secrets. A draconian application of the jury's award to this statutory mechanism would effectively foreclose M&A from any such damages. Accordingly, at least a portion of the $150,000 award must be characterized as compensatory damages arising from trade secret misappropriation in order to properly afford some measure of exemplary damages.

Mattern has moved for this recharacterization pursuant to Federal Rule of Civil Procedure 59(e), which provides, "[a] motion to alter or amend the judgment shall be served not later than 10 days after entry of the judgment." The Third Circuit has explained that a court may amend or otherwise alter a judgment that, inter alia, results in "manifest injustice." *North River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir. N.J. 1995). Furthermore, several courts have recognized the propriety of adjusting the damage award where, as here, the jury previously determined the underlying liability. *See Liriano v. Hobart Corp.*, 170 F.3d 264, 273 (2d Cir. 1999)

20

(noting that where a jury has previously determined liability, a federal court may properly amend the judgment to include an inadvertently omitted item); *see also United States Equal Employment Opportunity Comm'n v. Massey Yardley Chrysler Plymouth, Inc.*, 117 F.3d 1244, 1252-53 (11th Cir. 1997); *Decato v. Travelers Ins. Co.*, 379 F.2d 796, 798 (1st Cir. 1967).

The court concludes that manifest injustice would result from failing to amend the jury award to include exemplary damages. Consistent with its reasoning above, the court does not believe that the jury intended to deprive M&A of a statutory remedy solely because M&A had the foresight to ascertain in good faith the compensatory damages it would sustain if Seidel breached the LLC Agreement. Moreover, it is axiomatic that exemplary damages provide a valuable function above and beyond compensatory damages in the punishment and deterrence of unlawful conduct. *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 568 (1996). Allowing Seidel to act willfully and maliciously without additional penalty would render ineffective DUTSA's proscription against exactly this type of behavior. For the aforementioned reasons, the court amends the judgment to reflect that $1,500 of the $150,000 damage award is attributed to Seidel's willful and malicious misappropriation of trade secrets. Pursuant to the exemplary damage mechanism provided by DUTSA, the court further awards M&A $500 in exemplary damages.[15]

---

[15]Due to the entanglement of the harm associated with both the breach of the LLC Agreement and the trade secret misappropriation, the court cannot apportion the damages between these two counts with any degree of precision. In spite of this uncertainty, it would strain credulity that not even $1,500 can be attributed to harm specific to trade secret misappropriation. Furthermore, the record demonstrates that, at a minimum, nominal recognition of Seidel's unlawful and blameworthy actions is

21

## 2. M&A's motion for attorney fees

As a further consequence of willful and malicious trade secret misappropriation,

DUTSA provides that "the court may award reasonable attorneys' fees to the prevailing

party." 6 Del. C. § 2004. Because the evidence favors application of this remedy, the

court concludes that Seidel must pay M&A's reasonable attorney fees.

The court calculates attorney fees pursuant to the "lodestar" approach. *Brytus v.*

*Spang & Co.*, 203 F.3d 238, 242 (3d Cir. 2000). The lodestar amount results from

multiplying the amount of time reasonably expended by reasonable hourly rates. *Id.*

The court may exclude from the lodestar calculation unnecessary hours or hours that

lack proper documentation. *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). The

prevailing community market rates assist the court in determining a reasonable hour

rate. *Blum v. Stenson*, 465 U.S. 886, 895 (1984). The prevailing party bears the

burden of establishing the reasonableness of both the time expended and the hourly

rates. *Hensley*, 461 U.S. at 434; *Blum*, 465 U.S. at 895 n.11.

Calculation of the lodestar does not end the reasonable attorney fees inquiry, as

the court may adjust the lodestar upward or downward. A district court may use twelve

factors[16] (the "Johnson factors") to adjust the lodestar. *Hensley*, 461 U.S. at 434. A

---

justified.

[16]The twelve factors are: (1) the time and labor required; (2) the novelty and difficulty of the question; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Johnson v. Ga. Highway Express,*

court "can adjust the lodestar downward if the lodestar is not reasonable in light of the results obtained." *Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3d Cir. 1990) (citing *Hensley*, 461 U.S. at 434-37). A court may not sua sponte reduce a request for attorney fees. *Bell v. United Princeton Properties, Inc.*, 884 F.2d 713, 719 (3d Cir. 1989). However, "the district court retains a great deal of discretion in deciding what a reasonable fee award is, so long as any reduction is based on objections actually raised by the adverse party." *Id.* at 721. The party who asks for the fees to be adjusted has the burden of proving an adjustment is necessary. *Stenson*, 465 U.S. at 898.

M&A engaged the services of three law firms over the course of this litigation. Young, Conaway, Stargatt &Taylor, LLP ("YCST") represented M&A immediately following Seidel's resignation until after litigation had commenced. M&A then retained the law firm of Seitz, Van Ogtop & Green, P.A. ("SVG"). SVG represented M&A as lead counsel during the state proceedings and for a time after the action was removed to federal court. Rubin, Fortunato & Harbison, P.C. ("RFH") took over as lead counsel for the remainder of the federal proceedings, while SVG served as local counsel for RFH.

Each firm has submitted its detailed invoices of itemized records indicating the nature of the work performed, the attorney performing the work, the date of the work, the hourly rate of the performing attorney and the number of hours spent. The attorneys for M&A have submitted affidavits reflecting 608.9 hours billed in connection with this litigation, resulting in an alleged lodestar amount of $110,103.84. M&A has partitioned the cost and amount of time billed by each firm as follows:  (1) YCST

Inc., 488 F.2d 714, 717-19 (5th Cir. 1974).

23

charged M&A $5,174.88 for 15.7 hours; (2) SVG charged M&A $30,133.96 for 276.3 hours; and (3) RFH charged M&A $74,795 for 316.9 hours. (D.I. 95)

### i. Reasonable hourly rates[17]

M&A has submitted hourly rate information for a multitude of attorneys associated with the instant litigation. (D.I. 94)  M&A contends that the hourly rates charged by both YCST and SVG conform with those reasonably charged by other firms in the Wilmington market.  M&A further argues that the experience and services provided by the attorneys of RFH (namely Michael J. Fortunato, Esquire and Imogene E. Hughes, Esquire) justify the reasonableness of its rates.

The court notes initially that Wilmington is the relevant community upon which to base the hourly rate standard.[18]  Within this community, the court must determine a prevailing rate by examining rates that are "in line with those [rates] prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." Missouri v. Jenkins, 491 U.S. 274, 286 (1989) (quoting Blum, 468 U.S. at 896 n.11).  The court finds that an appropriate standard lies in the extensive legal experience of Delaware counsel George H. Seitz III, Esquire of SVG.[19]  Accordingly, the

---

[17]The calculation of reasonable hourly rates subsumes the following Johnson factors: (1) the skill requisite to perform the legal service properly; (2) the experience, reputation, and ability of the attorney; and (3) the amount involved and the results obtained. Stenson, 465 U.S. at 898-900; Del. Valley, 478 U.S. at 565.

[18]The court does not agree with M&A's contention that Philadelphia is brought into the relevant community because Seidel sought (and failed) to transfer venue to the Eastern District of Pennsylvania.

[19]Mr. Seitz obtained his J.D. from University of Virginia in 1971, after which he has served as a state prosecutor and a private litigator.

24

court shall cap the reasonable hourly rate at Mr. Seitz's rate of $290/hour.[20] (D.I. 94, ex. D 1)

### ii. Time reasonably expended

The court prefaces the following analysis by noting that M&A's attorneys achieved victory for M&A in almost every manner possible. Irrespective of this performance, this action generated 608.9 billable hours. (D.I. 95) Upon consideration of the Johnson factors, namely the "novelty and difficulty of the question" and "the skill requisite to perform the legal service properly," the excessive nature of the time spent by M&A's attorneys becomes apparent. The subject matter of this litigation, while not simple, certainly cannot be characterized as complex. Indeed, the trial itself spanned three days and required two principal witnesses (five others took the stand only briefly). Several items contained in the invoices also bring into question the necessity of the

---

[20]In order to normalize the rates of RFH and YCST against the reasonable hourly rate cap of $290/hour, the court applied the following formula: $290/x$, where $x$ = the highest asserted hourly rate of the firm. This result was then used to proportionately adjust the hourly rate of each attorney in that firm. For example, when applied to the $450/hour rate of Michael J. Fortunato, Esquire of RFH, the normalization factor obtained is ($290/$450) = 0.64. This normalization factor, different for each firm, was then multiplied by the billing rates of all attorneys of the respective firm who billed in this litigation. In the interest of avoiding redundant calculations, the court multiplied the normalization factor by the average hourly rate asserted by each firm (obtained for each firm by dividing the total amount billed by the number of hours billed) to obtain the reasonable average hourly rate. This reasonable average hourly rate replaces the reasonable hourly rate called for by the lodestar formula.

In the case of RFH, the reasonable average hourly rate is (0.64 * $236.02/hour) = **$152.10/hour**. Likewise, the court determined the reasonable average hourly rate of YCST to be (($290/$361) * $329.61) = **$264.64/hour**. Because Mr. Seitz is his firm's highest billing member on this matter, the reasonable average hourly rate of SVG is identical to its asserted average hourly rate (($290/$ 290) * $109.06) = **$109.06/hour**.

25

time spent by M&A attorneys.[21]  Accordingly, the court finds that 70% of the hours submitted by M&A represent the reasonable amount of time expended.

### iii.  The lodestar

Based on the preceding analysis, the court concludes that the lodestar in this case is: $57,743.[22]

### 3.  M&A's motion to amend the judgment to include the jury award

M&A moves to amend the judgment of October 30, 2008 to include the monetary award determined by the jury.  M&A explains that it cannot enforce the jury award against Seidel in New Jersey unless the judgment actually states the monetary amount awarded by the jury.  See N.J. STAT. ANN. § 2A:49A-27 (2008).  The judgment in this case shall be revised to reflect the order accompanying this memorandum, which shall reflect the jury's monetary award, as well as the exemplary damages and attorney fees determined by the court above.  This motion, therefore, shall be granted.

### 4.  Seidel's motion to stay execution of the judgment

The preceding analysis moots Seidel's motion to stay entry of the judgment pending the court's resolution of the post-trial issues submitted by the parties.  The court, therefore, denies Seidel's motion to stay entry of the judgment.

---

[21]The court acknowledges Seidel's complicity in accruing time through his motion to transfer venue.  However, M&A has failed to justify the 36.2 hours its attorneys spent responding to this relatively simple motion.  Other excesses are present in:  the 40 hours spent by SVG drafting a ten page, three count complaint; the 16.45 hours M&A's attorneys billed in responding to Seidel's three page counterclaim and third-party complaint; and time billed to bring transitioning attorneys up to speed.

[22]($152.10/hour * (0.7 * 316.9 hours)) + ($264.64/hour * (0.7 * 15.7 hours)) + ($109.06/hour * (0.7 * 276.3 hours)) = $57,743.

## V. CONCLUSION

For the foregoing reasons, the court:  (1) denies Seidel's motion for judgment as a matter of law or, in the alternative, a new trial (D.I. 98); (2) grants M&A's motion to amend the jury award and include exemplary damages in the amount of $500 (D.I. 96); (3) grants M&A's motion for attorney fees in the amount of $57,743 (D.I. 94); (4) grants M&A's motion to amend the judgment (D.I. 91) to include the monetary award (D.I. 108); and (5) denies Seidel's motion to stay execution of the judgment (D.I. 111).

Consistent with 28 U.S.C § 1961(a) and (b), interest shall be awarded on the money judgment reflected above.  Such interest is to be calculated from the date of the entry of the judgment at a rate equal to the weekly average 1-year constant maturity Treasury yield (as published by the Board of Governors) for the calendar week preceding the date of the judgment.  Such interest shall be computed daily to the date of payment, and shall be compounded annually.

An appropriate order shall issue.